# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| Steven Menzies, | |
| Plaintiff, | Case No. 15 C 3403 |
| v. | |
| Seyfarth Shaw LLP, Graham Taylor, Northern Trust Corporation, and Christiana Bank & Trust Company, | Judge John Robert Blakey |
| Defendants. | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff is a rich man who, ostensibly through hard work and good fortune, put himself in a position to sell over sixty million dollars in stock in a company he helped create. No crime in that, closing on such a sale exemplifies part of the American Dream. But when lawyers and financial consultants sold him on a 100% tax avoidance plan to save him millions on the deal, Plaintiff later paid the price to Uncle Sam with an even bigger IRS bill. Any crime in that? Plaintiff claims it constitutes civil racketeering and violates a host of state laws. Defendants disagree and claim that, at worst, it was just bad advice. They now challenge his right to sue in federal court.

Specifically, Plaintiff Steven Menzies ("Menzies" or "Plaintiff") sued Defendants Seyfarth Shaw LLP ("Seyfarth"), Graham Taylor ("Taylor"), Northern Trust Corporation ("Northern") and Christiana Bank & Trust Company

1

("Christiana"), collectively "Defendants," based upon the purchase of a tax planning product designed to allow Plaintiff to avoid paying capital gains tax. Ultimately, the plan failed, and, in addition to the tax burden he owed the IRS, Plaintiff incurred fees, interest and penalties. Among other relief sought in his Complaint [1], Plaintiff seeks more than $10.4 million in damages from Defendants via nine causes of action, including civil racketeering, fraud, conspiracy, negligence, breach of fiduciary duty and unjust enrichment.

Defendants deny any wrongdoing and now move to dismiss [29] [31] [35] the Complaint under Federal Rules of Civil Procedure 9(b), 12(b)(2) and 12(b)(6). For the following reasons, the motions are granted in part and denied in part. As explained below, this Court dismisses the RICO counts under Rule 12(b)(2) and 12(b)(6), and, in light of the findings regarding the RICO claims, defers the motions to dismiss as to the state law counts.

## I.    Legal Standard

Under Rule 12(b)(6), this Court accepts as true all well-pleaded facts in the Complaint and draws all reasonable inferences from those facts in Plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Although this Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, when a document is referenced in the Complaint and central to Plaintiff's claims the Court may consider it in ruling on the motion to dismiss. *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009).

To survive a Rule 12(b)(6) motion, the Complaint must not only provide Defendants with fair notice of a claim's basis, but must also be "facially" plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the Complaint need not include detailed factual allegations, Plaintiff's obligation to provide the grounds for his entitlement to relief requires more than mere labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Likewise, Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. Pro. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011)). Rule 9(b) applies to "all averments" of fraud, not just claims of fraud. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotations omitted). Any "claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

3

The Seventh Circuit has not yet explicitly examined whether Rule 9(b)'s heightened standard extends to each and every element of a civil RICO claim containing fraud-based predicate activity within it, or whether Rule 8's less rigorous pleading standard applies to the non-fraud elements of the violation. The Seventh Circuit has, however, explicitly applied the Rule 8 standard to RICO's enterprise element. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995); *Drobny v. JP Morgan Chase Bank, N.A.*, 929 F. Supp. 2d 839, 845 (N.D. Ill. 2013) (applying the Rule 8 standard to the non-fraud elements of a civil RICO claim). Following that lead, this Court applies the traditional Rule 8 standard to the non-fraud elements of the RICO claims, and the stricter Rule 9(b) standard to the underlying allegations of fraud-based racketeering activity within those claims (here, the mail and wire fraud predicates themselves). *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001) (finding "allegations of fraud" within a civil RICO complaint are "subject to the heightened pleading standard" of Rule 9(b)).

## II.  Facts

Without predicting which parties and claims might prevail later at summary judgment or trial, this Court gleans the following from the Complaint:

### A.  Initiation of the Estate Planning Conspiracy

Plaintiff is the co-founder, President and Chief Operating Officer of Applied Underwriters Inc. ("AUI"), a financial services firm that specializes in providing

workers' compensation insurance to small and mid-sized businesses. Compl. ¶ 1. In November 2002, Northern contacted Plaintiff and other AUI senior executives to gauge their interest in Northern's estate planning services. Northern, a Delaware corporation with its principal place of business in Chicago, Illinois, is a prominent financial services firm with offices dotting the globe. Plaintiff and others at AUI accepted a meeting to learn about Northern's tax products, and, thereafter, Northern gave a presentation highlighting its services. *Id*. ¶¶ 8-9, 28-29.

In the following months, Northern marketed and discussed its estate planning and personal financial services solutions with Plaintiff and other AUI executives. Through in-person meetings and phone calls, Northern outlined the ways Plaintiff could avoid certain tax liabilities, including those related to his ownership of the highly-valued AUI stock. *Id*. ¶ 30. In January 2003, Northern sent Plaintiff a proposal for personal financial consulting. Northern proposed to: (1) review Plaintiff's financial data and personal information; (2) develop a financial plan of action tailored to his "goals and objectives"; and (3) implement an appropriate plan of action. A key element of Northern's proposal entailed financial planning for income tax liability and "special strategy ideas relative to any potential liquidity events." *Id*. ¶¶ 31-32. Persuaded by the proposal, Plaintiff retained Northern in March 2003. *Id*. ¶ 33.

Plaintiff alleges that by mid-2003, Northern and its agents, Mark Harbour ("Harbour"), Michael Niemann ("Niemann") and Tom Hines ("Hines"), had gathered enough information about Plaintiff and other AUI executives that they then decided to perpetrate an illegal tax scam, what Plaintiff terms an "abusive" tax avoidance scheme ("Tax Scheme"). Compl. ¶ 34. Disguised as a legitimate estate planning tax-savings strategy, this Tax Scheme purported to lawfully reduce (if not eliminate) capital gains tax on a participant's gains, such as Plaintiff's disposition of AUI stock, by artificially inflating the shareholder's tax basis, thereby diminishing or eliminating any capital gains associated with the stock sale. *Id*. ¶ 16. Plaintiff avers that Defendants hatched—and then participated in, promoted, marketed and implemented—the Tax Scheme to pocket substantial fees from its participants, including Plaintiff. *Id*. ¶ 17. By early July 2003, Northern pitched the specifics of the Tax Scheme to Plaintiff and others at AUI, and marketed it as a lawful tax strategy for the disposition of the AUI stock, which supported Plaintiff's estate planning objectives. *Id*. ¶ 36.

On July 30, 2003, Northern arranged a conference call with Plaintiff to outline the steps of the Tax Scheme, describing it as a legal tax shelter for the contemplated gains realized from his disposition of AUI stock. The proposed tax shelter plan involved a series of loans, unsecured structured notes from alleged co-conspirator European American Investment Bank, AG ("Euram Bank") and the creation and use of trusts and other devices. Plaintiff alleges that Northern failed

to disclose during the call, or ever, that this type of tax shelter was unlawful and would subject him to significant liability for taxes, penalties and interest. Relying upon Northern's false representations, Plaintiff set up the tax shelter transactions for the purpose of selling his AUI stock and avoiding tax liability. Compl. ¶¶ 37-40.

On July 31, 2003, Plaintiff believes a conference call took place, without him, among agents for Euram Bank, Northern, Taylor, Christiana and others. The purposes of the call were: (1) to advise the conspirators that Plaintiff (as well as other AUI executives) had agreed to proceed with the Tax Scheme; (2) to discuss details on how the transactions would be structured and implemented; and (3) to determine how the parties would introduce one another to Plaintiff (and the other AUI targets) in furtherance of Defendants' conspiracy. *Id.* ¶ 42.

On August 7, 2003, Plaintiff believes another conference call took place, again without him, among agents for Euram Bank, Northern, Taylor, Christiana and others. The purpose of this call was to discuss the details of drafting the Euram Bank loan documents, the promissory notes, and the necessary trust documents, all in furtherance of the illegal conspiracy. During the call, Plaintiff believes that Taylor promised to draft the necessary opinion letters to provide the purported legal justification and appearance of "legitimacy" for the fraudulent tax shelter plan. *Id.* ¶ 43.

7

On August 7, 2003, Niemann (one of Northern's agents) emailed Plaintiff, advising him to retain Taylor, a partner at the Seyfarth law firm. Plaintiff followed this advice. Agents for Northern also convinced Plaintiff to engage Christiana as trustee for the various trusts. As part of the plan, none of the Defendants ever disclosed to Plaintiff the prior relationship that purportedly existed between the various conspirators. Compl. ¶¶ 44-47.

### B. Execution of the Tax Shelter Scheme

Defendants then marched Plaintiff through a series of scripted steps to create tax shelters for 2003 and 2004, all in furtherance of the same Tax Scheme. Plaintiff took the first step on August 11, 2003. He obtained a loan from Euram Bank for an amount equivalent to the value of the AUI stock he intended to sell first (approximately $19 million). Per the loan agreement, Plaintiff deposited the loan funds into an account at Euram Bank, and agreed to pay Euram Bank significant fees and interest (London Interbank Offered Rate "LIBOR" plus 40 basis points). *Id.* ¶¶ 48-49.



On August 25, 2003, Plaintiff took the second step, creating the "Steven Menzies Grantor Retained Remainder Trust" ("Menzies GRRT"). Under the Menzies GRRT, Plaintiff retained the power in a non-fiduciary capacity to reacquire the trust corpus by substituting other property of equal value. Plaintiff also retained a remainder interest in the trust, namely, the assets of the trust remaining upon termination of the trust term. The Menzies GRRT appointed the "Menzies Discretionary Trust" as the "Unitrust" beneficiary of the trust. According to the Menzies GRRT, the Menzies Discretionary Trust was also entitled to receive annual distributions in an amount equal to 1% of the assets of the Menzies GRRT (the "Unitrust Distributions") for the life of the trust. The Menzies Discretionary Trust was, in turn, obligated to pay the Unitrust Distributions it received from the Menzies GRRT to Plaintiff's mother, as beneficiary of the Menzies Discretionary Trust. Plaintiff held personally the remainder interest in the Menzies Discretionary Trust. Christiana served as the trustee of both the Menzies GRRT and the Menzies Discretionary Trust. Compl. ¶¶ 51-54.



In the third step, the Menzies GRRT opened a bank account at Euram Bank. Plaintiff deposited the proceeds of the $19 million loan from Euram Bank into the Menzies GRRT account at Euram Bank as the initial funding of the Menzies GRRT. Compl. ¶ 55. On August 26, 2003, Christiana, as trustee of the Menzies GRRT, then "invested" the loan funds deposited in the Menzies GRRT with Euram Bank (the very same party that loaned the funds to Menzies in the first place and who remained in possession of the funds at all times). The "investment" was a promissory note issued by Euram Bank paying interest of three months of LIBOR plus an equity multiplier based on the performance of gold (referred to hereafter as the "Euram Bank Structured Note"). *Id.* ¶ 56.



On September 24, 2003, in the fourth step, Plaintiff created a second trust named the Persephone Trust for the benefit of the Menzies Discretionary Trust. Christiana once again served as the trustee. Two days later, Plaintiff sold his

remainder interest in the Menzies GRRT (which held the note from Euram Bank) to the Persephone Trust valued at approximately $18.9 million, in exchange for a promissory note of equal value from the Persephone Trust to Plaintiff ("Persephone Trust Promissory Note"). At this stage of the transactions, the Persephone Trust owned the remainder interest in the Menzies GRRT (which held the Euram Bank Structured Note), but the Persephone Trust had a note of obligation to Plaintiff in the principal amount of approximately $18.9 million (*i.e.*, equal to the value of the remainder interest in the Menzies GRRT). Although Plaintiff no longer held the remainder interest in the Menzies GRRT, he still had the power to reacquire assets of the Menzies GRRT by substituting other assets of equal value. Under the terms of the Menzies GRRT, Plaintiff had the right to exercise this power in his absolute discretion and in a non-fiduciary capacity. In early October 2003, through various phone calls, Taylor and Harbour assured Plaintiff that this substitution of assets would be a non-taxable event. Compl. ¶¶ 57-59.



On October 10, 2003, in the fifth step, Plaintiff took a fixed number of AUI shares and substituted those shares in exchange for the assets of equivalent value in the Menzies GRRT, namely, the Euram Bank Structured Note. After the substitution of assets, the Menzies GRRT held the AUI stock and Plaintiff held the Euram Structured Promissory Note as a receivable from Euram Bank and virtually identical in value to his payable to Euram Bank (*i.e.*, the loan obligation to Euram Bank arising from Plaintiff's original loan). Later, to satisfy that original obligation on the Euram Bank loan, Plaintiff used the Euram Bank Structured Note as repayment for his personal debt obligation to Euram Bank, and thereby extinguished both the Euram Bank loan and the Euram Bank Structured Note. Compl. ¶¶ 60-62.



At this point, in the sixth step, the Persephone Trust owned the remainder interest in the Menzies GRRT, and the Menzies Discretionary Trust held the

"Unitrust" beneficial interest in the Unitrust Distributions. The Menzies Discretionary Trust then sold the Unitrust interest to the Persephone Trust, which then owned both the Unitrust interest and the remainder interest in the Menzies GRRT. The AUI stock, earlier substituted by Plaintiff, constituted the sole asset of the Menzies GRRT. On February 25, 2004, Plaintiff terminated the Menzies GRRT. The Persephone Trust, as the holder of all the legal and beneficial interest of the trust, thus received the AUI stock upon termination. Compl. ¶ 63.



13

As of February 25, 2004, the first set of financial transactions was complete. The Persephone Trust now held the AUI stock valued at approximately $19 million and, per the Persephone Trust Promissory Note, it owed an obligation to Plaintiff personally for approximately $19 million. Compl. ¶ 64. For ease of reference, the Court will refer to the foregoing portion of the overall Tax Scheme as the 2003 Tax Shelter.



In June 2004, at Defendants' direction and as part of the same Tax Scheme, Plaintiff performed a substantially identical series of transactions involving the same parties and steps, but this time to set-up the sale of the rest of his AUI stock worth approximately $54 million. *Id.* ¶¶ 65-66. The Court will refer to this portion of the overall Tax Scheme as the 2004 Tax Shelter.

To provide Plaintiff with additional assurance that the Tax Scheme was legitimate and lawful, and that Plaintiff would later be able to "sell" his stock tax-free, Taylor informed Plaintiff that Seyfarth would provide "independent" opinion

letters confirming the propriety of the strategy. Taylor explained that the opinion letters would convince the IRS that the two Tax Shelters were legitimate in the unlikely event that the IRS audited Plaintiff. On September 24, 2004, Seyfarth provided a signed opinion letter for the 2003 Tax Shelter, and, on June 7, 2005, provided a signed opinion letter for the 2004 Tax Shelter. When Seyfarth issued the Opinion Letters, Seyfarth (and other Defendants) allegedly knew that their conclusions were false and misleading. Compl. ¶¶ 71-77. With Seyfarth's issuance of the Opinion Letters, Defendants completed all necessary transactions in furtherance of the Tax Scheme, and pursuant to the conspiracy, they were all paid substantial fees and expenses from Plaintiff. *Id*. ¶ 76.

By late 2005, Berkshire Hathaway Inc. ("BHI") planned to acquire AUI. By early 2006, AUI agreed to sell its shares to BHI. BHI agreed to buy AUI stock from its stockholders in exchange for a cash payment. As part of the deal, BHI agreed to keep senior executives, including Plaintiff, at their positions at AUI. In May 2006, and consistent with the stock purchase agreement between the AUI shareholders and BHI, BHI purchased the AUI stock held by the Persephone Trust for $64,328,160 in cash. *Id*. ¶¶ 79-82.



Thereafter, the Persephone Trust used the $64,328,160 in proceeds to repay Plaintiff the amounts owed under the promissory notes it had issued to him when it acquired his remainder interest through the Menzies GRRT device. Consequently, when filing his 2006 federal income tax returns in 2007, and relying upon Defendants' investment and legal advice, Plaintiff did not report the sale of the $64 million in AUI stock to BHI as a taxable event, because the AUI stock was "owned" by the Persephone Trust at the time of sale, and the Persephone Trust had a full tax basis in the AUI stock and thus recognized little or no gain on disposition of the stock. Compl. ¶¶ 83-84.



### C. Resolution of the IRS Audit

In October 2009, the IRS advised Plaintiff of its intention to audit his 2006 tax filings. The IRS audit occurred from October 2009 through most of 2012. Near the end of its audit, the IRS focused on BHI's purchase of the AUI stock from the Persephone Trust. Despite Defendants' assertions that the Tax Scheme was legitimate, the IRS audit deemed the plan to be an unlawful tax avoidance maneuver, because Plaintiff's transfer of AUI stock to "Grantor Retained Remainder Interest Trusts (GRRTs) did not represent arm's length transactions."

Compl. ¶ 88. As such, the 2006 disposition of AUI stock was actually a "sale" that should have been reported by Plaintiff as a long-term capital gain. Specifically, the IRS found that the transfer and substitution of assets and the various trusts were designed as elements of an abusive tax shelter with "the primary purpose" to disguise the ownership of the stock, inflate Plaintiff's basis, and allow him to evade the 2006 tax liabilities related to the stock sale. *Id*. ¶ 89. The IRS determined that Plaintiff, not the Persephone Trust, had sold the AUI stock to BHI for $64,328,160; and therefore, the IRS re-calculated the basis of the AUI stock as $19,436,324. Upon this basis, the IRS determined that Plaintiff unlawfully failed to report $44,891,836 of capital gains from the sale of his AUI stock. *Id*. ¶¶ 85-90.

In December 2012, Plaintiff agreed to settle with the IRS and later paid $10,427,201.98, in capital gains taxes, penalties and interest for the disposition of the AUI stock to BHI. *Id*. ¶¶ 91-92. Thereafter, Plaintiff sued Defendants.

## III. Analysis

Because each Defendant has echoed, or even incorporated by reference, the arguments raised by the other Defendants in their motions to dismiss, this Court addresses the motions collectively, and begins with Counts I and II of the Complaint.

### A. Counts I and II: Sufficiency of the RICO Allegations

In 1970, Congress enacted the Organized Crime Control Act containing Title IX, otherwise known as "RICO." 18 U.S.C. §§ 1961-68. Creating enhanced criminal

17

and civil remedies, Congress drafted RICO to address "enterprise criminality," that is, "patterns" of unlawful conduct, including: (1) acts of violence and terrorism; (2) the provision of illegal goods and services; (3) corruption in labor or management relations; (4) corruption in government; and (5) criminal fraud by, through, or against various types of licit or illicit enterprises. *St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (summary restatement of RICO's elements).

As part of RICO's remedial scheme, a private civil plaintiff may sue under § 1964(c) for a violation of the statute that proximately causes an injury to his business or property. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265-68 (1992).[1] In Counts I and II of his Complaint, Plaintiff alleges both a substantive RICO violation under § 1962(c) and a RICO conspiracy violation under § 1962(d). Compl. ¶¶ 104-36.

Under § 1962(c), RICO makes it unlawful for any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, in order to establish a violation of § 1962(c), Plaintiff must allege: (1) conduct; (2) of an enterprise; (3)

---

[1] Under § 1964(c), any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee..."

through a pattern; (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

Likewise, because § 1962(d) prohibits any person from conspiring to violate subsections (a), (b) and (c) of § 1962, the overall objective of the RICO conspiracy claim often mirrors the underlying RICO substantive claim. This case is no exception. Hence, as to § 1962(d), Plaintiff must establish that each Defendant joined an agreement to participate in "an endeavor which, if completed, would satisfy all of the elements" of a substantive violation of RICO, here, the elements of the § 1962(c) offense noted above. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000).

In moving to dismiss Counts I and II, all Defendants attack the Complaint's allegedly insufficient showings under RICO of: (1) an "enterprise"; (2) "pattern"; (3) "conduct" (otherwise known as the "operation-management" test); and (4) the purported non-existence of a RICO conspiracy generally. They also argue that (5) Plaintiff's RICO claim is precluded by the statutory exception of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This Court considers each challenge in turn below.

### 1. Elements of a RICO Enterprise

Under 18 U.S.C. § 1961(4), an "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. These examples are

19

illustrative, not exhaustive. *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n.1 (1934) (distinguishing the non-exhaustive statutory term "includes," which is used in RICO, from its counterpart "means"). The entities comprising a RICO enterprise can also play different roles in the case, including the roles of victim, prize, instrument or perpetrator of the violation. *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 n.5 (1994); *see* Prof. G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 307-25 (1982).

Relevant here, for "association-in-fact" enterprises in particular, the Supreme Court defines the term as a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). These enterprises, licit or illicit, may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* In this regard, Congress has broadly defined the "enterprise" concept to mean any group of persons "whose association, however loose or informal, furnishes a vehicle for the commission" of two or more predicate crimes (or the collection of unlawful debt). *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978).

Although an "association-in-fact" enterprise must have some ascertainable structure, it need not be "much" more than a bare-bones conspiracy to commit the predicate acts themselves. *Boyle v. United States*, 556 U.S. 938, 948-49 (2009)

20

(explaining the "breadth" of RICO's enterprise concept). In the *Boyle* case, the Supreme Court outlined the three essential features of an "association-in-fact" enterprise: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Id.* at 946-48. The Court then gave examples of how such an enterprise might satisfy this broad structural requirement:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948; *see also Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010). Given the flexibility of RICO's statutory language, a single "association-in-fact" enterprise can even exist when its members and associates constitute opposing factions. *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994) (finding that internal divisions did not undermine the existence of a single "association-in-fact" enterprise under RICO). As with all RICO enterprises, however, the existence of an association-in-fact "enterprise" is a "separate" element

21

from the "pattern" of racketeering activity itself. *Turkette*, 452 U.S. at 583 (finding that RICO requires "separate" or distinct elements, even though the proof at trial may "coalesce"); *see United States v. Torres*, 191 F.3d 799, 805-06 (7th Cir. 1999) (general discussion of sufficient RICO "association-in-fact" allegations).[2]

Applying such standards at this preliminary stage of the proceedings, the Complaint here properly alleges a RICO enterprise. The allegations, and the reasonable inferences drawn therefrom, establish both common purposes under RICO and various relationships among those associated with the enterprise. Compl. ¶¶ 104-36. Among such purposes and relationships, the allegations here show that Defendants joined together to enrich themselves and further the common interests of the group as a whole—not just their own, otherwise unrelated self-interests. Compl. ¶¶ 44-47, 104-36. Thus, the alleged interactions among the members of the enterprise here extend beyond those typical of normal commercial relationships. The alleged enterprise also exhibits sufficient longevity (at least 31 months or more) to permit its associates to pursue its purposes. Compl. ¶¶ 44-47, 104-36. No further features or other ascertainable structures beyond those inherent in the predicate activity are required. *Boyle*, 556 U.S. at 943-49; *St. Paul Mercury Insurance*, 224 F.3d at 440-41.

---

[2] An "association-in-fact" enterprise also generally constitutes an exception to the "enterprise-person" rule arising under violations of § 1962(c). *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 399-402 (7th Cir. 1984) (enterprise-person rule); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162-63 (2001) (collecting decisions from the circuits, the Court found that substantive violations of § 1962(c) require that the alleged "person" and "enterprise" be separate or distinct elements).

Having considered Defendants' arguments, this Court's conclusion about the legal sufficiency of the enterprise allegations remains firm. For example, Defendants' reliance on the *Walgreen* case is misplaced. *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013). Like the defendants in *Walgreen*, which involved a scheme to fraudulently fill prescriptions for generic drugs with differentials in dosage and price from those actually prescribed, Defendants here claim that the alleged interactions among the co-conspirators show only "a commercial relationship" and not that they had "joined together to create a distinct entity" for RICO purposes. *Id.* at 855-56. This theory does not get Defendants far.

In *Walgreen*, unlike here, the Seventh Circuit *assumed* that the complaint had pled the "existence of an association-in-fact enterprise under *Boyle*," and only then affirmed dismissal of the complaint because the pled allegations failed to establish that the defendants "were conducting the affairs" of that enterprise, rather than their "own affairs" under the requisite operation-management test. *Id.* at 854; *see Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (holding that RICO requires compliance with the "operation-management" test). This Court will address the sufficiency of the Complaint under *Reves* in Section III(A)(3) below, but, for the purposes of pleading the existence of a RICO enterprise under Rule 12(b)(6), the Complaint passes muster. Unlike *Walgreen*, Plaintiff here has alleged much more than "parallel uncoordinated fraud" among Defendants. 719 F.3d at 855.

In contrast to *Walgreen*, a more recent Seventh Circuit decision—*Bible*—confirms that the allegations here satisfy the "enterprise" pleading requirements. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015). In that case, the plaintiff brought RICO claims based upon the managing of accounts as part of an unlawful loan rehabilitation process. In doing so, the plaintiff, as here and unlike in *Walgreen*, alleged facts permitting the "reasonable inference" that the defendants worked as a "single" enterprise. *Id.* at 655-57. For example, the alleged "economic interdependence" among the enterprise membership in *Bible* included allegations that the violators referred defaulting loans to one another. *Id.* The Seventh Circuit thus concluded that the members of the RICO enterprise in *Bible* did "not operate as completely separate entities" in managing the loan rehabilitation process. *Id.* The same conclusion must be drawn here.

Like the Seventh Circuit in *Bible*, this Court can distinguish the allegations here from "run-of-the-mill" commercial activity, because the Complaint establishes a "truly joint enterprise" in which each individual entity acted in concert with the others to "pursue a common interest." *Bible*, 799 F.3d at 655-56. Here, Defendants planned and worked in concert, even referring business to one another vital to the fraud. Defendants then performed other services, such as issuing opinion letters and conducting trust activities, all in aid of a single overall scheme that generated sustained profits for the enterprise membership. As in *Bible*, these allegations, when taken together, show a common purpose, relationships among the entities

24

associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes. 799 F.3d at 656; *see also Crichton v. Golden Rule Insurance Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (distinguishing a normal marketing arrangement among distinct entities from a RICO enterprise); *Sykes v. Mel Harris & Associates, LLC*, 757 F. Supp. 2d 413, 426-27 (S.D.N.Y. 2010) (finding that the complaint alleged a plausible RICO enterprise comprising of a debt-buying company, debt collection agency, process service company and others).

Defendants fare no better by citing *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671 (N.D. Ill. 2012). In that case, the court found no "common purpose" in the allegations to establish any enterprise relationships among the violators as required by *Boyle*, nor any "conduct" that otherwise satisfied the *Reves* test. *Guaranteed Rate*, 912 F. Supp. 2d at 686-89. Indeed, Defendants here misread *Guaranteed Rate* to argue that RICO requires the enterprise members to share the profits of their illegal scheme. There is no such requirement. Although sharing profits (or otherwise comingling illicit proceeds) might show a "common purpose" under RICO, the law after *Boyle* is clear that such allegations are merely relevant and possibly sufficient—but in no event necessary—for liability. This Court rejects Defendants' efforts to extend *Guaranteed Rate*, and declines to create a new and unfounded "profit-sharing" test for establishing membership within a RICO enterprise.[3]

---

[3] In determining whether a defendant is a member of the enterprise, or merely an outside "hireling" earning a "normal" fee, the existence or absence of profit-sharing is a relevant

## 2.     Elements of a RICO Pattern

For substantive violations, a RICO "pattern" under § 1961(5) requires the commission of at least two acts of "predicate" activity enumerated in § 1961(1) that occur within ten years of each other (excluding any period of imprisonment), with at least one act occurring after the enactment of RICO itself on October 15, 1970.  18 U.S.C. §§ 1961(1) and (5).

In *H.J. Incorporated v. Northwestern Bell Telephone Company*, the Supreme Court set forth the process for determining what conduct meets this "pattern" requirement under RICO. *H.J.*, 492 U.S. 229, 236-50 (1989). The Court began with the proposition that proof of two acts of racketeering activity, without more, does not establish a pattern. Instead, the Court found that the "pattern"  element requires a showing of continuity plus relationship. *H.J.*, 492 U.S. at 237-39 (pattern reflects relation and continuity (or its threat)).  Although these two constituents of a RICO offense are discussed separately for analytic purposes, their proof often will overlap in practice.  *Id.* at 239.

In its analysis in *H.J.*, the Supreme Court developed a six-step process for determining if a "pattern" is present within the meaning of RICO.  To determine

---

factor, but it is neither required nor dispositive in the analysis. *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (observing that the "operation" of an enterprise includes "foot soldiers" as well as "generals" and can even include a participant's acquiescence to *losing* money to advance the enterprise's goals); *Nesbitt v. Regas*, No. 13-8245, 2015 WL 1331291, at *11 (N.D. Ill. March 20, 2015) (explaining the narrow significance of the profit-sharing language in *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932-33 (7th Cir. 1999)).

whether the goals of relationship and continuity are met, up to six questions must be asked. The first two questions are:

1. Are the acts in a series (at least two) related to one another, for example, are they part of a single scheme?

2. If not, are they related to an external organizing principle, for example, to the affairs of the enterprise?

*H.J.*, 492 U.S. at 238; *see also Elliott*, 571 F.2d at 899; *United States v. Sinito*, 723 F.2d 1250, 1261 (6th Cir. 1983). When analyzing a RICO pattern, a broad range of criminal conduct can exhibit relationship, including unlawful acts that have the same or similar purposes, results, participants, victims or methods of commission, or acts that are otherwise interrelated by distinguishing characteristics. In this way, RICO's pattern element can be shown with either a "horizontal" relationship between the predicate acts themselves or a "vertical" relationship of the predicate acts to the RICO enterprise itself. If both of the above questions are answered in the negative, no relationship is present and this Court need not proceed further.

If either question is answered "yes," however, relationship is present and the following additional questions must be asked:

3. Are the acts in the series open-ended, that is, do the acts have no obvious termination point?

4. If not, did the acts in the closed-ended series go on for a substantial period of time, that is, more than a few weeks or months?

*H.J.*, 492 U.S. at 241-43. Generally, if either question is answered in the affirmative, continuity is present.

If both questions are answered in the negative, however, up to two additional questions must be asked:

5. May a threat of continuity be inferred from the character of the illegal enterprise?

6. If not, may a threat of continuity be inferred because the acts represent the regular way of doing business of a lawful enterprise?

*H.J.*, 492 U.S. at 242-43; *Torres*, 191 F.3d at 808. If either question is answered in the affirmative, a threat of continuity is present.

As to a "threat" of continuity (Questions 5 and 6), the Seventh Circuit in *Torres* emphasized that, as "other courts of appeal have noted, in cases where the acts of the defendant or the enterprise were inherently unlawful" or "were in pursuit of inherently unlawful goals," then courts generally have "concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering activity was short." 191 F.3d at 808 (internal quotations omitted). As such, the continuity requirement may be satisfied by showing past conduct which "by its nature projects into the future" with a "threat" of repetition. *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992) (internal quotations omitted); *see also Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1296-97 (7th Cir. 1992) (finding that a threat of continuity may be shown by establishing that the conduct is a "regular way" of doing business) (internal quotations omitted); *United States v.*

28

*Aulicino*, 44 F.3d 1102, 1112 (2d Cir. 1995) (observing that continuity is assessed prospectively and not from hindsight, after the pattern ends).

When assessing a RICO pattern as a whole, the Seventh Circuit includes among the relevant factors "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, and the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). In *Morgan*, however, the court also cautioned that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement" because the pattern requirement is "a standard, not a rule." *Id.* at 975-76. Thus, the determination "depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative." *Id.* at 976. Elements of the RICO violation beyond the racketeering activity itself also may be considered in assessing relatedness and continuity.

In the end, this Court must evaluate all the allegations with the goal of "achieving a natural and commonsense result, consistent with Congress' concern with long-term criminal conduct." *Roger Whitmore's Automotive Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005) (internal quotations omitted); *see also 420 East Ohio Ltd. Partnership v. Cocose*, 980 F.2d 1122, 1124 (7th Cir. 1992) (finding that the Seventh Circuit still examines the *Morgan* factors

29

post-*H.J.* when assessing continuity "with an eye towards achieving a natural and common sense result") (internal quotations omitted).[4]

### a) Pattern Allegations Are Not Strictly Construed

Here, Defendants claim the Complaint fails to allege a proper RICO pattern. Defendants begin this challenge by misreading the holding of *Midwest Grinding* for the proposition that the federal courts must strictly construe the pleading requirements for civil RICO in order to prevent it from supposedly becoming a federal surrogate for "garden-variety fraud actions properly brought under state law." 976 F.2d at 1019, 1022.

No strict-construction rule, however, exists for RICO cases in general or for civil RICO in particular. The Seventh Circuit applies "ordinary civil standards to pleadings in civil RICO cases" and sees "no reason to depart from that practice." *Haroco*, 747 F.2d at 404. Nor could any such judicially-created rule for civil RICO cases be reconciled with the Supreme Court's admonition to read the statute's provisions the same way in both a criminal or civil context. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987) ("a pattern for civil purposes is a pattern for criminal purposes") (internal quotations omitted); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 489 (1985) (same). Nor could any special "strict

---

[4] Of course, under § 1962(c), the "pattern" must also be *in the affairs* of the enterprise. *United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995) (pattern must regularly utilize the facilities or services of the enterprise, or otherwise have an effect upon the common affairs of the enterprise). If not, liability will not obtain. *Palmetto State Medical Center, Inc. v. Operation Lifeline*, 117 F.3d 142, 149 (4th Cir. 1997) (no evidence conduct was "in the affairs" of the enterprise).

construction" rule withstand Congress' mandate to "liberally" construe the statute in light of its broad remedial purposes. Pub. L. No. 91-452, § 904(a), 84 Stat. 947; *Sedima*, 473 U.S. at 497-98. As the Supreme Court has repeatedly warned, such narrow distortions of RICO must be rejected based upon the "self-consciously expansive language and overall approach" of Congress in enacting RICO. *Sedima*, 473 U.S. at 497-98 (citing *Turkette*, 452 U.S. at 586-87 and *Russello v. United States*, 464 U.S. 16, 26-29 (1983)); *see also H.J.*, 492 U.S. at 236-50.[5]

Instead, when read properly, *Midwest Grinding* and its precedents merely require what RICO already requires, namely, a showing of pattern that can satisfy the well-settled "continuity plus relationship" test. *H.J.*, 492 U.S. at 237; *Jennings*

---

[5] Since RICO's enactment over 45 years ago, various judicial calls to invalidate the statute's enhanced remedies and legal standards have been uniformly, and rightly, rejected by Congress and the federal courts. *See, e.g.*, William H. Rehnquist, *Remarks of the Chief Justice*, 21 St. Mary's L.J. 5, 9-10 (1989); *Bingham v. Zolt*, 66 F.3d 553, 566 (2d Cir. 1995) (explicitly rejecting a call to invalidate RICO for vagueness, and holding that the pattern and enterprise requirements are not unconstitutionally vague); *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1108 (6th Cir. 1995) (stating that RICO provides a clear standard of conduct, which is proscribed by the pattern requirement); *United States v. Bennett*, 984 F.2d 597, 606-07 (4th Cir. 1993) (holding that RICO provides members of a RICO enterprise or RICO conspiracy adequate notice that certain acts are prohibited); *United States v. Glecier*, 923 F.2d 496, 498 n.1 (7th Cir. 1991) (joining First and Third Circuits in re-affirming constitutionality of RICO despite *dicta* from a Supreme Court Justice raising concerns over the pattern requirement). Various attempts to artificially narrow RICO with judicially-created limitations have, likewise, been properly rejected. *See, e.g.*, *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) (unanimously rejecting the creation of any "economic motive" limitation for civil RICO cases); *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 244 (1989) (rejecting judicially-created "organized crime" limitation and noting that the contention that RICO is somehow limited to organized crime finds no support in the Act's text and remains at "odds with the tenor of its legislative history"); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489-90 (1985) (rejecting judicially-created "criminal conviction" and "racketeering injury" limitations for civil RICO cases).

*v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007). To the degree "garden-variety" fraud in the marketplace otherwise meets the well-settled elements of a RICO claim, Congress intended the RICO statute to address such fraud and "weed" it out of the garden.

### b) Plaintiff's Pattern Allegations Lack Continuity

As to the pattern requirement, Defendants next attack Plaintiff's continuity showing.[6] Here, the Complaint alleges a closed-ended pattern involving multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in furtherance of the overall scheme to defraud, and all within the affairs of the alleged RICO enterprise. Compl. ¶¶ 1-136; [41] at 5 (Plaintiff concedes he has alleged a "closed-ended" pattern). When, as here, mail and wire fraud form the alleged pattern, each requisite element of the underlying predicate activity must be set forth with the particularity and specificity required by Rule 9(b). *Slaney*, 244 F.3d at 599. At a minimum, this requires Plaintiff to show: (1) a scheme to defraud; (2) the intent to defraud; and (3) the use of the mails or wire communications in furtherance of the scheme to defraud. *See Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656

---

[6] In contrast, Defendants do not (and cannot in light of Plaintiff's allegations here) challenge the sufficiency of Plaintiff's "relatedness" showing. If nothing else, the alleged predicates in this case all relate to "an external organizing principle," that is, to the affairs of the same enterprise. *H.J.*, 492 U.S. at 238; *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779 (7th Cir. 1994) ("vast majority of cases dealing with RICO pattern requirement" fail to "turn on the relatedness of the alleged predicate acts").

(2008) (finding that civil RICO plaintiffs need not show reliance on any misrepresentation to establish proximate causation).

Given the numerous predicate acts and their duration over 31 months, the allegations here initially seem to present a sufficient pattern but, upon further inspection, the Complaint ultimately fails to make a proper showing. *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1267-68 (7th Cir. 1990); *Sutherland v. O'Malley*, 882 F.2d 1196, 1205 n.8 (7th Cir. 1989). Specifically, Counts I and II of the Complaint, even when considered as a whole, do not allow this Court to draw the reasonable inference that Defendants can be found liable under RICO, because the showing of continuity remains insufficient.

### (1)  Plaintiff's Pattern Allegations Lack Closed-Ended Continuity

First, Plaintiff makes a weak showing of "closed-ended" continuity, because the predicate acts all occurred in furtherance of a single scheme to defraud a single victim, whose injuries all stem from a single tax planning product. Lacking any variety in the nature of the underlying criminal offenses, the predicate activity here involves only two substantive crimes (wire fraud and mail fraud) in the execution of a single tax avoidance plan for the disposition of a single person's ownership of stock. Although Defendants staged the complex tax plan over time, the totality of the circumstances alleged here still constitutes "one dishonest undertaking" for pattern purposes. *U.S. Textiles*, 911 F.2d at 1267-69.

This case tracks *U.S. Textiles*. There, the alleged RICO violators (Anheuser-Busch and others) extorted a discounted sales contract from a t-shirt manufacturing company and then, over an approximately two-year span, engaged in various acts of mail and wire fraud as orders and shipments were made under the contract. *U.S. Textiles*, 911 F.2d at 1264. Although the number-of-victims factor "cannot be dispositive of any 'pattern' determination," the Seventh Circuit still found "highly significant" the presence of only a single victim with no apparent threat of repetition. *Id.* at 1268-69; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 523 (7th Cir. 1995) (finding that the existence of a single victim remains a relevant factor even though it does not, by itself, preclude the existence of a pattern of racketeering activity). As here, the allegations in *U.S. Textiles* gave "no indication that this is a type of activity" in which the defendant "normally engages or, indeed, that there are other potential Busch victims waiting in the wings." 911 F.3d at 1268-69. The Seventh Circuit thus found the alleged pattern insufficient.

Although the existence of a single "dishonest undertaking" (even one directed against a single victim incurring ostensibly non-distinct injuries) is not necessarily a determinative factor, the entirety of Plaintiff's allegations here put the existence of RICO continuity in doubt. In this case, like *U.S. Textiles*, despite the "pure happenstance" that the predicate acts included a significant "raw number of transactions" over a substantial length of time, which at "first glance" would seem to otherwise mandate a finding of pattern, Plaintiff alleges a single victim (himself)

34

whose injuries all flowed from a single scheme. 911 F.3d at 1268-69. Without more (and there is nothing more here), these allegations fail to establish a sufficient showing of closed-ended continuity. This is especially true in the absence of any showing of a potential threat of continuity, as explained further in Section III(A)(2)(d) below.

Contrary to Plaintiff's assertions, the mere "multiplicity" of mailings or wire communications does not automatically translate into a pattern of racketeering activity; and although a RICO pattern may be established on the basis of a single scheme, "it is not irrelevant, in analyzing the continuity requirement, that there is only one scheme" as the allegations here show. *Sutherland v. O'Malley*, 882 F.2d 1196, 1204-05, 1205 n.8 (7th Cir. 1989). The complexity of the transaction itself sometimes creates the potential for a greater number of possible fraudulent acts, but the sheer number of mail or wire fraud acts alone does not, by itself, establish the requisite threat of continued criminal activity. *Lipin Enterprises Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986); *see also Midwest Grinding*, 976 F.2d at 1024-25 (finding that, given the nature of the scheme, the mere multiplicity of mail and wire fraud acts by itself "may be no indication of the requisite continuity of the underlying fraudulent activity") (internal quotations omitted); *Jennings*, 495 F.3d at 475 (same); *Vicom*, 20 F.3d at 781 (same).

That the alleged pattern occurred over a lengthy period of time does not alter this Court's conclusion regarding RICO continuity. Although the Seventh Circuit

does not employ any bright-line rule for how long a closed period must be to satisfy continuity, this Court does not hesitate to find that, in appropriate cases like this one, "closed periods of several months to several years" will sometimes fail to qualify as "substantial" enough to satisfy RICO's continuity requirement. *Roger Whitmore's Automotive Services*, 424 F.3d at 672-73 (affirming summary judgment and dismissing the plaintiffs' RICO claim because of a lack of continuity, even though the defendants' predicate activity lasted for approximately two years). As in *Rogers Whitmore's Automotive Services*, the "natural and commonsense" result here is to find a lack of continuity.

### (2)     Plaintiff's Pattern Allegations Lack Threat of Continuity

Second, the current allegations present no showing of any "threat" of continuity because the Complaint sets forth a single victim with a "clear and terminable" goal. *Vicom*, 20 F.3d at 782. In this way, the Complaint creates a "natural ending point" for the alleged pattern of criminal activity that dispels any "threat" of repetition. *Id.* In fact, the Complaint here states that, by June 7, 2005, Defendants "completed all necessary transactions in furtherance of the Tax Shelters, and pursuant to the Defendants' Conspiracy were paid substantial fees and expenses from Menzies." Compl. ¶ 76. On the Complaint's own terms, the alleged pattern does not project into the future in any way, either from the character of the enterprise, or from the regular manner in which the enterprise allegedly did business.  Compl. ¶¶ 104-36.

36

In these respects (and more), this case follows the Seventh Circuit's findings in *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1150 (7th Cir. 1990). In *Olive Can*, the defendants set up a sham corporation to divert money from their own failing cookie manufacturing business. They concealed the corporation's existence from the plaintiffs, who had provided defendants with supplies on credit. The district court found that the scam lacked sufficient RICO continuity, because the entire scheme to pay off one of the defendants' personal obligations possessed a clear and natural ending point with no threat of ongoing criminal activity. The Seventh Circuit agreed, affirming the dismissal of the RICO counts. *Id.* at 1151-52. The Complaint here warrants a similar finding.

Plaintiff claims that he is "not yet privy" to the underlying facts as to how broadly Defendants "marketed" the tax shelter at issue, but avers that "discovery will likely reveal" whether Defendants promoted the scheme to others, thus suggesting the existence of a potential threat of ongoing criminal activity. [42] at 10; [41] at 14. Counsel for Plaintiff reiterated this theory at the hearing on the motions to dismiss, suggesting that discovery might uncover other sales by Defendants of the purportedly abusive tax plan to other victims. Transcript of Proceedings of 1/28/16 [52]. Nevertheless, no details of any such sales or victims appear in either Count I or II the Complaint, and no such facts have otherwise arisen during discovery due to the parties' *joint* request to stay discovery pending

resolution of the present motions. See Order issued 6/24/15 [40] (granting the parties' joint request to stay).

Falling short of the requirements of Rules 9(b) and 12(b)(6), the Complaint merely states that:

> Defendants, comprising of lawyers, bankers, and financial planners, conspired to develop, market and promote to, *among others*, Menzies, an abusive tax avoidance scheme – disguised as a tax savings plan that would lawfully shield capital gains from the sale of his AUI stock from tax liability.

Compl. ¶ 1 (emphasis added). Similarly, the Complaint elsewhere makes references to unnamed "others" and "participants," noting, for example, that Defendants disguised their abusive tax scheme as a legitimate tax plan to purportedly reduce "capital gains tax on a participant's, such as Menzies, disposition of stock." Compl. ¶¶ 16, 20, 28-30, 34-36, 42, 112-113 and 126 (examples of Plaintiff's vague references to "participants" or "others"). Yet, the Complaint never states when, why, how, or even if, such "other" unnamed participants were actually defrauded, nor how they might have suffered any economic injury or might otherwise be connected at all to the alleged RICO violations. To be sure, Plaintiff does reference Taylor's 2008 conviction for tax fraud, and Senate hearings about Euram Bank's purportedly abusive tax shelters. But Plaintiff then fails to identify any other victims or otherwise connect these two facts to the RICO counts in this case. Compl. ¶¶ 7, 26. To survive a motion to dismiss, Rules 9(b) and 12(b)(6) require more than mere allusions about the prospect of other fraud victims.

In sum, by setting forth a single scheme to defraud only Plaintiff, the Complaint here fails to establish any threat of continuity. Compl. ¶¶ 104-36. As alleged in Paragraph 109 of the Complaint, Defendants' course of conduct "operated as a fraud *upon Menzies*"—not anyone else. *See also U.S. Textiles*, 911 F.2d at 1269 (allegations fail to indicate other potential victims are "waiting in the wings").

### c) Plaintiff's Pattern Allegations Must Be Dismissed

Because Plaintiff failed to make a proper showing of continuity or its threat, the RICO counts are dismissed without prejudice. This Court nonetheless gives Plaintiff leave to file an Amended Complaint re-alleging Counts I and II, provided he can do so consistent with his obligations under Federal Rule of Civil Procedure 11. Because mail and wire fraud presumably will still form the basis of Plaintiff's alleged pattern of predicate activity, this Court will later address whether any Amended Complaint sets forth each requisite element of mail or wire fraud with the specificity required by Rule 9(b). *Slaney*, 244 F.3d at 599. Although any Amended Complaint need only provide a general outline of the unlawful scheme, it "must, at minimum, describe the predicate acts with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Midwest Grinding*, 976 F.2d at 1020 (internal quotations omitted).

In its analysis, this Court will also review any Amended Complaint to ascertain whether Plaintiff has alleged the existence of other victims, or the manner in which he or others suffered distinct injuries resulting from Defendants' alleged

scheme. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1300-05 (7th Cir. 1987) (repeated infliction of separate economic injuries upon a single victim of a single scheme over seven months was sufficient to establish a pattern of racketeering activity for purposes of civil RICO); *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1048-49 (7th Cir. 1998) (finding a 14-month closed-ended pattern sufficient based in part upon the presence of other victims); *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 962-64 (7th Cir. 1996) (RICO jury verdict upheld and pattern found sufficient, in part, due to the presence of "separate and distinct injuries") (internal quotations omitted). But as currently pled, the RICO counts cannot survive Defendants' motions to dismiss.

### 3. Elements of RICO Conduct: The "Operation-Management" Test

In *Reves*, the Supreme Court resolved a circuit split, holding that for a substantive violation under § 1962(c), the phrase "conduct or participate" requires "some part in directing those affairs" through "operation or management." *Reves*, 507 U.S. at 177-86. In other words, a person conducts or participates in the conduct of the affairs of an enterprise only if that person uses his position in, or association with, the enterprise to perform acts which are involved in some way in the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so. To be associated with an enterprise, a person must be involved with the enterprise in a way that is related to its affairs or common purpose, although the person need not have a stake in the goals of the enterprise

40

and may even act in a way that subverts those goals. A person may be associated with an enterprise without being so throughout its existence. The *Reves* "operation-management" test, as it has become known, is deployed to include and exclude certain RICO defendants.

In a conspiracy case like this one, the law adjusts the *Reves* concept. Specifically, a RICO conspiracy does not require violators to meet the "operation or management" test themselves, but instead a conspiracy defendant must "knowingly agree to perform services of a kind which facilitate" the activities of those who are operating or managing the RICO enterprise. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000); *see also United States v. Quintanilla*, 2 F.3d 1469, 1485 (7th Cir. 1993) (*Reves* does not "address the principles of conspiracy law undergirding § 1962(d)"); *Goren v. New Vision International, Inc.*, 156 F.3d 721, 731 (7th Cir. 1998) ("a defendant can be charged under § 1962(d) even if he cannot be characterized as an operator or manager of a RICO enterprise under *Reves*").

Thus, Defendants here cannot be held liable for RICO violations unless they exercised some direction over the named enterprise or helped to operate it, or otherwise conspired knowingly to facilitate the activities of anyone who was a manager or operator of the enterprise. *United States v. Cummings*, 395 F.3d 392, 397-98 (7th Cir. 2005).

For purposes of the motions to dismiss, the Complaint satisfies the *Reves* test. As either a principal offender or as an aider and abettor, each Defendant

personally operated, or otherwise exerted control over, the affairs of the enterprise. This participation included the planning and commission of the predicate activity and the active concealment of their prior relationships as part of the fraudulent scheme as a whole. Compl. ¶¶ 44-47, 104-36. By way of example, this alleged conduct includes: (1) luring Plaintiff into the bogus tax shelter plan; (2) referring business to other violators by convincing Plaintiff to hire co-conspirators; (3) participating in various telephone conversations (without Plaintiff) to plan the scheme; (4) structuring the legal instrumentalities of the scheme; (5) defrauding Plaintiff and supporting the appearance of legitimacy of the scheme with false statements and opinion letters; and (6) otherwise controlling the instrumentalities of the scam through active service as a trustee for the relevant assets and legal instrumentalities used to injure Plaintiff. Compl. ¶¶ 104-36. These allegations suffice, because the class of potential RICO violators entails, of course, not only "upper management" but also "lower-rung participants in the enterprise who are under the direction of upper management," or "others associated with the enterprise who exert control" over its affairs. *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 976, 977 (7th Cir. 1995) (citing *Reves*) (internal quotations omitted).

Unlike *Crichton*, 576 F.3d at 399, and *Goren*, 156 F.3d at 727-28, which Defendants cite, each of the alleged violators in this case did far more than just perform otherwise "legitimate" services. Therefore, Defendants' alleged conduct

42

constitutes more than a mere "tangential involvement" in the affairs of the RICO enterprise. *Crichton*, 576 F.3d at 399.

### 4. Elements of a RICO Conspiracy

As in all conspiracies, the essence of a RICO conspiracy violation is the agreement itself; the distinction between a traditional conspiracy and a RICO conspiracy is simply the breadth of the overall objective. *Salinas v. United States*, 522 U.S. 52, 63-66 (1997). Accordingly, the fact that the "many defendants and predicate crimes were different, or even unrelated," is irrelevant in a RICO case, so long as it can "be reasonably inferred that each crime was intended to further the enterprise." *United States v. Gonzalez*, 921 F.2d 1530, 1539-40 (11th Cir. 1991); *see also United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988) (finding that a RICO conspiracy is "by definition broader than an ordinary conspiracy to commit a discrete crime"); *United States v. Valera*, 845 F.2d 923, 930 (11th Cir. 1988) (finding that "a series of agreements, which, pre-RICO, would constitute multiple conspiracies, can form, under RICO, a single 'enterprise' conspiracy").

Consistent with these general principles, the essential elements of a conspiracy to violate § 1962(c) are well-settled. A plaintiff must prove that the conspiracy existed and that each named defendant knowingly became a member of the conspiracy with an intention to further that conspiracy. Obviously, a conspiracy may be established even if its purposes were not accomplished, and in order to be a member of the conspiracy, the defendant need not join at the beginning or know all

the other members or means by which its purposes were to be accomplished. A defendant, however, must be generally aware of the common purpose or purposes of the RICO conspiracy, and be a willing participant. *Goren*, 156 F.3d at 732 ("In order to plead a viable § 1962(d) claim, a plaintiff must allege that a defendant agreed to the objective of a violation of RICO.") (internal quotations omitted).

Finally, RICO conspirators need not personally commit any predicate act, or otherwise agree as to *which* two predicates would be committed. Instead, RICO merely requires that each defendant, "by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise," through the proposed commission of "two or more predicate crimes" by any member of the conspiracy. *United States v. Campione*, 942 F.2d 429, 436 (7th Cir. 1991) (citing *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir. 1986)); *see also Salinas*, 522 U.S. at 63-66 (usual conspiracy rules apply to RICO); *H.J.*, 492 U.S. at 237; *Glecier*, 923 F.2d at 499-501 (the agreed upon predicate-act objectives of the conspiracy need not "come to fruition"); *Elliott*, 571 F.2d at 903.

But for the failure to allege the requisite element of pattern (as discussed above in Section III(A)(2)(e) of this Opinion), the Complaint here would otherwise appear to contain the additional facts necessary to support Count II at this preliminary stage. *Brouwer*, 199 F.3d at 963-64 (stating that RICO conspiracy requires an agreement not to commit, but rather simply to facilitate a pattern of two or more statutorily enumerated predicate acts). Because Defendants have not

asserted any other independent conspiracy-based objections in their motions to dismiss (beyond their challenges to Count I and RICO generally), this Court need not address Count II in any further detail at this time. Given the fatal absence of continuity (or its threat) in the underlying RICO claim, the RICO conspiracy count cannot stand, and it is thus dismissed without prejudice.

### 5. The PSLRA'S RICO Exception

Defendants argue that Plaintiff's RICO claims are barred by the PSLRA. In Pub. L. No. 104-67, § 107, 109 Stat. 737, 758, Congress enacted a series of securities law reforms via the PSLRA, and in doing so also amended § 1964(c) of RICO. Among its provisions, the PSLRA added the italicized language below to § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.*

18 U.S.C. § 1964(c) (emphasis added). The phrase "fraud in the purchase or sale of securities" refers to violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), which bans the use of manipulative or deceptive devices or contrivances in

connection with the purchase or sale of securities.  15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5.[7]

Defendants argue that Plaintiff's RICO claims are barred by § 1964(c) because the claims rely upon conduct that would have been "actionable" as fraud in the purchase or sale of securities. To decide this claim, the Court must address two related PSLRA issues:  (1) the scope of conduct "actionable" as fraud in the purchase or sale of securities; and (2) whether the misconduct alleged here occurred "in the purchase or sale" of securities.

### a) Defining the Scope of "Actionable" Conduct

### (1) A Plain Text Reading of § 1964(c)

In determining the scope of civil RICO's securities fraud exception, this Court looks first to the operative legislative text, and asks "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Exelon Generation Co., LLC v. Local 15, International Brotherhood of Electrical Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012) (internal quotations omitted); *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014) (courts must give "the words used their ordinary meaning").  If the "statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language

---

[7] The Securities Exchange Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), define a "security" as "any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

must ordinarily be regarded as conclusive." *Turkette*, 452 U.S. at 580 (internal quotations omitted); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) (same). In short, when a "statute is unambiguous, our inquiry starts and stops with the text." *United States v. Marcotte*, Nos. 15-1266 and 15-1271, 2016 U.S. App. LEXIS 10883, at *6 (7th Cir. June 16, 2016).

Such a plain reading begins with the words and grammar employed by Congress. Here, the linguistic structure of the amended version of § 1964(c) itself sets forth both a general rule and an exception to that rule.[8] The first clause of § 1964(c) establishes a private civil remedy for RICO violations (the "Rule"):

> "Any person injured in his business or property by reason of a violation of § 1962 of this chapter" may sue and "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee..."

18 U.S.C. § 1964(c). The second clause of this same sentence (the "Exception") then creates an exception to this general rule, stating that:

> "...except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of § 1962."

*Id.* Like any other exception, the exception created by the second clause is, by definition, more narrow than the general rule that it modifies; thus, the class of "persons" authorized to pursue a remedy under the first clause defines the subset class of "persons" barred under the second clause from doing so where the

---

[8] Although not relevant here, the final sentence of the revised provision also creates an exception to the exception for private civil claims against those who are "criminally convicted in connection with the fraud." 18 U.S.C. § 1964(c).

underlying conduct relied upon triggers the RICO "exception." According to a plain reading of the text, therefore, a civil RICO claim filed under the first clause of § 1964(c) will fall under the second clause exception if the predicate activity alleged by the "person" seeking remedy for the RICO injury would be "actionable" as "fraud in the purchase or sale of securities."

Despite this plain reading, some litigants have disputed the "actionable" conduct concept under the PSLRA. Essentially, the dispute asks: When Congress used the term "actionable" conduct in the PSLRA's RICO exception, did it mean actionable conduct by any *conceivable* person, or rather actionable conduct that caused the injuries to the same "person" referenced twice in § 1964(c)?

Some courts have emphasized the absence of yet a third reference to such "person" in the statute, and based upon that absence found that the exception applied to conduct "actionable" by any conceivable person. *E.g.*, *MLSMK Investment Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 275-76 (2d Cir. 2011). Ostensibly, such courts would require Congress to have inserted the additional words "by such person" in the text after the words "that would have been actionable" (and before the words "as fraud in the purchase or sale of securities") in order to conclude that Congress was referring to the same injured "person" throughout the sentence. That purported omission of a theoretical third reference to "person" in the PSLRA amendment, as the logic goes, forms the basis for some courts to dismiss any RICO count if the underlying conduct would have been

48

"actionable" by *any* person as a securities fraud (not just conduct injuring the RICO

"person" as listed in the statute), as illustrated below.

| Relevant Text of § 1964(c) | Theoretical Addition |
|---|---|
| Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. | Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable **by such person** as fraud in the purchase or sale of securities to establish a violation of section 1962. |

This "actionable-by-anyone" approach, however, distorts the plain statutory

text. Within a single sentence, the statute already states that any "person" injured

by the RICO violation may sue, except that no "person" may rely upon any conduct

that would have been "actionable" as securities fraud. This sentence structure

shows that "actionable" modifies the injurious "conduct" being relied "upon" by the

same "person" seeking a remedy for the RICO injury. Per the statute's text, the

person must first have been "injured in *his* business or property by reason of a

violation of section 1962" in order to fall within the general rule of § 1964(c). *Id.*

(emphasis added). A reading of the statute's plain language, then, shows that all

"actionable conduct" within the RICO exception must constitute conduct that

injured the plaintiff in his business or property in order for it to be relied upon by

that "person" to establish a RICO violation. If the actionable "conduct" concept does

not refer to the injurious conduct harming the business or property of the "person"

in the "Rule" portion of § 1964(c), and instead somehow refers to conduct harming

49

anyone generally, then the underlying conduct would not fall within the general "Rule" of § 1964(c) in the first place. And thus, no second-clause "Exception" would be needed to take such "conduct" out of the general rule. It would make little sense for Congress to create an exception covering so broad a landscape of conduct that certain conduct covered by the exception would never fall within the general rule. There would be no need to except such conduct from a rule that does not reach it. As a matter of pure linguistics, the "actionable-by-anyone" reading is thus over-inclusive, preempting actions without regard to whether the underlying actionable conduct falls within § 1964(c) in the first place. An over-inclusive reading is a false reading.

In contrast, a plain reading of the phrase "any conduct that would have been actionable" means conduct that: (1) injured a person's business or property (and is thus being relied upon by that person to establish a RICO violation); and (2) would have been actionable as fraud in the purchase or sale of securities. When such injurious "conduct" to the RICO "person" could also trigger an "action" for remedies under the securities laws, then it constitutes "actionable" conduct under the exception. As such, the term "actionable" conduct means injuries to the "person" that he could use to seek a remedy via a private securities fraud action, or the same injurious conduct to such person that could otherwise be remedied via a public action filed by the SEC.[9]

---

[9] As explained in more detail in this Opinion, this Court's plain text interpretation of the amended version of § 1964(c) remains consistent with the legislative history showing

Despite the precedent relied upon by Defendants, there is simply no basis in the text to read the term "actionable" conduct to include injurious conduct that could be "actionable-by-anyone" as a securities fraud. Such a reading fails to tie that underlying "conduct" to the rest of the sentence in § 1964(c). As noted before, in a single sentence, § 1964(c) already refers to the same RICO "person" twice, and refers to the "conduct" that "injured" such person in "his business or property." Securities fraud conduct that merely injured some third-party (rather than the RICO plaintiff himself) cannot be "actionable" conduct under a plain reading of the RICO exception, because it does not relate to the "conduct" being relied upon by the "person" bringing suit to address "his" injury to business or property.

### (2) *MLSMK Investment*

Nevertheless, certain courts have still adopted some form of an "actionable-by-any-conceivable-person" construction. Often without rigorous analysis of the PSLRA's text or a proper concern for creating an unwarranted and unintended remedial gap in statutory coverage, these cases offer little in the way of compelling textual or contextual justification for their interpretation, other than citing certain favorable legislative remarks and ignoring unfavorable ones.[10]

---

Congress' intent to eliminate overlap, not create gaps, in remedial statutory coverage. It further reads all of the various PSLRA provisions in harmony (as courts must do), including the RICO exception and the reservation of aiding/abetting securities fraud actions to the SEC, as set forth independently in another part of the PSLRA. *See* 15 U.S.C. § 78t(f) (aiding and abetting securities fraud actionable by the SEC but not private parties).

[10] As discussed in this Opinion, this Court finds unpersuasive the language, often found in *dicta* in other non-binding cases, that misreads the plain language of the PSLRA so far as

Notable is the Second Circuit's decision in *MLSMK Investment*. 651 F.3d at 275-76. In that case, the court resolved a split of authority within the Second Circuit and dismissed civil RICO counts against defendant JP Morgan, who served as the bank and trading partner of Bernie Madoff. The plaintiff alleged that JP Morgan learned of Madoff's now-infamous Ponzi scheme, but continued to knowingly aid and abet the fraud anyway—thereby inflicting massive losses upon its victims—because JP Morgan received "substantial" profits from the fees it charged through continuation of the scheme. Noting that the plaintiff could not have brought a private claim against JP Morgan for aiding and abetting the fraud under securities laws, the Second Circuit dismissed the plaintiff's RICO claims because, in the court's view, the alleged mail and wire fraud predicates were "actionable" by someone other than the plaintiff.

To justify dismissing the plaintiff's private remedy under RICO, the Second Circuit quipped:

> [The] language of the statute simply does not require that, for a RICO claim to be barred, the plaintiff who sues under RICO must be able to

---

to create a remedial gap, rather than merely eliminate an overlap, in the statutory framework formed by RICO and the securities laws. *See Hollinger International*, 2004 WL 2278545, at *5, *7 ("RICO bar operates irrespective of whether the RICO plaintiff has standing to bring a securities claim—*i.e.*, was a purchaser or seller of the company's stock—as long as another plaintiff could bring a securities action based on the alleged conduct"); *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws. The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws."); *Payton v. Flynn*, No. 06-465, 2006 WL 3087075, at *6 (N.D. Ill. Oct. 26, 2006); *Jones v. U.S. Bank National Association*, No. 10-8, 2012 WL 899247, at *5 (N.D. Ill. March 15, 2012); *Howard v. America Online Inc.*, 208 F.3d 741, 749-50 (9th Cir. 2000).

> sue under securities laws, or that the conduct "actionable as securities fraud" on which the plaintiff relies to establish the RICO violation must be that of the defendant.

*MLSMK Investment*, 651 F.3d at 275-76 (internal citations omitted). According to the court, the "better interpretation," and the one supposedly "supported by the plain meaning" of § 107 of the PSLRA, is "that the RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws." *Id.* at 278 (internal citations omitted). Without addressing the specific grammar tying together the references to "person," "injury," "conduct" and "actionable" in the text, the Second Circuit concluded that "the plain language of the statute" does not require that "the same plaintiff who sues under RICO must be the one who can sue under securities laws." *Id.* (internal citations omitted). According to the Second Circuit's reading, the wording of the RICO exception "does not make such a connection." *Id.* (internal citations omitted). The Second Circuit then quoted a Texas district court decision to confirm its interpretation:

> [W]hen Congress stated that "no person" could bring a civil RICO action alleging conduct that would have been actionable as securities fraud, it meant just that. It did not mean "no person except one who has no other actionable securities fraud claim." *It did not specify that the conduct had to be actionable as securities fraud by a particular person to serve as a bar to a RICO claim by that same person.*

*Id.* (quoting *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F. Supp. 2d at 620 (citing *Hemispherx Biopharma, Inc. v. Asensio*, No. 98-5204, 1999 WL 144109, at *4 (E.D. Pa. Mar. 15, 1999))) (emphasis added).

Failing to address the PSLRA's legislative history as a whole, the Second Circuit then cited portions of the legislative history consistent with its ultimate decision. *See MLSMK Investment*, 651 F.3d at 278-79 (citing H.R. Rep. No. 104–369, at 47 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 746 (Congress "intend[ed]" that the section would "eliminate securities fraud as a predicate offense in a civil RICO action," and would bar a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud"); S. Rep. 104–98, at 19 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 698 (Congress appears satisfied that the securities laws "generally provide adequate remedies for those injured by securities fraud")) ("The [Senate] Committee believes that amending the 1934 [Securities Exchange] Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to [the RICO Amendment's] goal of reducing meritless securities litigation. The Committee does, however, grant *the SEC* express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws" (emphasis added)).[11]

---

[11] Like *MLSMK Investment*, several other courts have conducted a truncated analysis of the PSLRA's legislative history to justify their removal of an actionable injury to the RICO person from the plain language of the RICO exception. Typically, these cases either cite broad statements about the general purpose of securities reform or they turn specifically to the partisan statements of Representative Christopher Cox (R-CA) when he initially proposed an early version of the § 1964(c) amendment. *See, e.g.*, *Bald Eagle Area School District v. Keystone Financial, Inc.*, 189 F.3d 321, 327-28 (3d Cir. 1999) ("The 'focus' of the Amendment was on 'completely eliminating the so-called 'treble damage blunderbuss of

54

### (3)    A Critique of the "Actionable-by-Anyone" Approach

With all due respect, this Court disagrees with both the Second Circuit's reasoning and its result. First, the Second Circuit (through its citation to *In re Enron*) misread the PSLRA's text. Here, Congress did not need to again specify that the injurious conduct had to be "actionable" as to a particular person, because the provision already defines the relevant person—in the very same sentence—to be the same RICO "person" who suffered the "injury" to his business or property, and whose injury was otherwise "actionable" under the securities laws. Per the text, the focus remains upon the actionable *injury* inflicted upon the RICO person (and whether such injury can be remedied under the securities laws), not the *standing* of people generally to file a securities fraud lawsuit for conduct, which may or may not have injured the RICO person.

Second, the legislative history of the § 1964(c) amendment fails to justify the creation of a statutory gap in the remedies created by Congress for fraud. Neither the plain text of the RICO exception nor its context supports the notion that the PSLRA as enacted constitutes any intent to affect general or wholesale reform of civil RICO. Instead, via the RICO amendment, Congress intended simply to create a specific exception to RICO's civil provision to avoid overlapping private remedies

---

RICO' in securities fraud cases.'") (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 161 F.3d 156, 157 (3d Cir. 1998); 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995), *as reprinted in* 1996 U.S.C.C.A.N. 679, 746 (1995) (statement of Rep. Cox)). A piecemeal historical account cannot prevail, however, when one takes an honest look at the bill's entire path to enactment.

under RICO and the federal securities laws. Nothing in the legislative history justifies the notion that, in eliminating an overlap, Congress intended to create a "gap" in the remedial scheme such that real fraud victims would be denied any federal remedy under either statute.

Nevertheless, after focusing upon only portions of the legislative history, the Second Circuit in *MLSMK Investment* adopted an "actionable-by-anyone" standard because, in part, it feared that any other reading of the term "actionable" would require the courts to "overlook" that the RICO exception "was made in the same statute that explicitly authorized only the SEC—not private parties—to bring enforcement actions against aiders and abettors." 651 F.3d at 275-76. According to the court, it would be a "treacherous" interpretation and "strange indeed if Congress, in a statute that otherwise bars private causes of action under RICO for predicate acts that describe conduct actionable as securities fraud, nevertheless chose to allow enhanced RICO remedies" against "*only* the very parties that Congress simultaneously made immune from private suit" under the reformed securities laws. *Id.* (quoting *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F.Supp.2d 267, 282-83 (S.D.N.Y 2009)). Unfortunately, in attempting to avoid one result it viewed as absurd, the Second Circuit chose another absurdity.

As noted above, the *MLSMK Investment* court focused much of its concern upon the "aiding and abetting" provision of the PSLRA passed in response to the

Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Prior to *Central Bank*, federal courts generally held that a private plaintiff could bring a private aiding and abetting action under § 10(b) of the 1934 Securities Exchange Act. The courts based this understanding upon the following language in § 10(b):

> It shall be unlawful for any person, *directly or indirectly* . . . (b) to use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j (emphasis added). In *Central Bank*, however, the Supreme Court rejected, as a matter of statutory construction, the inclusion of any aiding and abetting actions under § 10(b) of the 1934 Act. *Id*. at 177-78. While the Court did not specifically say so, its ruling by implication precluded both private aiding and abetting actions, and public aiding and abetting actions filed by the SEC. Thus, prior to the passage of the PSLRA, § 10(b) did not provide for *any* remedial actions for aiding and abetting securities fraud (private or public).

Subsequently, as part of the congressional debate over the enactment of the PSLRA, the Senate considered legislatively overruling the *Central Bank* decision by clarifying § 10(b) and expressly permitting aiding and abetting securities fraud actions by both private parties and the SEC. As explained in the Committee on Banking, Housing, and Urban Affairs Report:

> Prior to the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, [114 S.Ct. 1439 (1994)] courts of

57

> appeals had recognized that private parties could bring actions against persons who 'aided and abetted' primary violators of the securities laws. In *Central Bank*, the Court held that there was no aiding and abetting liability for private lawsuits involving violations of the securities antifraud provisions. The Committee considered testimony endorsing the result in *Central Bank* and testimony seeking to overturn this decision. The Committee believes that amending the 1934 Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to S. 240's goal of reducing meritless securities litigation. The Committee does, however, grant *the SEC* express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws.

S. Rep. No. 104-98, at 19 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 727-28 (emphasis added). Ultimately, then, even though Congress declined to overturn *Central Bank* for *private* plaintiffs in the PSLRA, Congress did choose to overrule *Central Bank* in part by expanding (not restricting) remedial coverage in the PSLRA to allow the SEC to file public § 10(b) actions against individuals and entities aiding and abetting securities fraud.

In *MSLMK Investment*, the Second Circuit sought unsuccessfully to square the congressional response to *Central Bank* with the RICO exception, and in the process, lost sight of the textual requirement of tying the actionable injury to the RICO plaintiff. In the Second Circuit's view, if Congress specifically chose not to allow private actions for aiding and abetting under the securities laws via the PSLRA, then the court could not read the RICO amendment to allow private RICO actions for the same conduct. Apparently, the Second Circuit believed that if it read the § 1964(c) amendment to exempt only claims "actionable by the plaintiff" under

the securities laws, it would then be forced to allow private aiding and abetting securities claims under the RICO exception. Such a reading of "actionable" in the PSLRA, said the Second Circuit, would have directly contradicted Congress' decision not to create such a private cause of action in response to *Central Bank*. Even though the Second Circuit properly avoided an ostensibly absurd reading (*i.e.*, allowing a private securities-based RICO action for aiding and abetting when Congress clearly sought to limit such actions under the securities laws), the *MSLMK Investment* ruling focused only upon standing (not injury), and thus ultimately adopted, in place of the absurd reading it feared, an even more absurd reading (the nullification of  actionable conduct tied to the RICO injury of the "person"). As noted previously, this Court's reading of the text shows that an adherence to its plain language avoids the Second Circuit's false-dichotomy of absurdities.

At its core, *MLSMK Investment*, and the cases which follow it, implicitly repeals important applications of civil RICO. Such a reading defies precedent. When "two statutes are capable of co-existence . . . it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995) (applying canon to find two federal statutes compatible with each other) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Moreover, when "two statutes complement each other"—that is, "each has its own scope and purpose" and

59

imposes "different requirements and protections"—finding that one precludes the other would flout congressional design. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) (internal quotations omitted). Courts will harmonize overlapping statutes "so long as each reaches some distinct cases." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 144 (2001). Implied repeal should be found only when there is an "irreconcilable conflict between the two federal statutes at issue." *Matsushita Electric Industrial Co., Ltd. v. Epstein*, 516 U.S. 367, 381 (1996) (internal quotations omitted). As the Court warned in *Morton*, when addressing the interactions of federal statutes, federal courts may not go out *looking* for trouble or "pick and choose among congressional enactments." 417 U.S. at 551. Instead, courts must employ a strong presumption that each of the statutes be given its full effect. *Id.* By properly avoiding any remedial gaps or unfounded implicit repeal, this Court's plain reading of § 1964(c) thus interprets the operative statutory language in a manner consistent with the ultimate version enacted by Congress itself.[12]

### (4)    A Full Legislative History of the PSLRA

A comprehensive analysis of the legislative history supports this Court's plain reading of the PSLRA—a reading that leaves no unwarranted gaps in

---

[12]This Court's plain language approach to the PSLRA finds compelling support from the legal academy. Prof. G. Robert Blakey & Michael Gerardi, *Eliminating Overlap or Creating a Gap? Judicial Interpretation of the Private Securities Litigation Reform Act of 1995 and RICO*, 28 Notre Dame J.L. Ethics & Pub. Pol'y 435 (2014) (After analysis of the text and legislative history, authors state the case for the coexistence of RICO and the securities law without any remedial gaps in coverage, or any implicit repeal of RICO under the *Billing*'s test set forth in *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007)).

remedial statutory coverage. Focusing upon securities reform, not RICO reform—(in a bill aptly named the Private *Securities* Reform Act)—the initial draft of the bill did not even mention RICO when it first appeared in the House of Representatives from the Committee on Commerce in February 1995. *See* A Bill To Reform Federal Securities Litigation, H.R. 1058, 104th Cong., (1995). One week later, Representative Cox proposed the first version of the RICO exception. 141 Cong. Rec. H2717 (daily ed. Mar. 6, 1995). On the floor, Representative Cox claimed that the omission of a RICO exception in the bill to reform securities litigation was an administrative oversight, and that he and the other sponsors had always intended to include it, but it must have slipped through the cracks as the bill made its way to the House floor. *Id.*

These statements and the proposed amendment faced immediate challenge in the House. For example, Representative John Conyers (D-MI) warned that, as drafted, the proposed amendment overreached and would bar worthy lawsuits that provide important relief to legitimate victims. Citing various high-profile white collar cases at the time, such as the "Lincoln Saving and Loan debacle" and the "Bank of Credit and Commerce International" scam, Representative Conyers also attacked the suspicious timing of the amendment:

> [T]his amendment was hastily put together without the benefit of any hearings or debate in any committee or the possibility of a markup where there could have been important improvements, and now within an 8-hour ambit, we are asked to consider the revocation of the greatest single crime-fighting bill provision, RICO, on the law books today.

61

141 Cong. Rec. H2759 (daily ed. Mar. 7, 1995). The initial version of the amendment then passed out of the House of Representatives, but the battle lines of the rival legislative factions had been drawn. *See* Vote Report: Private Securities Litigation Reform Act, 1995 House Role No. 216 (Mar. 8, 1995).

Meanwhile, in the Senate, another version of the securities reform bill also contained a RICO exception when it reached the Senate floor in January 1995. Originating in the Committee on Banking, Housing, and Urban Affairs, Senate Bill 240 contained a section amending RICO, which read: "[N]o person may bring an action under this provision if the racketeering activity involves fraud in the sale of securities." Private Securities Litigation Reform Act, S. 240, 104th Cong. (1995). This version, however, faced opposition by then-Senator Joe Biden, and other Senators, who proposed and obtained various changes to the language to broaden RICO coverage, including maintaining private civil RICO suits for securities-based fraud claims involving prior criminal convictions. 18 U.S.C. § 1964(c).

The final version of the bill produced in the Senate did not end the political debate. Thereafter, the House rejected the Senate version, and a conference committee convened to fashion a new bill to send to the White House. *See* H.R. Rep. No. 104-369 (1995) (Conf. Rep.). This effort, in turn, met with opposition by President Bill Clinton, who vetoed the conference committee's revision of the bill. H.R. Doc. No. 104-159 (1995). In his words: "I am not willing to sign legislation that will have the effect of closing the courthouse door on investors who have

legitimate claims. Those who are the victims of fraud should have recourse in our courts." *Message to the House of Representatives Returning Without Approval the Private Securities Litigation Reform Act of 1995*, 31 Weekly Comp. Pres. Doc. 2210 (Dec. 19, 1995).

At the conclusion of this legislative maneuvering and partisan political debate, another compromise version of the PSLRA amendment emerged from the conference committee that was much narrower than the versions first proposed. In the end, the requisite super-majority in both houses of Congress approved the current "would have been actionable" language, and not the earlier proposed versions, such as the phrasing: "no person may bring an action under this provision if the racketeering activity involves fraud in the sale of securities." Private Securities Litigation Reform Act, S. 240, 104th Cong. (1995). As part of the substantive compromises needed to override the Presidential veto, Congress included the narrower "actionable" language to define a smaller class of cases being brought by RICO plaintiffs, rather than a broader "involves" securities fraud approach, or the judicially-created "actionable-by-anyone" construction used by some courts.

In sum, the legislative history confirms this Court's plain reading of the text of the § 1964(c) amendment as a narrow exception borne of a legislative compromise and designed to merely eliminate overlapping remedies under the securities laws and civil RICO—nothing more, nothing less. For example, the legislative reports

63

draw heavily upon the comments of Arthur Levitt, the chairman of the SEC at the time, who testified before both the House and Senate committees. H.R. Rep. No. 104-369, at 42-43, 48 (1995) (Conf. Rep.) *as reprinted in* 1995 U.S.C.C.A.N. 730; S. Rep. No. 104-98, at 19 (1995) *as reprinted in* 1995 U.S.C.C.A.N. 679, 698.

In discussing the merits of the various proposals, Chairman Levitt crystalized the ultimate consensus motivation behind the PSLRA provisions and, time and again, articulated a balanced approach that would both deter frivolous securities litigation yet still protect the effective remedies and rights of legitimate victims of fraud. *Securities Litigation Reform Proposals S. 240, S. 667, and H.R. 1058: Hearings Before the Subcomm. on Securities of the S. Comm. on Banking, Housing, and Urban Affairs*, 104th Cong. 232 (1995) (statement of Arthur Levitt, Chairmen, SEC). Despite the competing factions within the legislative process, at the very least, both sides of the aisle appeared to find agreement in the SEC's view that Congress should "[e]liminat[e] the overlap between private remedies under RICO and the Federal securities laws." *Id.*; H.R. Rep. No. 104-369, at 42-43, 48 (1995) (Conf. Rep.) *as reprinted in* 1995 U.S.C.C.A.N. 730 (Conference Report lists the RICO amendment and quotes Chairman Levitt's rationale). Clearly, the purpose of the PSLRA was not to leave legitimate victims without *any* remedy, but rather to find the *appropriate* statutory remedy depending upon the circumstance, i.e., either a private RICO suit, a private securities fraud suit, or, a public suit brought on behalf of victims by the SEC (in the case of offenders aiding and abetting

securities fraud). In Chairman Levitt's words, the ultimate goal remains the provision of adequate remedies: "[T]he securities laws provide adequate remedies for those injured by securities fraud, [therefore] it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." *Securities Litigation Reform Proposals S. 240, S. 667, and H.R. 1058: Hearings Before the Subcomm. on Securities of the S. Comm. on Banking, Housing, and Urban Affairs*, 104th Cong. 251 (1995) (statement of Arthur Levitt, Chairmen, SEC).

In light of the plain text of the statute, and considering the complete legislative history for context, this Court finds unpersuasive any construction of the word "actionable" that ignores whether the RICO plaintiff's injury was actionable as a securities action, either privately or via the SEC. In the end, judicially transforming the term "actionable" to become "actionable-by-anyone" would implicitly repeal RICO for legitimate claims and leave real victims without any of the remedies that Congress clearly intended to give them through the enactment of a carefully-designed framework of federal statutes.

This Court's analysis above raises another important point: whenever review of legislative history becomes necessary (and it need not here in light of the plain text), such review remains useful and legitimate only to the extent that courts consider such legislative history in its entirety. Stray partisan comments offer little in isolation and often lead courts upon a false path. Indeed, to the degree that

65

snippets of the legislative history (as cited by *MLSMK Investment* and other courts) conflict with the words of the statute itself, then the statute's plain text must prevail and ultimately define any interpretation of the law – here, the scope of the PSLRA's RICO exception. As so aptly explained in *In re Sinclair*, "[s]tatutes are law, not evidence of law" and thus, the text of the statute controls. 870 F.2d 1340, 1341, 1343 (7th Cir. 1989). Unlike the legislative history, which merely provides contextual background for the text, the statute must prevail:

> Which prevails in the event of conflict, the statute or its legislative history? The statute was enacted, the report just the staff's explanation. Congress votes on the text of the bill, and the President signed that text. Committee reports help courts understand the law, but . . . [if a committee] report contradicts rather than explains the text . . . [then] the statute must prevail.

*Id.* Accordingly, courts must distinguish between the proper and improper uses of legislative history and recognize the dangers of substituting the views of any individual legislator—like Representative Cox here—for the express language employed by Congress in enacting the statute. As the court in *Sinclair* observed, the clarity of the text will always depend upon context, which legislative history may illuminate, but the process must remain an objective one, because "the search is not for the contents of the authors' heads but for the rules of language they used." *Id.* at 1342; *see also* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 113 (Feb. 2010) ("To respect the deals that are inevitably struck along the way, the outcome of this complex process – the statutory text – must control").

### b)    Misconduct "in the Purchase/Sale of Securities"

Having determined the proper scope of the PSLRA amendment, the Court now must address whether Plaintiff's claims fall within that exception. Looking once again at the plain text, Congress' use of the words actionable "as fraud in the purchase or sale of securities" in the second clause controls this Court's analysis, because, under established rules of statutory construction, the revised version of § 1964(c) must be read in conjunction with the text of the securities laws. *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 990 (7th Cir. 2001) (stating the rule that "different acts which address the same subject matter, which is to say are *in pari materia*, should be read together such that the ambiguities in one may be resolved by reference to the other"). Here, the specific subset of misconduct "actionable" under § 10(b) is narrower than the universe of all misconduct merely "involving" securities fraud generally or otherwise involving securities in  the  background. From the plain language of the PSLRA amendment, therefore, the exception only applies if the "person" seeking relief for a RICO injury relies "upon any conduct" that would have been actionable "as fraud in the purchase or sale of securities."  18 U.S.C. § 1964(c).

The PSLRA's structure confirms this ordinary reading of the text. For example, in the "saving clause" of § 108 of the PSLRA, the statute states that the "amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the

Securities Act of 1933." Thus, the PSLRA exception to RICO draws upon a known and closed set of unlawful actions in defining its boundaries, rather than some amorphous standard broadly prohibiting any predicate activity merely involving mail or wire fraud in which some form of a security interest might otherwise appear. Certainly, since § 108 explicitly refers to enumerated statutory actions, this Court cannot read the RICO "securities" exception (contained in the immediately preceding provision (§ 107)) as creating some absolute preclusion of RICO for any securities-related conduct not otherwise actionable "as fraud in the purchase or sale of securities" under the securities laws.

Given this interpretative backdrop, the assessment of the preclusive effect of the RICO exception must be determined based upon whether the underlying conduct alleged by the person could constitute an actionable securities fraud claim under the 1933 and/or 1934 Acts. Here, Defendants' invocation of the RICO exception fails this test.

For an actionable securities fraud claim, § 10(b) of the Securities Exchange Act requires five elements: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) proximate causation of such loss. *AnchorBank*, 649 F.3d at 617; *In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 280 (7th Cir. 1996). To satisfy the "in connection with the purchase or sale of securities" requirement, the claim must allege a fraud or misrepresentation

68

"coinciding" with or "touching" upon the securities transaction itself. *United States v. Durham*, 766 F.3d 672, 681-82 (7th Cir. 2014) (internal quotations omitted).

In applying § 10(b)'s reach to specific conduct, the Supreme Court explains that the securities laws should be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotations omitted). To that point, the Supreme Court has observed that the executive branch generally adopts "a broad reading" of the phrase "in connection with the purchase or sale of any security" and, given the SEC's role in enforcing the Act, its view is "entitled to deference if it is reasonable" within the particular dispute faced by a court.[13] *Id.* at 819-20.

Using the appropriate standard, this Court finds that Plaintiff has not alleged an "actionable" securities claim, because nothing about the sale of his AUI stock itself was fraudulent in this case. By selling Plaintiff a bogus tax shelter plan, Defendants were attempting to hide the resulting income from Plaintiff's sale of stock from the IRS. In both form and substance, therefore, this case remains a case about tax shelter fraud, not securities fraud. The relevant misrepresentations concerned the legitimacy of Defendants' plan to avoid capital gains tax on the

---

[13] Based upon such controlling precedent (which states the requisite approach to the securities laws more precisely), and Congress' mandate to liberally construe RICO in light of its remedial purposes, Pub. L. No. 91-452, § 904(a), 84 Stat. 947, this Court finds unpersuasive the simplistic language in such cases as *Hollinger International, Inc. v. Hollinger Inc.*, No. 04-698, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004), which urges federal courts to "broadly" construe the RICO exception in an effort to dismiss any civil RICO claims whenever they are based upon mail or wire fraud. Although merely sweeping RICO cases out of court with a broad brush may be an objective for some defendants, the joint construction here of two federal statutes, in tandem, requires a more tailored analysis.

disposition of an asset, which—by happenstance—was the non-fraudulent sale of an interest in corporate shares. This same scheme could have been perpetrated in connection with the sale of any asset: a piece of real estate, a piece of art, or any other conceivable property interest that might incur capital gains. Hence, the Complaint fails to trigger any bar to RICO relief, because the conduct underlying Plaintiff's cause of action, per the statute itself, must first be "actionable" as a securities fraud case before it can trigger the PSLRA's RICO exception. Having a defendant simply point to some "securities" interest in the record is not enough to invoke the exception. Sand in the shoe does not a beach make.

In the absence of any guidance from the Seventh Circuit to the contrary, compelling cases from the Sixth and Ninth Circuits (plus decisions from this District), support this Court's plain reading of the PSLRA. All conclude that the PSLRA exception does not bar RICO claims, like the ones alleged here, if the fraudulent tax shelter scheme at issue only incidentally involved the underlying securities or securities transactions. *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783 (6th Cir. 2012); *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010); *Martinek v. Diaz*, No. 11-7190, 2012 WL 2953183 (N.D. Ill. July 18, 2012); *Moorehead v. Deutsche Bank AG*, No. 11-106, 2011 WL 4496221 (N.D. Ill. Sept. 26, 2011).

In *Rezner*, a taxpayer sued the firms that misled him with advice to take out loans to avoid taxes, a recommendation that turned out to be fraudulent. 630 F.3d

70

at 869. Although the taxpayer had pledged an interest in an account holding municipal bonds as collateral for the loans, that fact did not establish that the misrepresentation occurred "in connection with" a securities transaction. *Id.* at 872. The Ninth Circuit thus held that the taxpayer's RICO claim was not precluded by the PSLRA. *Id.* In reaching that holding, the Ninth Circuit emphasized that the taxpayer's losses did not flow from the pledge of the securities, or any misrepresentation about their value, and thus the securities at issue, like the ones here, were "merely a happenstance cog in the scheme." *Id.*

Likewise, in *Ouwinga*, the Sixth Circuit found that the PSLRA's RICO exception did not preclude RICO claims directed against a fraudulent tax avoidance scheme. There, the plaintiffs alleged RICO and fraud claims relating to the tax consequence of a tax shelter plan requiring the purchases of variable life insurance policies. Because it was "merely incidental" that the policies happened to be securities, the Sixth Circuit found that the RICO exception did not apply. The court then drew from a similar Southern District of New York decision that "articulated the distinction" well:

> Plaintiffs do not allege a securities fraud, but rather a tax fraud. There was nothing *per se* fraudulent from a securities standpoint about the financial mechanism and schemes used to generate the tax losses. While the alleged fraud could not have occurred without the sale of securities at the inflated basis (which created the artificial loss to offset Plaintiffs' major capital gains), it is inaccurate to suggest that the actual purchase and sale of securities were fraudulent. In actuality, the securities performed exactly as planned and marketed; it was the overall scheme that allegedly defrauded the Plaintiffs and Class Members. . . . This Court as well finds that the alleged fraud

71

here involved a tax scheme, with the securities transactions only incidental to any underlying fraud. Accordingly this Court will not apply the PSLRA bar to Plaintiffs' RICO claims.

694 F.3d at 791 (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458 n.9 (S.D.N.Y. 2009)).  This simple logic controls here.

The present case also mirrors the tax fraud scenario noted in *Moorehead*. 2011 WL 4496221. In that case, the plaintiffs sued the defendants for a fraudulent investment plan to avoid tax liability, known as an "Offshore Portfolio Investment Strategy." *Id.* at *1. When analyzing the defendants' PSLRA argument, the court emphasized that in their dealings with defendants, plaintiffs "were hoping to minimize the income tax consequences of sales of securities they had recently sold." *Id.* at *11. In response, the court noted that, if this were "the only role that securities played in the transactions at issue, the PSLRA would *not* bar plaintiffs' claims." *Id.* (emphasis added). Like the Sixth Circuit, the court in *Morehead* also relied on *Kottler*; and noted that the PSLRA would not apply because, "[f]ramed this way, the claims do not allege a securities fraud, but rather a tax fraud." *Id.* (quoting *Kottler*, 607 F. Supp. 2d at 458 n.9).

Ultimately, in *Moorehead*, the court barred the claim under the PSLRA, but only did so when, unlike here, the complaint included additional assertions alleging traditional securities fraud.  As emphasized in *Moorehead*, the complaint repeatedly alleged "that defendants made false and misleading representations about the securities transactions—not just regarding their tax effects, but also regarding their

profitability." *Id.* at *12. (noting that the alleged misrepresentations were about "both the investment results *and* the tax consequences") (emphasis added); *see also MJK Partners, LLC v. Husman*, 877 F. Supp. 2d 596, 606 (N.D. Ill. 2012) (applying the PSLRA bar and distinguishing cases in which, as here, "the primary thrust of the fraudulent scheme was unlawful tax avoidance").

Also instructive is *Martinek*. 2012 WL 2953183. In that case, the court dismissed a RICO claim under the PSLRA's RICO exception, but did so only because, unlike here, the plaintiffs "agreed to purchase" the securities at issue as a "result" of the defendants' fraudulent misrepresentations. *Id.* at *13. Although the plaintiffs sought to avoid the RICO exception by arguing that the misrepresentations did not go to the "value" of the securities *per se*, the court still found the bar applicable because it found a causal connection between the false statements and the decision to buy the securities themselves. *Id.* In the court's words, even though "the Seventh Circuit does not appear to have had occasion to speak on [the] scope of the RICO bar," the Ninth Circuit's approach is informative:

> [I]t interprets the requirement that the fraud be committed "in connection with" a securities transaction to mean that "a certain relationship [must] be established between the fraud and the transaction that resulted in the injury complained of."

*Id.* (citing *Renzer*, 630 F.3d at 871-72) (brackets in original).

Following this line of cases, the fraudulent tax scheme here was not "in connection with" the sale of AUI stock. Indeed, the sale of AUI stock possessed no causal connection to the tax shelter fraud. Thus, the RICO exception does not apply

73

because the tax fraud and the securities transactions alleged were "essentially independent events." *Ouwinga*, 694 F.3d at 791.[14]

## B.    Counts III to IX: Sufficiency of State Law Claims

As to the remaining counts of the Complaint, Defendants Seyfarth, Taylor, Northern, and Christiana all challenge the legal sufficiency of the Plaintiff's state law claims. Particularly troubling for Plaintiff is the potentially fatal time-bar of his state law claims raised by Defendants pursuant to 735 ILCS 5/12-214.3.

Yet, in light of this Court's dismissal of Counts I and II, this Court will defer ruling on the state law counts until, and if, Plaintiff can properly amend his complaint with viable RICO claims consistent with the requirements of Rule 11. If Plaintiff cannot plead viable RICO claims, then this Court may decline to exercise supplemental jurisdiction over his state law claims. *Wright v. Associated Insurance Cos. Inc.*, 29 F.3d 1244, 1251-52 (7th Cir. 1994). Indeed, the "general rule is that, when all federal-law claims are dismissed before trial," the pendent claims should be left to the state courts. *Id.* at 1252; 28 U.S.C. § 1367(c). The Seventh Circuit

---

[14] Unlike other cases applying the PSLRA's RICO exception, the tax shelter fraud alleged here could also never form the basis of an action by the SEC or any shareholders' class, because nothing about the securities transactions by themselves is "actionable" as securities fraud. *Bald Eagle Area School District*, 189 F.3d at 328 (noting that the SEC's complaint alleged the same scheme which "is at the heart of this RICO action"); *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 165 F. Supp. 2d 1345, 1356-57 (S.D. Fla. 2001) (in dismissing RICO claims under § 1964(c), the court compared the RICO action with a shareholder action to determine if the predicate acts were actionable as securities fraud); *In re Ikon Office Solutions, Inc. Securities Litigation*, 86 F. Supp. 2d 481, 486 (E.D. Pa. 2000) (same); *Tyrone Area School District v. Mid-State Bank & Trust Co.*, No. 98-881, 1999 WL 703729, at *4 (W.D. Pa. Feb. 9, 1999) (fact that the conduct involved in the scheme "is actionable under securities laws is evidenced by the SEC's commencement" of a public action for "violations of federal securities laws" based upon the same conduct alleged in the RICO claims).

also instructs that, in exercising its discretion, this Court should consider "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources," among other factors. *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994). When the matter becomes ripe here, this Court will consider the merits of Defendants' motions to dismiss the state law counts, and if necessary, all of the pertinent factors within its discretion regarding the possibility of exercising supplemental jurisdiction over those claims.

But for now, Defendants' motions to dismiss Counts III to IX of the Complaint are denied without prejudice, and the parties will be given leave to revisit the issues raised, if needed, at a later time.

### IV. Conclusion

For these reasons, Defendants' motions to dismiss [29] [31] [35] are granted in part and denied in part. Counts I (RICO) and II (RICO Conspiracy) are hereby dismissed without prejudice. This Court further lifts the current stay of discovery and grants Plaintiff leave to file an Amended Complaint properly re-alleging Counts I and II, provided he can do so consistent with his obligations under Rule 11. To the degree Defendants seek to dismiss Plaintiff's state law claims alleged in Counts III to IX, the requests are denied without prejudice, and the parties will be given leave to revisit the issues raised, if needed, at a later time.

This matter is set for a status hearing on 7/26/16, at 9:45 a.m. in Courtroom 1725. At the status heating, the parties should come prepared to discuss the timing

75

for the filing of any amended complaint, and the parties' positions regarding the possibility of seeking an immediate interlocutory appeal of this Court's order under 28 U.S.C. § 1292(b).

IT IS SO ORDERED

Dated: July 15, 2016

John Robert Blakey
United States District Judge