1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3
   STEVEN MENZIES                    )  Docket No. 15 C 03403
4                                    )
                    Plaintiff,       )  Chicago, Illinois
5                                    )  November 15, 2016
            v.                       )  9:01 a.m.
6                                    )
   SEYFARTH SHAW, LLP, GRAHAM        )
7  TAYLOR, NORTHERN TRUST            )
   CORPORATION and CHRISTIANA BANK   )
8  & TRUST COMPANY,                  )
                                     )
9                   Defendants.      )

10

              TRANSCRIPT OF PROCEEDINGS - Motion Hearing
11             BEFORE THE HONORABLE JOHN ROBERT BLAKEY

12

   APPEARANCES:
13

   For the Plaintiff:   HARRIS WINICK HARRIS, LLP, by
14                       MR. JEFFREY B. CHARKOW
                         333 West Wacker Drive
15                       Suite 2600
                         Chicago, IL 60606
16

17 For the Defendant Seyfarth Shaw, LLP, and Graham Taylor:

18                       PERKINS COIE, LLP, by
                         MR. MATTHEW J. GEHRINGER
19                       MS. BATES LARSON
                         131 South Dearborn Street
20                       Suite 1700
                         Chicago, IL 60603
21

22 For Defendant Northern Trust Corporation:

23                       NEAL GERBER & EISENBERG, LLP, by
                         MR. H. NICHOLAS BERBERIAN
24                       MR. KYLE D. RETTBERG
                         Two North LaSalle Street
25                       Suite 1700
                         Chicago, IL 60602

```
 1    APPEARANCES (Continued):

 2

      For Defendant Christiana Bank & Trust Company:
 3
                              SHOOK, HARDY & BACON, LLP, by
 4                            MS. AMY CHO
                              MR. PETER F. O'NEILL
 5                            111 South Wacker Drive
                              Chicago, IL 60606
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Court Reporter:        LISA H. BREITER, CSR, RMR, CRR
                              Official Court Reporter
21                            219 S. Dearborn Street, Room 1728
                              Chicago, IL 60604
22                            (312) 818-6683
                              lisa_breiter@ilnd.uscourts.gov
23

24

25
```

1          (In open court.)

2               THE CLERK:  15 C 3403, Menzies vs. Seyfarth Shaw, LLP.

3               THE COURT:  Good morning.  Appearances, please.

4               MR. CHARKOW:  Jeff Charkow on behalf of the plaintiff,

5     your Honor.

6               MS. CHO:  Amy Cho and Peter O'Neill on behalf of

7     Christiana.

8               MS. LARSON:  Good morning, your Honor.  Bates Larson

9     on behalf of defendants Seyfarth Shaw and Graham Taylor.  I'm

10    expecting my partner, Mr. Gehringer, as well.

11              THE COURT:  Please try to find the microphone.  It

12    makes it easier.

13              MR. BERBERIAN:  Good morning, your Honor.  Nick

14    Berberian and Kyle Rettberg on behalf of Northern Trust.

15              THE COURT:  How are you?  If we still have one

16    attorney trying to get through security, do you mind if we pass

17    the case?

18              MR. CHARKOW:  No objection, your Honor.

19              THE COURT:  All right.  Thank you, everybody.

20              MS. LARSON:  Thank you, your Honor.

21         (The Court attends to other matters.)

22              THE CLERK:  15 C 3403, Menzies vs. Seyfarth Shaw, LLP.

23              MR. CHARKOW:  Good morning, your Honor.  Jeff Charkow

24    on behalf of the plaintiff.

25              MS. CHO:  Amy Cho on behalf of Christiana.

1    MR. O'NEILL:  Peter O'Neill on behalf of Christiana.

2    MR. GEHRINGER:  Good morning, your Honor.  Matt

3 Gehringer for Seyfarth Shaw and Graham Taylor.

4    MR. BERBERIAN:  Good morning, your Honor.  Nick

5 Berberian and Kyle Rettberg on behalf of Northern Trust.

6    THE COURT:  Okay.  We have three motions up today.  Do

7 the parties want to argue those?  And then I know they've all

8 been fully briefed and the Court's aware of it.  But do you

9 want to argue your motions?

10    MR. CHARKOW:  They've all been fully briefed.  There's

11 some overlapping issues.  I mean, how does your Honor want to

12 handle this?

13    THE COURT:  Well, let me start with my standard

14 question.  What's the status of the motions?  Has there been

15 any movement since it was fully briefed?

16    MR. CHARKOW:  I think there has been movement insofar

17 as we've now gotten the production from all the defendants of

18 the documents related to Mr. Ferenc, who was also invested in a

19 similar tax shelter at the same time as Mr. Menzies, and that

20 issue has been resolved.

21    I don't believe -- and I'm sure the team over here

22 will correct me if I'm wrong.  I don't think we've resolved the

23 scope of defendants' involvement in other tax shelters or the

24 confidentiality and the privilege issues that have been raised

25 by the other --

1        THE COURT:  Well, it's your motions or your motion.

2   So why don't you argue those three, and then I'll hear the

3   response and then everyone will have a chance to respond to

4   what everyone else is saying.

5        MR. CHARKOW:  Certainly, your Honor.  I think that

6   what we have, as alleged in our complaint, and based on the

7   information set forth in our briefs related to the discovery

8   we've gotten since that time, is the existence of an enterprise

9   and some continuity involving the players here.

10       And the issue is whether evidence of their involvement

11  in other tax shelters is relevant to the issues in this

12  lawsuit, to cut through some of the language here that's been

13  tossed about back and forth.

14       I think that we've set forth that, for example, with

15  Christiana, they had been involved in another substantially

16  similar transaction in which they base the documents on this

17  transaction.  The correspondence between Christiana and Euram

18  Bank shows that they'd engaged in these sort of transactions

19  before, the same tax shelter.

20       They used the documents at issue for the basis for

21  Mr. Menzies' transaction.  I believe Mr. Ferenc's, too, since

22  they were similar to each other.  We know that this was a tax

23  shelter that was marketed broadly.  We have received a white

24  paper describing in a seven- or eight-page document the details

25  of this transaction, which shows that it was instituted for

1    other investors.  Yet we have not received any information or

2    complete discovery responses to, for example, Christiana's

3    involvement in what appear by all accounts to be substantially

4    similar tax shelters involving at least two of the

5    co-conspirators in this case.

6         The evidence in general of defendants' involvement in

7    other tax shelters is relevant under Federal Rule of Evidence

8    404(b)(2), which is really an exception to the rule, to show

9    the background of this transaction in question, to show the

10   motive, opportunity, intent and absence of mistake in executing

11   the two tax shelters for Mr. Menzies and for Mr. Ferenc.

12        In addition, I think the evidence goes to establish

13   the continuity of this enterprise.  Not all of the members need

14   to be involved in every transaction in order for the

15   information to be relevant to prove specifically the continuity

16   element.  And I don't think there's really any question, to the

17   extent that we were to survive, that defendants' other

18   involvement in tax shelters would be relevant under Rule 404.

19        In terms of the privilege and confidentiality thing,

20   that really needs to be addressed separately, I think.  Because

21   as to Northern Trust and Christiana, there's a separate

22   argument than there is with respect to Seyfarth.

23        With respect to all of them, what we've asked for is

24   their involvement in fraudulent tax shelters defined

25   consistently with the IRS regulations.  This is not the sort of

1    investment where customers are determined to have protection of

2    confidentiality.  Given the very nature of the agreement, I

3    think that's set forth in the Seventh Circuit cases very

4    clearly.

5            With respect to Seyfarth, obviously those same

6    arguments apply.  But even if the Court were to find that

7    there's a higher standard to apply to the attorney, they can

8    provide substantive responses without identifying the

9    individual -- the individuals that were involved and can

10   provide substantive responses either redacting or using John

11   Does or some other description that will allow them to provide

12   the information.

13           With regard to Seyfarth, we have an actor that was

14   involved in more than 10 years of criminal conduct, which he

15   testified to exclusively.  The idea that this range of conduct

16   is not relevant to our lawsuit, I think, just strains

17   credibility.

18           The IRS certainly found it relevant when they audited

19   Mr. Menzies in 2012, that the person that had issued the legal

20   opinion had spent time in federal prison regarding other tax

21   frauds.  And that's why we think the information is relevant,

22   we think can be provided consistent with the protection

23   provided under the confidentiality order in this case and

24   should be produced.

25           THE COURT:  Who wants to go first?

1          MR. GEHRIGER:  Your Honor, Matt Gehringer on behalf of

2     Seyfarth and Graham Taylor.  A couple of things here.  In terms

3     of what we have done, we have produced to him all of the

4     documents we have regarding the Menzies transactions and all

5     those things.

6          There's another guy by the name of Ferenc, who we

7     mentioned earlier, who was actually the co-founder of Applied

8     Underwriting, Inc., with Mr. Menzies.  So he participated in

9     all the meetings together with Mr. Menzies, with Northern, with

10    Euram, with Seyfarth Shaw and effectively was doing the same

11    thing at the same time with him.  And Mr. Ferenc has now -- we

12    have produced all those documents.

13         We have also produced anything to him or in this case

14    have told him that we are not aware of any other substantially

15    similar transactions with respect to anyone else that involve

16    members of the enterprise.  So we have, in fact --

17         THE COURT:  Wait.  When you say members of the

18    enterprise, do you mean all of them or individually or

19    collectively?

20         MR. GEHRIGER:  I do mean -- I do mean the enterprise

21    that he alleged, so yes, all of them, but not all -- the way he

22    alleged it in the complaint, it included a bunch of individuals

23    included within the enterprise.  We did not include those.  We

24    only included the entities, so that we didn't, you know, overly

25    limit this.

1          THE COURT:  Well, obviously an enterprise, especially

2    an association of fact in terms of the life of the enterprise,

3    the membership can change.

4          So in determining which documents were responsive, did

5    you only include those documents in which all of the alleged

6    enterprise participants were involved, or did you include any

7    other relevant tax shelters where some, but not all of the

8    alleged enterprise members were involved?

9          MR. GEHRIGER:  We restricted it to the substantially

10   similar transactions, the tax shelter, if you want to call it,

11   and to all members of the enterprise.

12         THE COURT:  Okay.  All right.  Go ahead.  I

13   interrupted you.  I'm sorry.

14         MR. GEHRIGER:  That's all right.

15         The one thing that's clear from the documents that

16   have been produced so far is that Euram, who is not here as a

17   defendant, designed this tax strategy.  That's who designed it.

18         The white paper that he refers to that was produced in

19   this case, that's a white paper that Mr. Ferenc and Mr. Menzies

20   had in 2006 after these transactions.  But they sent it to

21   Graham Taylor at Seyfarth Shaw and said here are the documents

22   that Pali Capital, which was a Euram entity, have produced to

23   the IRS, and they sent it to us.

24         So this idea that we found out that there's a white

25   paper, they had that from the inception because they sent it to

1    us from 2006.  But in any event, what's clear is that other

2    than the Menzies and Ferenc tax strategies here, tax shelters

3    here, there are none other that these members of the enterprise

4    and Seyfarth or Taylor participated in that are substantially

5    similar to this one.

6              And in terms of the other tax shelters -- because I

7    think this is -- it's extremely important.  Because he

8    essentially has found nothing to support the allegations of the

9    enterprise which he has alleged, what he's trying to do is lump

10   all the tax shelters together as some homogenous mass and seek

11   all discovery over an 11-year period regardless of any

12   similarity to the Menzies tax shelter and regardless of the

13   connection to the alleged members of the enterprise.  That does

14   not meet either the relevance or the proportionality standard

15   under Rule 26.

16             For example, Judge, to give just an idea, he has not

17   asked only for illegal tax shelters or illegitimate tax

18   shelters.  He asked for us to produce information on any

19   reportable transaction in which we had any involvement in any

20   capacity.  That's wildly overbroad and not relevant, and I'll

21   tell you why.

22             There's no way to answer that, first of all, from our

23   perspective without reviewing every transaction over 11 years

24   of 850 lawyers.  Because you may be involved in a transaction.

25   Whether you're the one doing the tax portion or not the tax

1    portion, you may be involved in that.

2         But more importantly, what would it find?  Reportable

3    under the IRS code, it does not mean illegal.  It doesn't mean

4    illegitimate.  There are a bunch of different types of

5    transactions, four different types, that include confidential

6    transactions, transactions with contractual protection, loss

7    transactions of five different categories and transaction of

8    interest.

9         But probably most important, Judge, when you look at

10   the CFR that he cited to us as defining reportable

11   transactions, the very first section, subsection A, says, "The

12   fact that a transaction is a reportable transaction shall not

13   affect the legal determination of whether the taxpayer's

14   treatment of the transaction is proper."

15        So these are not illegitimate tax shelters.  They're

16   not anything.  What they are is transactions that the IRS has

17   interest in, that they want to look at and know about.  And so

18   they put a requirement out on the taxpayer to actually disclose

19   them when they filed them on their tax returns.  But it doesn't

20   say anything about them being part of a predicate act or an

21   illegal or illegitimate thing.

22        So what are we actually doing here?  I mean, it seems

23   like we're taking reportable transaction, and we're going to

24   just wipe away the burden on Seyfarth and these other banks,

25   which are going to be in a similar position, and the rights of

1    third-party clients who have no connection whatsoever to this

2    lawsuit, and somehow force Seyfarth and these other people to

3    disclose a bunch of transactions that have no relationship to

4    this transaction either in substantial similarity or in the

5    members of the enterprise.

6            And what are we going to do with the information if we

7    disclose it?  How can plaintiff make allegations or tie the

8    Menzies case into these others without knowing was it an

9    illegal tax shelter or abusive?

10           Was the client involved taken for a ride, or were they

11   completely in pari delicto if it was a bad transaction?  Was

12   the client -- was there any predicate act involved under RICO?

13   Is there any commonality involved between the tax shelter and

14   the enterprise or the similarity of the tax shelter?

15           So the same problem exists with the concept of, oh,

16   yeah, produce every tax shelter with which you've had any

17   involvement at any time.  You know, tax shelter is not in and

18   of itself illegal, and that's why his analogy that he uses in

19   the papers to the drugs and saying, well, it's like saying,

20   well, if you sold heroin, then I don't have to produce things

21   if I was selling cocaine.

22           Well, no, because every one of those drug sales is

23   illegal, and they're all potentially predicate acts under RICO.

24   And the tax shelters or reportable transactions are not that.

25   And the drug analogy also doesn't work because it's usually in

1    the affairs of the enterprise, and he's ignoring that as well.

2         So, Judge, in your opinion on July 15th, page 30, you

3    said, "Of course, under Section 1962(c), the pattern must also

4    be in the affairs of the enterprise.  If not, liability will

5    not obtain."  So if there's no connection to the enterprise,

6    there's no reason to discover this and certainly not to

7    discover it at this stage of the proceedings where he hasn't

8    stated a viable claim yet and where all the claims against my

9    client are barred.

10        The same thing you properly cited U.S. vs. Starell

11   (sic).  "The pattern must regularly utilize the facilities or

12   structure of the enterprise or otherwise have an effect upon

13   the common affairs of the enterprise."

14        So the enterprise is important.  I understand we may

15   disagree with respect to whether it's all members or some

16   members, but to just say every tax shelter or every reportable

17   transaction in which we were involved for an 11-year period

18   somehow now is going to be subject to the discovery when the

19   burden of that is incredible, the relevance is zero, just does

20   not make sense, Judge.

21        We cited a lot of cases to you and won't go through

22   them all here, but he didn't cite a single case to suggest that

23   unrelated bad acts are somehow relevant to pattern and even if

24   they aren't related to the enterprise.

25        So at this stage of the proceedings, Judge, I think

1   allowing plaintiff discovery, that broad-base discovery he's

2   talking about makes no sense and should not be allowed because

3   to allow far afield discovery with no clear relevance, no

4   relationship to the affairs of the enterprise, an incredible

5   burden on third parties and an incredible burden on the parties

6   themselves is neither relevant nor proportional to the needs of

7   the case.

8           Mr. Taylor, he's several times referred to him.

9   Number one, he didn't spend time in prison.  That's not true.

10  But he was convicted for tax fraud.  He pled guilty to tax

11  fraud related to something done in 1999, two law firms before

12  he got to Seyfarth Shaw.  And none of -- he has not shown to

13  this day any relevance between that and what went on here.

14          He's got the transcript available to him from

15  Mr. Taylor's testimony, as he cited to the Court, and there's

16  still no way to show any relevance between those two.  So just

17  dropping out the fact that Mr. Taylor was convicted of tax

18  fraud does not somehow create the ability to discover

19  everything under the sun.

20          THE COURT:  Can you address the privilege issue?

21          MR. GEHRIGER:  Yes.  Our point there, Judge, is that

22  what he's asked for is tell us whether you were involved in any

23  capacity in a reportable transaction or tax shelters or -- I'm

24  trying to remember the other thing.

25          But the Seventh Circuit is clear that if you're

1    involved -- if you have to disclose the identity of a client,

2    and the identity of the client would, in fact, reveal why the

3    client sought your advice, which is exactly what responding to

4    that interrogatory would do, you can't do that.  And that's

5    exactly what we'd be doing here, Judge.

6         The cases he has cited, both of them, involve

7    situations where the IRS has brought either lawsuits or

8    subpoenas to BDO Seidman, to Sidley & Austin.  And in those

9    cases, they were involving reportable transactions.  And they

10   said vis-a-vis the IRS, the client has no expectation of

11   confidentiality because those things by law have to be reported

12   to the IRS.  But they are not reported to the world.  They are

13   reported to the IRS.

14        So they may have no expectation of confidentiality to

15   the IRS, but I don't believe that all the clients who may have

16   consulted Seyfarth Shaw between 2000 and 2010 had no

17   expectation of confidentiality with respect to this kind of

18   lawsuit.  So I don't think the attorney/client privilege goes

19   away.

20        THE COURT:  Okay.

21        MS. CHO:  Do you want a reply?

22        THE COURT:  I think we should have each of the

23   defendants address, and then he can collectively respond.

24        MS. CHO:  Okay.  I don't want to repeat a lot of the

25   things that were said.  But just to give you some background on

1    Christiana-specific issues.  Christiana was asked by Euram to

2    be a trustee for trusts that were set up by Mr. Menzies.  And I

3    don't think anyone disputes, from our review of the documents

4    and other parties' documents, Euram was the party that was

5    driving the bus.  And in this stage, plaintiff could have

6    subpoenaed Euram, but it didn't.

7            And from where Christiana stands, we've produced

8    everything that is substantially related to the tax shelters at

9    hand.  To be specific, we've produced documents, all documents

10   dealing with Mr. Menzies.  And there was one other party that

11   everyone agrees entered into a substantially similar

12   transaction involving the alleged enterprise, and that was

13   Mr. Ferenc.

14           And once we received consent from Mr. Ferenc to

15   produce those documents, we produced those documents.  We are

16   not aware of any substantially similar -- another substantially

17   similar transaction.

18           Now, Mr. Menzies confuses this issue and says there

19   are documents that reference a similar transaction.  They

20   reference a similar trust.  Now, Christiana was involved in

21   setting up similar trusts that were referred to by Euram, and

22   those documents were produced.  I'm sorry, references to those

23   documents were produced.  But just because they reference a

24   similar trust doesn't mean that they relate anything to do with

25   the substantially similar transaction.

1    The other issue Menzies argues is that it is entitled

2    to any document related to Euram.  And a number of documents

3    referenced Euram because Christiana used Euram as an investment

4    manager of common funds that were invested primarily in foreign

5    investments.  Now, similarly, just because Euram may have been

6    involved in a financial transaction does not make the details

7    of that transaction discoverable for the purposes of this case,

8    does not mean that anything related to Euram related to a tax

9    shelter in any way.

10    I believe a lot of the other issues raised in

11    plaintiff's motion are moot.  Christiana has produced a

12    privilege log last week, and last night it produced a redaction

13    log and reproduced images that were previously redacted that

14    included Mr. Ferenc's name.  But now that we have consent, we

15    have produced those documents.

16    And in short, we're just not aware of any other

17    substantially similar tax shelter.

18    THE COURT:  Can you address whether or not you've

19    limited your production to substantially similar tax structures

20    involving all of the alleged members of the enterprise or

21    collectively or severably any individual or combination of

22    individual members of the enterprise.

23    MS. CHO:  We have preserved our objection, but we're

24    not aware -- we're not withholding any documents related to any

25    substantially similar tax shelter related to this enterprise or

1    not.

2        THE COURT:  So assume that instead of having all the

3    members of the enterprise involved in a substantially similar

4    transaction, there was one or just two as opposed to all three

5    or four members of the enterprise.  You are not aware of any

6    document that you are withholding that would fall within that

7    category; is that correct?

8        MS. CHO:  We're not aware of any -- we're not aware of

9    any documents, but we have preserved our objections to that

10   point.

11       THE COURT:  Okay.

12       MS. CHO:  Thank you.

13       THE COURT:  Thank you.

14       MR. BERBERIAN:  Good morning, your Honor.

15       THE COURT:  Good morning.

16       MR. BERBERIAN:  Nick Berberian and Kyle Rettberg again

17   on behalf of Northern Trust.

18       Your Honor, this is what we did.  There are three

19   individuals that the plaintiff alleges in his complaint are

20   individual Northern Trust conspirators.  They are not named as

21   defendants, but they are named within the body of the

22   complaint.

23       And these are senior people, your Honor.  They're no

24   longer at Northern Trust.  But it's Thomas Hines, who was the

25   national director of the financial consulting group; Mark

1    Harbour, who was head of the western region; and Michael

2    Niemann, who had primary contact with this particular

3    plaintiff.

4        We submitted -- not only documents, we submitted

5    affidavits on behalf of these three individuals, your Honor.

6    And what do those affidavits and documents show?  And the

7    document search we did, your Honor, was over 11 different

8    custodians, these three professionals who worked with them they

9    reported to, were responsible for.  We gave them the search

10   terms we utilized.

11       And the broad base of all of that disclosed the

12   following:  One, Northern Trust never itself created or

13   designed tax shelters.  It's not in that business, never has

14   been in that business.  So there's no central file that we can

15   go to and pull out tax shelters, all right.

16       In part of the financial consulting services that were

17   provided to individuals, they would from time to time refer

18   them to entities, if there was an interest in engaging in such

19   transactions, legitimate tax planning.  Euram was one of them.

20       Northern didn't receive any type of fee.  It was

21   something that was solely a referral.  The only persons that

22   they can identify that were referred for this transaction were

23   Mr. Menzies and Mr. Ferenc.  Mr. Ferenc apparently unwound it,

24   but those are the only two.

25       But here's more important, your Honor, and this goes

1   to your question.  We did not limit it to members of the

2   enterprise.  We submitted affidavits from these individuals,

3   and our document search has revealed that on the basis of those

4   searches, that we have no record of any other substantially

5   similar tax shelter.

6            These individuals are not aware of any.  Our search

7   didn't produce any.  They also went on to say that they never

8   had any type of ongoing relationship with either Seyfarth or

9   Christianity -- or Christiana Bank.

10           So those were the scopes of our search.  Your Honor's

11  order was, to determine the discovery that plaintiff wanted,

12  was how broadly defendants marketed the tax shelter issue.

13  Your order specifically referenced the representation that was

14  made by an oral argument that, quote, discovery might uncover

15  other sales by defendants of the purportedly abusive tax plan

16  to other victims.

17           We've searched extensively.  There is no evidence of

18  marketing this tax shelter to anyone else.  And more

19  importantly, on behalf of all the individuals that were

20  involved in these particular transactions, including very

21  senior people at Northern, and on the basis of the email

22  search, there is no evidence that we have found of any other

23  substantially similar tax shelters, whether they involve other

24  members of the enterprise or not.

25           If the defendant's not  -- if the plaintiff's not

1    happy with that, they want us to come back and do a search that

2    is impossible to conduct.  They want us to do a search over a

3    decade starting in 2000, over 16 years ago, of any transaction

4    with thousands of customers that somehow Northern may have

5    touched that may have involved some tax shelter of some ilk,

6    whether it was legitimate or not legitimate.

7            So, your Honor, there's simply no way that kind of

8    search could reasonably be conducted, and it wouldn't provide

9    any relevant evidence with respect to whether this particular

10   tax shelter, which is what is alleged here, was marketed to

11   anyone else.

12           This was simply not the business that Northern was

13   involved in.  It was simply a referral.  In this type of a

14   situation, a referral without a fee.  And we have conducted an

15   enormous search to determine that there was nothing else either

16   with respect to Mr. Menzies or Mr. Ferenc on this particular

17   tax shelter.  And all of the individuals that were involved had

18   no recollection whatsoever of anything that was substantially

19   similar.

20           Under the Illinois Banking Act, if we, Northern, are

21   required to produce documents relating to any other customer,

22   we have to provide them prior notice under the act.  We found

23   no other documents that required us to provide such notice.  So

24   we're not withholding any documents in that -- under that

25   statute once we got Mr. Ferenc's consent to release his.  So I

1    don't want there to be any confusion there.

2            But what is clear is that there can be no

3    justification under the proportionality test for this enormous

4    search to cover thousands of customers over a 10-year period

5    for tax shelters that may or may not exist.  Thank you, your

6    Honor.

7            THE COURT:  Do you want to respond to any of that,

8    Counsel?

9            MR. CHARKOW:  Your Honor, just briefly.  I mean, this

10   has obviously been -- there's a lot more information in the

11   briefs, which I'm sure you've read.

12           We are not looking for run-of-the-mill tax advice.

13   We've said that to defendants over and over and over again.  We

14   are only looking for abusive tax shelters.  If they look at a

15   tax shelter and don't believe it's abusive, then that certainly

16   would be something that they can see.  But the idea that a

17   reportable transaction is not a per se fraudulent or abusive

18   tax shelter is just not the case.

19           So we have narrowed the request to specific financial

20   arrangements that the IRS has found to be presumptively

21   fraudulent.  It's possible, for example, for years people

22   challenged the Son of BOSS transaction that it could be

23   justified under the tax -- under the tax code.  There were a

24   couple cases that found it, and then there were 78 cases that

25   rejected it.

1     So it is possible that somebody could argue that an

2     individual tax shelter is not fraudulent or abusive.  But what

3     we've done is created a definition and parameters that describe

4     per se fraudulent tax shelters that we think are directly

5     relevant.

6     A couple things here.  It was said earlier that we

7     could have subpoenaed Euram.  Euram is an Austrian-based bank

8     that presently, as far as we can tell, does not have any

9     presence in the United States.  Pali Capital, its operating

10    branch in the United States, has been dissolved in a

11    bankruptcy.

12    We are unaware of any way to receive documents

13    pursuant to -- against them other than some sort of

14    international thing.  It's not entirely clear that they're even

15    a member of the Geneva Convention -- not the Geneva Convention,

16    the appropriate protocol, or that we could even get them, which

17    is why we haven't asked directly for documents from Euram.

18    We don't dispute that Euram designed this tax shelter

19    based on the information that we've had, but it is also pretty

20    clear that Christiana was involved in at least these two

21    transactions plus one other.

22    Not only did they base the trust document on that, and

23    the idea that this is just some unrelated transaction just

24    strains credibility, but when they entered into the subsequent

25    acts to transfer assets in and out of the trust documents, they

1    also referenced that it was similar to another transaction that

2    had involved Euram and Christiana Bank.

3            So based on the documents they have submitted to us,

4    even with redactions from other clients, they were involved in

5    another substantially similar transaction.  And given there's

6    apparently some ambiguity on substantially similar, that's why

7    we had to broaden the definition to include other tax shelters

8    because it seems that they're making distinctions on these tax

9    shelters that are simply not material in terms of what is

10   the -- what is the enterprise at issue here.

11           Just quickly, with regard to Northern Trust, Northern

12   Trust did not say they didn't have any involvement.  They said

13   that they did not recall that they had any involvement, number

14   one.

15           And number two, one of the three witnesses, in fact,

16   said that they had other transactions involving Euram.  Euram

17   is one of the major players in the tax shelter industry at this

18   time, and the idea that they had other investment opportunities

19   with Euram certainly suggests that they did have involvement in

20   another tax shelter.

21           And finally, a very minor issue.  Seyfarth Shaw may

22   have 850 lawyers.  They don't have 850 lawyers practicing tax

23   law, number one.

24           Number two, to the extent that any one of these

25   defendants is involved in a reportable transaction, I find it

1    hard to believe that their legal departments or other sources

2    of information wouldn't reveal that.  And simply hiding behind

3    the idea that it's for a 10-year period involving this sort of

4    issue I think is avoiding the fundamental issues.

5                THE COURT:  Anything further on behalf of any party?

6                MR. GEHRIGER:  Judge, the statement just there that

7    reportable transactions are per se presumptively fraudulent,

8    that could not be less right.  I spoke directly from the CFR

9    that the fact that a transaction is reportable does not affect

10   the legal determination of whether a taxpayer's treatment was

11   improper.

12               Included within reportable transactions are five

13   different types of loss transactions, 10 million in any single

14   taxable year or 20 million in any combination of taxable years

15   by corporations.  That's it.

16               That is not in any way, shape or form something that

17   is going to be presumptively fraudulent.  And there are five

18   others just like that, Judge, that are just loss transactions.

19   So this idea that reportable transactions are presumptively

20   fraudulent or presumptively problem transactions, it just is

21   not correct, Judge.  It's not true.

22           (Counsel conferring.)

23               THE COURT:  You can talk, too.  You don't have to

24   whisper.  I'm happy to hear from you, Counsel, directly if you

25   want.

1      MR. GEHRIGER:  Absolutely.

2      MS. LARSON:  The additional point I was going make,

3  your Honor, is that with respect to the definition of

4  substantially similar, to the extent that the plaintiffs are

5  using our objection to that definition as grounds to expand the

6  scope of this vastly beyond anything that there's a

7  relationship to the Menzies -- what he's defined as the Menzies

8  tax shelter.

9      With respect to Seyfarth and Taylor, our objection to

10  that term was that it was circular.  It said substantially

11  similar means the same or similar.  We objected, clarified what

12  we were saying and said we were responding with respect to

13  transactions that were substantially similar to the Menzies --

14  to the Menzies tax shelter as it was defined.

15      There was a circularity that was easily removed, and

16  we removed it and used that definition for substantially

17  similar.  It's not a justification for broadening this to every

18  conceivable reportable transaction.

19      THE COURT:  I'll give you a chance, whatever you need

20  to say.

21      Do the defendants have any intrinsic objection to that

22  phrase "substantially similar" in terms of it being too vague

23  to respond?  I know -- I'm not addressing tax shelters being

24  too broad or reportable too broad, just the phrase

25  "substantially similar."  Do the parties have any trouble

1    figuring out what that means?

2             MR. GEHRIGER:  Well, Judge, we did and partly because

3    he also included another definition, a grantor trust, grantor

4    remainder reversionary trust with substituted assets.

5             And, you know, when he was talking about a transaction

6    like that, I mean, we said we were going to respond on those as

7    well.  Now, I know the banks may have different issues with

8    those because I think they see a lot of that, but it has

9    nothing to do with tax shelters.

10            So we didn't have any problem with substantially

11   similar, and we were not trying to say it had to be this tax

12   shelter, the Menzies tax shelter.  It had to be one that --

13            THE COURT:  What about the other --

14            MR. GEHRIGER:  -- that works the same way.

15            THE COURT:  -- defendant?  The phrase "substantially

16   similar," do I have to worry about you having trouble with that

17   phrase?

18            MR. BERBERIAN:  On behalf of Northern Trust, your

19   Honor, we had no problem with that phrase.

20            THE COURT:  Okay.

21            MR. GEHRIGER:  We can live with it as well, Judge.  No

22   problem.

23            THE COURT:  How about you?

24            MS. CHO:  Same with Christiana.

25            THE COURT:  Okay, great.  I interrupted you.  You were

1       going to say something.

2               MR. BERBERIAN:  No, your Honor.  I was just going to

3       add -- thank you, your Honor.  This notion that we can easily

4       identify reportable transactions, Northern Trust is not in this

5       business.  The people that had responsibilities for reportable

6       transactions or, quote-unquote, material advisers --

7               THE COURT:  You got to slow down a little bit,

8       Counsel.

9               MR. BERBERIAN:  Thank you.  Who get paid a fee for

10      that business.  So we check.  So we don't have any way of

11      identifying that other than a Herculean task of trying to find

12      out whether over a decade, the thousands of customers that

13      Northern Trust services may have been engaged in a reportable

14      transaction with someone else.  We just don't have any way of

15      doing that.  We searched for that.

16              And we also -- your Honor, it's not only on the basis

17      of the recollections of three affidavits of people that they

18      allege -- and they're not happy with being alleged -- as being

19      individual Northern Trust conspirators under RICO, but our

20      email search revealed the same thing.

21              Whether it was with Euram or anybody else, anything we

22      turned up did not produce any tax shelter that was

23      substantially similar to this one.  Thank you, your Honor.

24              THE COURT:  All right.  Anything further on behalf of

25      anybody?

1          MS. CHO:  Just one issue regarding this other

2     transaction involving Euram.  It didn't have to do with any of

3     the other individuals in the enterprise.  As I had mentioned

4     before, it was similar to the trust, but not similar to the

5     transaction.

6          And frankly, we have no problem producing documents

7     related to that trust so long as we get consent from that

8     client or the Court orders us to under the Illinois Banking

9     Act.  I don't think it's relevant and I don't think it's

10    problematic.  But if plaintiff wants information related to

11    that third transaction or that third trust, that's fine.

12          THE COURT:  Okay.  Anything else?

13          MR. CHARKOW:  It's referenced at two separate times,

14    your Honor.  And because of the redactions, I can't tell

15    whether it's the same transaction or not.  So anyway, that's

16    where we're --

17          THE COURT:  Well, you guys can meet and confer on

18    that.  It sounds like you guys are close to figuring that out.

19          Okay.  Anything further on behalf of any party?

20          Okay.  Based on the representation of the parties, it

21    might seem that it may ultimately appear that some of the

22    parties are actually in compliance with the Court -- with the

23    order that the Court's going to enter.

24          I'm going to grant in part and deny in part all three

25    motions to compel, which is Docket Entry 70, 73 and 76.  I'm

1    not going to require production of tax shelters or reportable

2    transactions.  That's too broad and not proportional under the

3    applicable rules.

4              However, substantially similar tax shelter schemes

5    will be produced.  And as you've indicated, it seems like the

6    parties might be in compliance with that.  But I'm not going to

7    limit it to those tax shelter schemes involving all of the

8    members of the enterprise.  It must include any member of the

9    enterprise.

10             Because the change -- the association, in fact,

11   obviously can include membership that changes over time, and I

12   believe it's proportional and appropriate.  Because, of course,

13   we're talking about what's discoverable, not necessarily what's

14   admissible.

15             So substantially similar tax shelter schemes,

16   including the members of the enterprise or any or all

17   individual members, either a subset or an individual or all of

18   them need to be produced.

19             All of those are going to be produced subject to

20   whatever privilege log or confidentiality orders the parties

21   want to work out.  I am ordering it, so you do have the benefit

22   of a Court order in terms of some of your statutory compliance

23   issues.  So you have the benefit of that.

24             But if there's additional privilege log that becomes

25   necessary or the parties want to enter into an agreed

1    confidentiality order, that's pretty routine, and you can take

2    a look at my standing orders to see how to proceed forward with

3    that, if it's necessary.

4            Is there anything else the parties need to address

5    today in light of the Court's ruling?

6            MR. CHARKOW:  I guess a time frame, and then I believe

7    the next step would be our amending our complaint, your Honor.

8    So just to identify that, or if you'd like us to come back for

9    a status.

10           THE COURT:  How long do the parties propose for

11   another status?

12           He's obviously going to need to digest discovery

13   depending -- I don't know how much additional discovery that my

14   order's going to produce, but let's assume it produces some.

15   He's going to need time to digest that before amending the

16   complaint.  So how long do you think?

17           MR. GEHRIGER:  Only because Thanksgiving is there,

18   Judge, can we have 21 days?

19           THE COURT:  How about 30?  Gloria, give me a date

20   about 30 days out depending as long as that doesn't put us

21   right in the heart of -- what's that look like?

22           THE CLERK:  We can do Wednesday, December 14th at

23   10:00 a.m.

24           THE COURT:  Is that good?  Is December 14th good for

25   the parties?  That's kind of like in between the two holidays.

1              What time, Gloria?

2              THE CLERK:  At 10:00 a.m. Judge.

3              THE COURT:  10:00 a.m.  All right.  I'll see you all

4    then.   Take care.

5              MR. GEHRIGER:  Thank you, your Honor.

6              MR. BERBERIAN:  Thank you, your Honor.

7         (Concluded at 9:47 a.m.)

8                     * * * * * * * * *

9                   C E R T I F I C A T E

10        I certify that the foregoing is a correct transcript of the

11   record of proceedings in the above-entitled matter.

12

13   */s/ LISA H. BREITER*                    *November 21, 2016*
     LISA H. BREITER, CSR, RMR, CRR
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25