**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN MENZIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No: 15-CV-03403 |
| | ) | |
| SEYFARTH SHAW LLP, GRAHAM TAYLOR, | ) | |
| NORTHERN TRUST CORPORATION, and | ) | |
| CHRISTIANA BANK & TRUST COMPANY, | ) | |
| | ) | |
| Defendants, | ) | |

## AMENDED COMPLAINT

Plaintiff, Steven Menzies, by and through its undersigned counsel, for his Amended

Complaint against Defendants Seyfarth Shaw LLP, Graham Taylor, Northern Trust Corporation,

and Christiana Bank & Trust Company (collectively, "Defendants"), states as follows:

## NATURE OF ACTION

1.      Plaintiff, Steven Menzies ("Menzies"), is the co-founder, President and Chief

Operating Officer of Applied Underwriters Inc. ("AUI"), a financial services firm that

specializes in providing workers' compensation insurance for small and mid-sized businesses.

Defendants, comprised of lawyers, bankers, and financial planners, conspired to develop, market

and promote to Menzies, among others, an abusive tax avoidance scheme.  The Defendants'

scheme was disguised as a tax savings plan that would lawfully shield capital gains from the sale

of his AUI stock from tax liability.  Menzies was an unwitting participant of Defendants'

scheme.  Ultimately, and after Menzies relied to his detriment on the Defendants' fraudulent

representations, the Internal Revenue Service determined that Menzies' disposition of over $60

million of AUI stock, through the artifice of various trust tax shelters, was done with "the

primary purpose … to disguise the ownership of the stock, inflate [Plaintiff's] basis, and allow

[Plaintiff] to evade … tax liabilities related to the stock sale."  As a result of Defendants' acts and omissions, Menzies has suffered many millions of dollars of damages.

## PARTIES

2.      Plaintiff Steven Menzies ("Menzies") is an individual and citizen of the State of Nebraska.

3.      Defendant Seyfarth Shaw LLP ("Seyfarth") is a limited liability partnership organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

4.      Seyfarth is a global law firm with over 800 attorneys with offices in the U.S., London, Shanghai, Melbourne and Sydney.  Seyfarth, with its national and international presence, claims a special expertise in tax planning services to help "clients structure their business and investment activities," including in "assist[ing] both domestic and foreign clients in … tax deferral strategies."

5.      Upon information and belief, Defendant Graham Taylor ("Taylor") was a partner of Seyfarth.  Taylor is an individual and, on information and belief, a resident of Australia.

6.      Defendant Northern Trust Corporation ("Northern Trust") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

7.      Northern Trust is one of the oldest and most well-recognized financial services firms, with offices around the United States and the world.  Northern Trust describes itself as a financial services firm "uniquely qualified to manage clients' trust assets" through comprehensive financial planning, which includes "income tax planning" services.  Northern Trust markets itself on its professional relationships with the necessary financial institutions and

law firms across the United States and world that make the firm a leader in "personal fiduciary, investment, private banking, wealth management, and worldwide trust and custody services."

8.     Upon information and belief, Defendant Christiana Bank & Trust Company ("Christiana Bank") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware.  Christiana Bank is a professional trust, tax, and investment services financial institution.  Christiana Bank markets itself as a unique supplier of personal and professional "trust, tax, and investment services" for "individuals and families with substantial assets [who] want workable, effective ways to help [] minimize the impact of income and estate taxes…."

## JURISDICTION

9.     This Court has subject matter jurisdiction in this case pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Alternatively, this Court has subject matter jurisdiction in this case pursuant 28 U.S.C. § 1332, and the matter in controversy exceeds the sum of seventy-five thousand dollars, exclusive of interest and costs.

## VENUE

10.     Venue is proper in this District pursuant to: 18 U.S.C. § 1965(a) because one or more of the Defendants resides, may be found, has an agent, or transacts business in this District; and/or, 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; and/or, 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.

11.    In particular, venue is proper as: (i) Seyfarth's principal place of business is in this District, (ii) Taylor as co-conspirator of Seyfarth was present and doing business in the State of Illinois, (iii) Northern Trust's principal place of business is in this District, and (iv) Christiana Bank's conduct in this District as alleged in the Complaint has been committed by and through its co-conspirators, including Northern Trust and Seyfarth.

12.    In connection with the wrongs complained of herein, Defendants directly or indirectly used the means and instruments of interstate and foreign commerce, including the United States mail and interstate and foreign wire communications.

## FACTUAL BACKGROUND

13.    During the early 2000s, Defendants were involved, along with other professional organizations, in the development and sale of potentially abusive and illegal tax shelters.  These tax shelters consisted of any of one of a number of different investment plans or arrangements, but they each had as a significant purpose and intent, to wit: avoidance or evasion of income tax. These plans or arrangements took a series of forms, involving transactions with little or no economic reality, and were  predicated upon unrealistic allocations, inflated appraisals, losses in connection with nonrecourse loans, mismatching of income and deductions, financing techniques that did not conform to standard commercial business practices, and/or mischaracterization of the substance of the transaction.  They were designed from the start to generate losses, deductions, basis or credits that would exceed the taxpayer's investment and unlawfully shield the taxpayer's income from taxes.

14.    In or about October 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs began an investigation into the

development, marketing, and implementation of abusive tax shelters by accountants, lawyers, financial advisors, and bankers.

15.     By 2003, Defendants and others in the tax shelter industry no longer focused solely on providing individualized tax advice but had expanded their focus to include generic "tax products" aggressively marketed to multiple clients.

16.     One of these tax shelter products was a multi-step transaction that provided the taxpayer with an artificially inflated basis on certain appreciated assets, so that upon ultimate sale of these assets, a large fictional tax loss would be generated.  The transaction employed use of a grantor trust, where the trust agreement provided the grantor with the power to reacquire the trust corpus by substituting other property of an equivalent value, by either (a) the grantor contributing options to the trust that were substantially offsetting over a relevant range of values, or (b) the grantor substituting appreciated assets for high-basis assets originally contributed to the trust.  Although falsely represented as an estate planning strategy, the purpose of this transaction was to allow the grantor to claim a tax loss greater than any actual economic loss sustained and to avoid recognition of capital gain.  (the "Euram Oak Strategy.")

17.     Defendants conspired with European American Investment Bank, AG ("Euram" or "Euram Bank"), an Austria private bank, to implement the Euram Oak Strategy.

18.     Euram's structured products group was involved in devising, promoting, and executing proprietary tax products for the benefit of U.S. individuals, including, without limitation, the Euram Oak Strategy, the Euram Rowan Strategy, POINT and the Split Option Trading Strategy.  The structured products group of Euram included John Staddon, Rajan Puri, Arfan Shaikh and Tania Salim.

19.     On information and belief, Pali Capital Inc. ("Pali") was acquired by Euram Bank in 2001 and divested by Euram in 2007.  Pali had a structured products group, including Paul Frelich and William Pepper that worked with Euram in connection with tax products, including the Euram Oak and Rowan strategies. Upon information and belief, Euram Bank through its agents, Pali Capital, Inc., engaged in purported financial transactions designed to produce fraudulent tax benefits.

20.     The Euram Oak Strategy was not custom-designed for Menzies, but rather was a tax shelter product available for implementation to multiple clients.  Once developed, the tax shelter strategy could (with minimal retooling) be sold to multiple clients, thus increasing (and leveraging) the fees that could be generated for the Defendants.

21.     The Euram Oak Strategy was marketed to high net worth individuals by Euram and Defendants and written marketing materials were prepared to assist in this endeavor.  On information and belief, these marketing materials were considered "confidential" by Euram and the Defendants.

22.     Motivated by the substantial fees to be paid by the taxpayer investors, Defendants with the participation of Euram, Pali and others, knowingly conspired, participated in, promoted, marketed and implemented tax shelters – including the Euram Oak Strategy– to multiple clients (the "Defendants' Conspiracy").

23.     Euram and Taylor required participation from financial institutions – Northern Trust, Christiana and Euram itself – both to execute the underlying "investments" as well as to provide a source of high net worth taxpayers who could be induced into their fraudulent schemes.

24.     Northern Trust used marketing tactics to sell tax shelter products to its clients and potential clients.  On information and belief, Northern Trust promoted and marketed the Euram Oak Strategy – along with other tax shelter products – to high-net worth individuals, including Menzies and another executive at AUI, Sidney Ferenc.  Northern Trust stood to benefit from the criminal enterprise by generating fees for itself when its clients invested in tax shelters, including the Euram Oak Strategy.

25.     Defendants' acts were part of their regular way of conducting and participating in an ongoing criminal enterprise.

26.     The Euram Oak strategy was only one of the tax shelters offered by Euram, as Euram had a long history in the world of fraudulent tax shelters.  Euram was called out in the United States Senates Permanent Subcommittee on Investigations Report entitled "Tax Haven Abuses: the Enablers, the Tools and Secrecy" as one of the regular off-shore participants in illegal tax shelters.

27.     Euram, Pali, Seyfarth, Christiana and Taylor were involved with the "Euram Rowan Strategy."   The Euram Rowan Strategy involved a series of integrated, pre-arranged, and scripted steps designed to provide a taxpayer who had significant ordinary or capital gain with a non-economic ordinary or capital loss and was substantially similar to the transactions described in IRS Notices 2002-50, 2002-65 and 2003-54.

28.     Defendants Seyfarth, Christiana and Taylor, along with Euram and Pali, were involved in the sale and implementation of the Euram Rowan Strategy to a taxpayer in North Carolina.  This taxpayer suffered damages, including professional fees, taxes, penalties and interest as a result of this taxpayer's involvement with the Euram Rowan Strategy.

29.     Euram was actively involved in promoting a fraudulent tax shelter known as "POINT." POINT was implemented between 2000 and 2001 and was reported to have generated $9.6 billion in fake investment losses using a complicated web of offshore companies based in the Isle of Man. Euram representatives Staddon, Puri and Arfan worked on the implementation of the POINT shelter, the Rowan Strategy and the tax shelters implemented for Menzies.

30.     In 2011, Jeffrey Greenstein, one of Euram's shareholders, and a promotor of the POINT shelter, was sentenced to more than four years in federal prison for his conspiracy to defraud the IRS and aiding in the filing of a false tax return in connection with the POINT Shelter.

31.     In or about November 2002, Northern Trust contacted Menzies to determine if he was interested in Northern Trust's estate planning service. Menzies, and his colleague, Ferenc, agreed to a meeting for purposes of learning about the estate planning services being offered by Northern Trust.

32.     In or about late November 2002, Northern Trust visited Menzies and Ferenc at AUI's offices in Nebraska. At this meeting, Northern Trust put on a presentation to highlight its breadth of knowledge in estate planning and personal financial services.

33.     Throughout the next several months, Northern Trust continued to communicate with Menzies (and Ferenc) about estate planning and personal financial services solutions. In particular, through in person meetings and various phone calls, Northern Trust discussed with Menzies ways in which he might be able to avoid certain types of tax liabilities, including those related to Menzies' disposition of significant stock ownership he held in AUI.

34.     In January 2003, Northern Trust sent a proposal to Menzies for personal financial consulting. The proposal provided that Northern Trust would (a) review Menzies' financial data

and personal information, (b) develop a financial plan of action tailored to Menzies' "goals and objectives," and (c) implement such plan of action.

35.     A key element of Northern Trust's proposal to Menzies was to provide financial planning for income tax liability "and special strategy ideas relative to any potential liquidity events."  In this regard, Northern Trust's proposal included such services as: "[e]valuat[ing] tax strategies related to investments, retirement planning, estate planning, education funding and other areas in order to minimize federal and state income tax liability;" "[p]repar[ing] or review[ing] periodic income tax projections with regard to regular and alternative minimum tax;" "[i]dentify[ing] alternative estate planning techniques … to minimize estate taxes and/or enhance flexibility…;" and "[r]eview[ing] Applied Underwriters compensation and benefit plans [to provide] suggestions for plans that you may with [sic] to incorporate to enhance wealth creation opportunity or executive retention goals."

36.     In March 2003, Menzies agreed to engage Northern Trust under this proposal for the financial planning services, and specifically for the tax planning services.

37.     On or about May 20, 2003, Northern sent an email to Menzies to discuss the range of "tax planning" solutions Northern Trust could offer.  Upon information and belief, by mid-2003 Northern Trust had targeted Menzies and Ferenc for the investment in one or more tax shelters that Defendants were actively marketing.

38.     On information and belief, at or about this time, Northern Trust and Euram communicated regarding a variety of tax shelter products.  On information and belief, Euram and Northern Trust discussed Menzies and Ferenc's investment in a broadly marketed tax strategy known as the Euram Oak Strategy.

39.     Defendants Seyfarth, Taylor and Christiana, along with Pali and Euram, had implemented the Euram Oak Strategy for another taxpayer in or about May 2003.

40.     On or before May 22, 2003, either Northern Trust or Euram provided Taylor with a copy of a white paper describing the Euram Oak Strategy.  At this time Taylor was a partner with the law firm of Altheimer & Gray.  On May 22, 2003, Mr. Taylor issued a memorandum providing a summary and analysis of the Euram Oak Strategy for a client other than Menzies or Ferenc.  On information and belief, Mr. Taylor was also provided with a draft legal opinion from Euram or others related to the Euram Oak Strategy at this time.

41.      On information and belief, prior to August 1, 2003, the law firm of Proskauer Rose had issued a written tax opinion regarding the tax treatment of the Euram Oak Strategy.

42.     By July 2003, Northern Trust promoted a specific transaction based on the Euram Oak Strategy to Menzies and Ferenc.  Even though Menzies was single and did not have any dependents, Northern Trust advised Menzies that his estate planning objectives supported his investment in the Euram Oak Strategy as a lawful tax strategy that would allow him to shelter the anticipated income derived from a potential disposition of the AUI stock.

43.     On or about July 30, 2003, Northern Trust arranged a conference call with Menzies to discuss the basic steps of the complex pre-arranged transactions comprising the Euram Oak Strategy, representing to Menzies that it was a legal tax planning vehicle.  On this call, Northern Trust explained to Menzies that through a series of loans, unsecured structured notes from Euram Bank, and the creation of trusts and various other complicated transactions, Menzies would be able to shield most or all of his gain on the disposition of the AUI stock from tax liability.  Despite the fact that the Euram Oak Strategy unlawfully sought to eliminate

millions of dollars of taxable gains and would expose Menzies to liability for tax, penalties and interest, Northern Trust assured Menzies the Euram Oak Strategy was legal and proper.

44.     Menzies is not a lawyer, estate planner, or tax expert, and has no training or experience in any of these areas.  He did not have knowledge of the complex tax, legal and estate planning laws, rules, and regulations relevant to the Euram Oak Strategy.  Instead, he reasonably relied on Defendants for their purported expertise.  Menzies reasonably believed that Defendants had devised a lawful tax strategy and he reasonably relied on Defendants to assist him in implementing the strategy.

45.     Based on Northern Trust's explanation of the Euram Oak Strategy and its representations that the tax shelter was lawful and would provide the tax saving benefits, and in reliance upon, among other things, the reputation, integrity and expertise of Northern Trust and the team it had assembled in providing Menzies advice, Menzies agreed to proceed in setting up the transactions.

46.     On information and belief, on or about July 31, 2003, a conference call took place by and between Euram Bank and Northern Trust.  Menzies was not on this call.  Upon information and belief, the purpose of the call was to report that Menzies and Ferenc had agreed to proceed with the Euram Oak Strategy.  Euram advised Northern that there were "a few items" that Euram wanted to "run by" Northern to make sure "we are all on the same page" and "rather than recording them here, perhaps we can discuss them on the phone later today."  Upon information and belief, Defendants and Euram further discussed details on how the transactions would be structured to fraudulently attempt to avoid tax liability, and the ways in which the parties would introduce one another to Menzies and Ferenc in furtherance of Defendants' Conspiracy.

47.     Given the nature of the transaction, the Euram Oak Strategy required an individual or institution to serve as trustee of certain trusts established to participate in the transaction.  It was important for the trustee to purportedly be independent and act in a fiduciary capacity in authorizing the trust's participation in the various steps of the transaction, even though each of the underlying steps of the transaction had been agreed to beforehand.

48.     On or about July 31, 2003, Euram contacted Christiana Bank to serve as the trustee for the proposed grantor trust.  It advised Christiana that the proposed transaction for Menzies and Ferenc would be "very similar" to a transaction for another customer.  Euram provided Christiana with a draft of one of the relevant trust documents, advising Christiana that "all your attorney's points will be included" because the trust document was based on a trust used for another transaction implementing the Euram Oak Strategy.  The prior transaction involved Defendants Taylor and Christiana, along with Euram Bank and Pali.

49.     In furtherance of Defendants' Conspiracy, Northern Trust advised Menzies to engage Christiana Bank as trustee for the various trusts.  Neither Northern Trust nor Christiana Bank advised Menzies of the relationship between each other, their relationship with the other Defendants, or their relationship with Euram Bank.  Christiana Bank participated in the conspiracy and agreed to act as trustee of the trusts and benefited in receiving its fees.  Menzies did not know that Christiana Bank was part of the conspiracy, and agreed to engage Christiana Bank as trustee for the various trusts.

50.     On or about August 1, 2003, Defendants provided Menzies with forms, which, on information and belief, had been prepared for customers prior to Menzies, to complete in order to implement the Euram Oak Strategy.  At the time the tax shelter was presented to Menzies, the transaction already had been planned, and had been executed for at least one other taxpayer.  The

transaction was a "turn-key" plan, namely, all Mr. Menzies needed to do was to execute several form documents.

51.     Upon information and belief, Defendants had another conference call on or about August 7, 2003 which included Euram Bank, Pali Capital, Northern Trust and Seyfarth.  Menzies again was not on this call.  On information and belief, the purpose of this call was to discuss details of drafting the Euram Bank loan documents, the promissory notes, and the necessary trust documents in furtherance of the Euram Oak Strategy.  Upon information and belief, Taylor agreed to draft the necessary opinion letters to provide the purported legal justification and legitimacy for this tax shelter.

52.     During the conference call on August 7, 2003, the parties addressed the compensation to be paid to Seyfarth, Euram and Northern Trust.  During this call, Seyfarth agreed to provide a legal opinion for each of the transactions for a fee of $75,000.   On information and belief, Euram was to be compensated at a rate of 3.75% of the proposed tax savings.  On information and belief, Euram further agreed to provide Northern Trust with a "kick back" of one-third of Euram's fee.

53.     On or about August 7, 2003, Northern Trust advised Menzies that Taylor was "up to speed and would quickly get documents ready to sign" and therefore should be engaged to provide a purported independent legal opinion.   Because Defendants, without any disclosure of their existing relationship with Taylor, recommended that Menzies hire Taylor as part of the transaction, Menzies retained Taylor to issue a legal opinion.  Menzies had no prior relationship with Taylor or Seyfarth.  On information and belief, since at least May 2003 – before he joined Seyfarth – Taylor had been involved in providing one or more legal opinions related to the Euram Oak Strategy.

13

54.    As part of the scheme, Seyfarth and Taylor were presented by Euram and Northern Trust as independent legal counsel who could provide opinion letters supporting the legitimacy of the Euram Oak Strategy and its contemplated tax benefits.

55.    Neither at this time, nor ever, did Northern Trust or Seyfarth advise Menzies of the relationship between each other, or their relationship with the other Defendants.  No one advised Menzies that the purported legal services Seyfarth was going to perform, including the drafting of the opinion letters, were part of a conspiracy and not in fact an independent legal evaluation of the tax strategies.

56.    Taylor had a long, and admittedly criminal, involvement in the tax shelter industry.  Beginning in 1994 or 1995, Taylor commenced writing opinion letters in connection with taxpayers' investments in a variety of tax shelters, many of which have subsequently been determined to be unlawful.   Taylor wrote tax opinions containing false and misleading statements for at least eight different tax shelters.   He charged anywhere from $50,000 to $200,000 for the opinion letters he issued for these shelters.

57.    In 1999, after Taylor's law partnership precluded him from issuing tax opinions related to tax shelters, he joined a series of international law firms in San Francisco, drafting dozens, if not hundreds, of tax opinions that contained false and misleading statements, before landing at Seyfarth in 2003.  Notwithstanding a long history of criminal conduct, Seyfarth hired Taylor in order to participate in the profits to be generated by the substantial fees associated with drafting of opinion letters.

58.    Taylor knew what he was doing was wrong, but continued in his course of conduct because it was profitable, it was intellectually stimulating and challenging; and because he was caught up in the fervor of the tax shelter world.

14

59.     Taylor was indicted by the United States in the District of Utah in November 2005 for tax fraud.  The tax fraud involved a tax shelter promoted, designed and implemented by Taylor.

60.     Although Seyfarth notified its clients of the indictment, it did not advise Menzies, maintaining that Menzies was not a client when Taylor was indicted.   None of the other Defendants advised Menzies that Taylor had been indicted.

61.     On January 24, 2008, Taylor pled guilty and agreed to cooperate with the United States government in connection with its investigation of widespread criminal conduct in the tax shelter industry.  None of the Defendants advised Menzies of Taylor's indictment or long history of criminal conduct.

62.     Instead, Defendants continued to stand behind their fraudulent representation that the Euram Oak Strategy provided Menzies with a lawful tax savings tool that properly eliminated capital gains on the disposition of his AUI stock.

63.     Defendants' fraudulent tax scheme was based on a series of integrated, prearranged and scripted steps as described below (the "2003 Tax Shelter").

64.     Euram Bank provided Christiana with a specific list of prearranged, and fraudulent steps to be undertaken for this transaction.

65.     The first step was for Euram Bank to loan Menzies an amount equivalent to the value of the AUI stock Menzies intended to sell.  On or about August 11, 2003, Menzies obtained a paper loan from Euram Bank for approximately $19 million, which was the anticipated value of the AUI stock he wished to protect from taxable gain on the sale.  Per the loan agreement, the funds were to be deposited into an account at Euram Bank, for which Menzies agreed to pay Euram Bank significant fees and interest (LIBOR plus 40 basis points).

15

66.     On August 14, 2003, Euram prepared engagement letters between Christiana and Menzies, that it requested Christiana execute with Menzies.   When Christiana edited the engagement letters, Euram advised it that they "do not achieve what we require" because they mentioned an "ESBT- it is *intended that this should not be contemplated at this time*" and that it did not purport to identify the client's investment objectives.   In fact, Defendants knew that (a) the ESBT (a permissible S corporation shareholder) was intended from the beginning as part of the transaction (as it would be necessary once the AUI stock was substituted in the Menzies' GRRT as described below), and (b) Menzies did not have investment objectives and was only seeking tax planning advice.

67.     Defendants knew that pursuant to the Euram Oak Strategy, the loan proceeds would never leave the effective control of Euram Bank, and therefore did not require Menzies to provide much, if any, financial information to support the purported loan.

68.     Euram provided Christiana with form documents that Euram indicated "should be familiar" to Christiana from another transaction involving Defendants which, on information and belief, was a substantially similar tax shelter as that which was being implemented for Menzies.

69.     On or about August 25, 2003, the "Steven Menzies Grantor Retained Remainder Trust" ("Menzies GRRT") was created for Menzies.

70.     The Menzies GRRT provided that Menzies retained the power in a non-fiduciary capacity to re-acquire the trust corpus by substituting other property of equal value.   The Menzies GRRT further provided that Menzies retained a remainder interest in the trust, namely, the assets of the trust remaining upon termination of the trust term.

71.     The Menzies GRRT named the "Menzies Discretionary Trust" as the "unitrust" beneficiary of the trust.   Per the terms of the Menzies GRRT, the Menzies Discretionary Trust

was entitled to receive annual distributions in an amount equal to 1% of the assets of the Menzies GRRT (the "Unitrust Distributions") for the term of the trust. The Menzies Discretionary Trust was in turn obligated to pay the Unitrust Distributions it received from the Menzies GRRT to Menzies' mother, Ann Menzies, as beneficiary of the Menzies Discretionary Trust. The remainder interest in the Menzies Discretionary Trust was held by Menzies personally.

72. Christiana Bank was the trustee of the Menzies GRRT and the Menzies Discretionary Trust.

73. Once the Menzies GRRT was created, the Menzies GRRT opened a bank account at Euram Bank. Defendants then directed Menzies to deposit the $19 million loan from Euram Bank into the Menzies GRRT account at Euram Bank. This purportedly represented Menzies' initial funding of the Menzies GRRT. The proceeds of the loan from Euram Bank however never left Euram Bank.

74. On or about August 26, 2003, Christiana Bank, as trustee of the Menzies GRRT, then invested the loan funds deposited in the Menzies GRRT with Euram Bank, the very party who had loaned the funds to Menzies and who at all times remained in possession of the funds. The "investment" was a promissory note issued by Euram Bank paying interest of three months of LIBOR plus an equity multiplier based on the performance of gold (referred to hereafter as the "Euram Bank Structured Note"). At this stage of the transaction, Euram Bank had now effectively received back its original $19 million loan, but had an obligation to make payments to the Menzies GRRT under the terms of the Euram Bank Structured Note.

75. A second trust was created for Menzies named the Persephone Trust ("Persephone Trust"). This trust was created on or about September 24, 2003, and was for the

benefit of the Menzies Discretionary Trust. The trustee of Persephone Trust was once again Christiana Bank.

76. On or about September 26, 2003, Menzies sold his remainder interest in the Menzies GRRT (which held the Euram Bank Structured Note) to the Persephone Trust valued at approximately $18.9 million, in exchange for a promissory note of equal value from the Persephone Trust to Menzies (referred to hereafter as the "Persephone Trust Promissory Note"). At this stage of the transaction, the Persephone Trust owned the remainder interest in the Menzies GRRT, which held the Euram Bank Structured Note, but the Persephone Trust had a note obligation to Menzies in the principal amount of approximately $18.9 million, *i.e.*, equal to the value of the remainder interest in the Menzies GRRT.

77. While Menzies no longer personally held the remainder interest in the Menzies GRRT, as the grantor of the trust, one of the powers he still possessed—and which was key to the transaction—was the power to reacquire assets of the Menzies GRRT by substituting other assets of equivalent value. Under the terms of the trust, Menzies had the right to exercise this power in his absolute discretion and in a non-fiduciary capacity. On or about early October 2003, through various phone calls and e-mails, Defendants (by way of Taylor and Northern Trust) repeatedly assured Menzies that this substitution of assets would be a non-taxable event.

78. On or about October 10, 2003, Menzies, pursuant to Defendants' scheme, substituted a fixed number of AUI shares of equivalent value in exchange for the assets of the Menzies GRRT, namely, the Euram Bank Structured Note.

79. After the substitution of assets, the Menzies GRRT held the AUI stock and Menzies held the Euram Structured Promissory Note. Menzies thus had a receivable from Euram Bank (the Euram Bank Structured Note) which was virtually identical in value to his

payable to Euram Bank (the loan obligation to Euram Bank arising from Menzies' original borrowing described above).

80.     In order to satisfy Menzies' original Euram Bank loan obligation, and at a later time, Menzies used the Euram Bank Structured Note as repayment for his personal debt obligation to Euram Bank.  Both the Euram Bank loan and the Euram Bank Structured Note were therefore extinguished.

81.     At this point in the transaction, the Persephone Trust owned the remainder interest in the Menzies GRRT, and the "unitrust" beneficial interest in the Menzies' GRRT was held by the Menzies Discretionary Trust.  The Menzies Discretionary Trust then sold its unitrust interest to the Persephone Trust.  The Persephone Trust now owned both the unitrust interest and the remainder interest in the Menzies GRRT.  The sole asset of the Menzies GRRT was the AUI stock which had earlier been substituted by Menzies.  On or about February 25, 2004, the Menzies GRRT was terminated and the Persephone Trust, as the holder of all the legal and beneficial interest of the trust, received the AUI stock on termination of the trust.

82.     As of February 25, 2004, the Persephone Trust now held the AUI stock valued at approximately $19 million and, per the Persephone Trust Promissory Note, owed an obligation to Menzies personally for approximately $19 million.

83.     Ferenc entered into a transaction substantially similar to the 2003 Tax Shelter with Northern Trust, Euram, Pali, Christiana, Seyfarth and Taylor at or about the same time as Menzies.

84.     But for the scheme pitched to him by the Defendants, Menzies had no prior relationship with Euram, had no interest in obtaining a loan from Euram Bank, establishing various trusts, or investing with Euram pursuant to the structured notes.  Menzies engaged in the

various transactions that made up the 2003 Tax Shelter, as directed by Defendants, because Defendants advised him that it was purportedly a lawful means to shelter income from taxation. Menzies was assured by Northern Trust and by Taylor that the 2003 Tax Shelter would eliminate gains from the sale of his AUI stock so long as (a) the proceeds of the sale were paid to the Persephone Trust as owner of the stock (and with full tax basis in the stock), and (b) Menzies would receive said proceeds from the Persephone Trust Promissory Note in repayment of Persephone Trust Promissory Note held by Menzies.

85.     In particular, in or about February 2004, Defendants had multiple phone calls with Menzies in which they represented that:

   a.     The 2003 Tax Shelter was valid, legitimate, and legal under federal and state law;

   b.     The 2003 Tax Shelter was a lawful tax avoidance mechanism and that it was not a fraudulent tax shelter;

   c.     The 2003 Tax Shelter would not be subject to challenge by the IRS;

   d.     The 2003 Tax Shelter was in compliance with all applicable court procedural and legal rules for federal tax purposes;

   e.     The 2003 Tax Shelter would not subject him to tax penalties;

   f.     The 2003 Tax Shelter would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

   g.     The various trusts being formed to execute the 2003 Tax Shelter had a business purpose and economic substance; and

   h.     The various loans and promissory notes being created in furtherance of the 2003 Tax Shelter had a business purpose and economic substance.

20

86.     Notwithstanding these representations, on or about June 5, 2004, Euram Bank contacted Christiana regarding the 2003 Tax Shelter (and a similar transaction entered into by Ferenc) regarding the possibility that the Euram Oak Strategy might be a reportable transaction to the IRS.  Christiana had its outside counsel review whether Christiana, as a material advisor, had an obligation to report to the IRS the 2003 Tax Shelter (and the similar transaction entered into by Ferenc).  Christiana failed to advise Menzies that it had sought counsel to consider whether Menzies had engaged in a reportable tax shelter transaction, notwithstanding that, on information and belief, Christiana charged the trust for the legal fees involved in pursuing such advice.

87.     In June 2004, the Defendants implemented a substantially similar transaction for Mr. Menzies involving the same parties (the "2004 Tax Shelter").

88.     The 2004 Tax Shelter used essentially the same steps as the 2003 Tax Shelter: Menzies obtained a $54 million loan from Euram Bank, Menzies formed a grantor retained remainder trust, the trustee of the grantor retained remainder trust then invested the proceeds of the loan with Euram Bank and received a structured note from Euram Bank; Menzies then sold his remainder interest in the grantor retained remainder trust to the Persephone Trust in consideration for a promissory note; Menzies then substituted AUI stock for the assets within the grantor retained remainder trust; Menzies then held a receivable from Euram Bank (the structured note) offset by his payable to Euram Bank arising from his original loan, and the grantor retained remainder trust was terminated with Persephone Trust receiving the AUI stock on termination of the trust.  The Persephone Trust owed a promissory note obligation to Menzies for the value of the AUI stock, and Persephone Trust held the AUI stock.

21

89.     Again, but for the scheme pitched to him by the Defendants, Menzies had no interest in obtaining a loan from Euram Bank, establishing various trusts, or investing with Euram pursuant to the structured notes.  Menzies engaged in the various transactions that made up the 2004 Tax Shelter, as directed by Defendants because Defendants advised him that it was purportedly a lawful means to shelter income from taxation.  Defendants, through Northern Trust and Taylor, assured Plaintiff that the 2004 Tax Shelter would eliminate capital gains from the sale of his AUI stock given that (a) the proceeds of the sale were paid to the Persephone Trust as owner of the stock (and with full tax basis in the stock) and (b) Menzies received said proceeds from the Persephone Trust in repayment of the Promissory Note held by Menzies.

90.     In particular, on or about December 2004, Defendants continued their representations to Menzies that:

    a.      The 2004 Tax Shelter was valid, legitimate, and legal under federal and state law;

    b.      The 2004 Tax Shelter was a lawful tax avoidance mechanism and that it was not a fraudulent tax shelter;

    c.      The 2004 Tax Shelter would not be subject to challenge by the IRS;

    d.      The 2004 Tax Shelter was in compliance with all applicable court procedural and legal rules for federal tax purposes;

    e.      The 2004 Tax Shelter would not subject him to tax penalties;

    f.      The 2004 Tax Shelter would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

    g.      The various trusts being formed to execute the 2004 Tax Shelter had a business purpose and economic substance; and

h.  The various loans and promissory notes being created in furtherance of the 2004 Tax Shelter had a business purpose and economic substance.

91.  Defendants represented to Menzies that the purpose of the complicated (and costly) 2003 Tax Shelter and 2004 Tax Shelter (collectively referred to as the "Menzies Tax Shelters") was to effectively and lawfully shield the disposition of the AUI stock from capital gains tax.

92.  To provide Menzies with additional assurance that the scheme was legitimate and lawful, and as Menzies always expected, Taylor informed Menzies that Seyfarth would provide "independent" opinion letters confirming the propriety of the strategy.  Defendants explained to Menzies that these "independent" opinion letters would convince the IRS as to the legitimacy of the Menzies Tax Shelters, in the event that Menzies was audited by the IRS, and would, among other things, provide protection from penalties and interest.

93.  Taylor had issued hundreds of opinion letters for no less than eight different tax shelters between 1994 and November 3, 2005, when he was indicted.  Taylor would essentially reuse the same form opinion letters, with any changes largely consisting of the personal details simply filled in for each specific client.

94.  On information and belief, Taylor and/or Seyfarth did not draft the Opinion Letters solely for Menzies, but effectively recycled the same basic letter that it had issued to other taxpayers purchasing the Euram Oak Strategy.

95.  On or about September 24, 2004, Seyfarth provided a signed opinion letter for the 2003 Tax Shelter, and, on or about June 7, 2005, Seyfarth provided a signed opinion letter for the 2004 Tax Shelter (these letters will be collectively referred to as the "Opinion Letters").

96.    By May 11, 2005, Seyfarth had instituted a policy pursuant to which a partner issuing a tax opinion was required to obtain the concurrence of another partner before the opinion could be issued.  Taylor provided his partner, John Rogers, with a draft of the legal opinion letter for Mr. Menzies, along with a draft statement of facts for review.  On or about May 28, 2005, Rogers provided Taylor with his agreement to the legal opinion which purported to support Menzies' fraudulent tax shelter.

97.    Taylor and Rogers engaged in a pattern of criminal conduct, having both been partners at a prestigious international law firm based in Chicago prior to joining Seyfarth.  In 2010, the United States sought to enjoin Rogers from continuing to promote Distressed Asset Debt (DAD) and Distressed Asset Trust (DAT) tax shelters, shelters that he had designed and promoted while a partner at Seyfarth, and which also involved trusts and foreign banks. Rogers first began promoting the DAD shelter in 2003, and continued to do so through 2006.  These shelter transactions used trusts to avoid detection and reporting obligations, eventually leading to what the IRS claimed were $370 million in bogus losses.  Although Seyfarth generated millions of fees over the years from Rogers' tax shelter activities, it was not until 2008 that Seyfarth forced Rogers to resign, purportedly because it "discovered" that Rogers refused to stop promoting fraudulent tax shelters.

98.    The Opinion Letters issued by Seyfarth and Taylor were nearly identical in form and substance, and both identified that the Menzies Tax Shelters provided a legal means for the tax-free disposition of the AUI stock.  The Opinion Letters were also substantially similar to opinion letters Seyfarth and Taylor issued for Ferenc.  In particular, the Opinion Letters represented the following to Menzies:

   a.  "The *investment strategy* you have pursued … should be in compliance with all applicable court procedural and legal

rules and should have economic substance, as to both you and the GRRT, including recognition of the Euram loans as a loan for federal tax purposes." (emphasis added.)

b.    "[Y]ou should be found to have acted with reasonable cause and in good faith with respect to the treatment on your United States federal income return and gift tax returns with respect to all components of the Transactions and there is, in our opinion, a greater than 50 percent likelihood that the tax treatment described herein will be upheld if challenged by the IRS."

c.    The "IRS should not succeed in arguing that the [transactions are a sham in substance such] that the sham transaction doctrine [would] appl[y] to the Transactions."

d.    "[W]e conclude that the IRS should not prevail if it invoked the substance over form doctrine to challenge the validity of the Transactions."

e.    "[I]f the IRS argues the Transactions should fail because of the end result test, the IRS should be unsuccessful, because the Transactions are not pre-arranged parts of a single transaction intended from the outset."

99.    At the time of the issuance of the Opinion Letters, Seyfarth (and the other Defendants) knew that these above conclusions (among others) were not true as the factual basis which formed these conclusions were in fact false.  The assumptions on which Seyfarth portended to rely in the Opinion Letters, and which Seyfarth knew to be false, included the following:

a.    "There is no pre-arranged binding agreement between the Trustee of the GRRT and you . . . relating to any element of the Transactions"

b.    "You established the GRRT for estate planning reasons, so as to transfer property of the value to the unitrust beneficiary whilst retaining the remainder interest"

c.    "You later decided that the corpus of the GRRT was likely to appreciate further and desired to transfer this

appreciation to the unitrust beneficiary, in order to further reduce the size of your estate."

d.    "[Y]ou concluded that another asset that you owned had an even greater potential of appreciation in the future, so you utilized your power under the GRRT to reaquire trust assets by substituting assets of equal value."

e.    "[A]s part of your overall estate plan, you had motives for establishing the GRRT and later selling your reminder interest in the GRRT to an entity created by the unitrust beneficiaries. . . . At a subsequent point, you decided that the corpus of the trust was likely to appreciate further and desired to transfer this appreciation to the unitrust beneficiaries in order to further reduce the size of your estate.  Thus, you sold the remainder interest to an entity for the benefit of the unitrust beneficiaries at its then fair market value, so that the unitrust beneficiaries would benefit from any growth in the trust assets occurring after the sale of the sale. . . . Thereafter you concluded that another asset you owned had an even greater potential of appreciation in the future, and you utilized your power under the GRRT to reaquire trust assets by substituting assets of equal value. . . . Accordingly, because of your *bona fide* estate planning motives for entering into the Transactions . . . the Transactions should not constitute one or more "'shams in substance.'" (emphasis added.)

f.    "[T]he decision for you to sell your remainder interest in the GRRT and your decision to reaquire the original GRRT assets by substituting assets of equivalent value were not contingent upon the happening of other events.  Rather, each decision was an actual, substantive transaction at the time and each transaction separately altered your economic situation."

g.    "You, the unitrust beneficiaries and Persephone created by the unitrust beneficiaries are not bound in any way to participate in the Transactions as a whole or any particular component of the Transactions.  We are relying on your representation that the entity created by the unitrust beneficiaries and the unitrust beneficiaries themselves had no pre-existing contractual obligation in any element of the Transactions."

26

h.      "[Y]ou have not been and were not under any obligation agreement or understanding to enter into any element of the Transactions, that each party to the Transactions received independent advice and there has not been and will not be any pre-arranged binding agreements, arrangements or understanding between you and the other parties to the Transactions with respect to the Transactions or any element thereof.  In addition, as previously mentioned, you have a bona fide economic reason for engaging in each of the Transactions and acted independently based on your own economic profit and estate planning motives."

100.    Seyfarth (and the other Defendants) knew that the foregoing assumptions (among others) were false and that in the absence of assumptions, Seyfarth had no basis for representing to Menzies that the Menzies' Tax Shelters were lawful and would provide the promised tax gains.

101.    Defendants were aware that the Menzies Tax Shelters disguised the preplanned nature of the termination of the various trusts and that Menzies motivation was not estate planning or economic profit, but instead was limited to obtaining the promised tax benefits.

102.    At the time of the Opinion Letters, Menzies was still under the (now known to be mistaken) belief that the Opinion Letters set forth an "independent" legal opinion of as to the legitimacy of the Menzies Tax Shelters.

103.    Menzies relied on the Opinions Letters.

104.    Menzies paid Defendants substantial fees and expenses to execute the necessary transactions in furtherance of the Menzies Tax Shelters.

105.    By early 2006, AUI agreed to sell its shares to Berkshire Hathaway, Inc. ("BHI").

106.    BHI agreed to purchase the stock of AUI from its stockholders in exchange for a cash payment.

27

107.    In or about May of 2006, and consistent with the stock purchase agreement by and among the AUI shareholders and BHI, BHI purchased the AUI stock held by the Persephone Trust for $64,328,160 in cash.

108.    Thereafter, the Persephone Trust used the proceeds from the sale of the AUI stock to repay Menzies the amounts owing under the promissory notes it had issued to Menzies when it acquired his remainder interest in the Menzies GRRTs.

109.    In July 2006, Menzies requested that Taylor provide him with further advice related to the tax treatment of the Menzies Tax Shelter.  On July 19, 2006, Taylor provided Menzies with additional assurances that Menzies Tax Shelters would be lawful and Menzies would receive the tax savings as promised.  Neither Taylor, nor Seyfarth, advised Menzies that Taylor had been indicted by the United States Attorney at the time he communicated with Menzies.

110.    When filing his 2006 federal income tax returns in 2007, and in reliance upon the words and conduct of Defendants, including the Opinion Letters, Menzies did not report the sale of the $64 million AUI stock to BHI as a taxable event.  As Menzies had been informed by Defendants, the AUI stock was owned by the Persephone Trust at the time of sale, and not by himself, and furthermore the Persephone Trust had full tax basis in the AUI stock (and thus recognized little or no gain itself on disposition of the stock.)

111.    Christiana filed the 2006 tax returns on behalf of the Persephone Trust in 2007.  This return did not report the sale of the AUI stock.  Christiana, as a member of the conspiracy, knew at the time that the Menzies Tax Shelter lacked economic substance and/or were sham transactions and, consistent with the Defendants' scheme, failed to report the AUI stock sale on Persephone Trust's 2006 income tax returns.

28

112. In or about October 2009, the Internal Revenue Service advised Menzies of its intention to audit Menzies' 2006 tax filings.

113. The IRS audit occurred from October 2009 through most of 2012. Near the end of its audit, the IRS focused on BHI's purchase of the AUI stock from the Persephone Trust. Menzies explained to the IRS that he did not own the AUI stock at the time of sale and that he understood that the trust in any event had full tax basis in the stock as a result of the transactions he had entered into. Menzies reasonably believed, and relied upon, the representations of Defendants and the Opinion Letters in explaining to the IRS why he did not report the AUI stock disposition in his personal tax filings.

114. Despite Defendants' representations to Menzies as to the legitimacy of the Menzies Tax Shelters, the IRS audit determined the Menzies Tax Shelters to be an unlawful tax avoidance scheme.

115. As explained by the IRS: "[i]t was determined Mr. Menzies' transfer of Applied Underwriters Inc. (AUI) stock to Grantor Retained Remainder Interest Trusts (GRRT's) did not represent arm's length transactions. As such, the 2006 disposition of AUI stock was actually a sale by Mr. Menzies which should have been characterized as a Long-Term Capital Gain."

116. The IRS found that the transfer and substitution of assets and various trusts were designed as elements of an abusive tax shelter with "the primary purpose of the transactions…to disguise the ownership of the stock, inflate Mr. Menzies' basis, and allow him to evade the 2006 tax liabilities related to the stock sale."

117. The IRS found it material that the purported legal opinion justifying the transaction had been authored by Taylor, who by that time had pled guilty to felony tax fraud.

118.    The IRS determined that Menzies, not the Persephone Trust, had sold the AUI stock to BHI for $64,328,160.  The IRS re-calculated the, basis of the AUI stock as $19,436,324 on the date he was deemed to have sold the AUI stock to BHI.  On this basis, the IRS determined that Menzies failed to report $44,891,836 of capital gains from the sale of the AUI stock.

119.    On or about December of 2012, under threats from the IRS of large fines, severe penalties, civil actions and even potential criminal liability, Menzies agreed to settle with the IRS.  The agreed upon settlement with the IRS included paying $6,718,108 in capital gains tax for the disposition of the AUI stock to BHI, $1,343,621.60 in penalties and $2,365,472.38 in interest, for a total of $10,427,201.98.

120.    Menzies paid the settlement amount to the IRS in October 2013.

121.    Subsequent to the settlement with the IRS, Menzies now knows that Defendants had actual knowledge of the affirmative misrepresentations and omissions of material fact set forth herein, or acted in reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

122.    Menzies now knows that the various steps assured to him by Defendants as necessary in creating the Menzies Tax Shelters were not deemed by the IRS to be independent steps in a lawful transaction.  Menzies now knows that the Menzies Tax Shelters were unlawful, and that Defendants promoted, marketed, and sold Menzies the scheme for the primary purpose of earning fees.  In fact, Menzies now knows that in November 2007, the IRS issued Notice 2007-73 identifying similar transactions as potentially abusive tax schemes.

123.    In this regard, Menzies now knows, that one or more of Defendants made the following statements which were false and misleading, and which are attributable to each of the

Defendants because they were made by persons or entities acting as agents of, or in furtherance of, the conspiracy:

    a.    That the Menzies Tax Shelters were valid, legitimate, and legal under federal and state law;

    b.    That the Menzies Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

    c.    That the Menzies Tax Shelters would not be subject to challenge by the IRS;

    d.    That the Menzies Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

    e.    That the Menzies Tax Shelters were not subject to tax penalties;

    f.    That the Menzies Tax Shelters were not subject to the sham transaction doctrine by the IRS;

    g.    That the Menzies Tax Shelters were more likely than not to be upheld by the IRS;

    h.    That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Menzies Tax Shelters, if audited;

    i.    That the various trusts being formed to execute the Menzies Tax Shelters had a business purpose and economic substance; and

    j.    That the various loans and promissory notes being created in furtherance of the Menzies Tax Shelters had a business purpose and economic substance.

124.    In addition, the following material omissions were part of the fraud:

a.  Failing to disclose the true likelihood that the Menzies Tax Shelters would not provide the tax savings promised;

b.  Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Menzies Tax Shelters;

c.  Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

d.  Failing to disclose that the Opinions Letters relied on factual assumptions that were known by the Defendants to be untrue;

e.  Failing to disclose that the author of the Opinion Letters had been indicted for tax fraud in connection with issuing other opinion letters; and

f.  Failing to revise, alter, and modify the advice and recommendations made to Menzies after the issuance of the Opinion Letters and after the IRS commenced its audit related to the Menzies Tax Shelters.

125.    In committing the wrongful acts alleged in this Complaint, the Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design to promote, sell and implement the Euram Oak Strategy.  The Defendants also intentionally and knowingly aided and abetted and/or assisted each other in breach of their respective duties regarding their respective roles in falsely, fraudulently and misleadingly promoting, selling and implementing the Euram Oak Strategy.  In taking such actions to substantially assist the commission of this wrongful conduct, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his/its overall contribution to and in furtherance of the wrongdoing.

126.    Menzies now knows that each Defendant:

a.      Directly or indirectly engaged in a common plan, transaction and course of conduct described herein in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters, in which they knowingly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Menzies;

b.      Devised and implemented a well-planned sales strategy that focused on leveraging trust and confidence from Menzies in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters;

c.      Intentionally concealed Defendants' Conspiracy from Menzies; and

d.      Fraudulently induced Menzies to participate in the Menzies Tax Shelters.

127.    In short, Menzies now knows that Defendants had a financial, business, and property interest in inducing him to enter the Menzies Tax Shelters, and to promise, opine, and assure him that the transactions would enable him to legally reduce and/or eliminate tax liability on the disposition of AUI stock.

128.    Menzies reasonably relied upon the material misrepresentations and omissions of Defendants in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters. Absent these misrepresentations and omissions, Menzies would not have engaged in the Menzies Tax Shelters, and consequently would not have suffered the damages asserted herein.

129.    Defendants had a duty to disclose to Menzies the truth about the Menzies Tax Shelters. Such disclosure was necessary so that their representations about the 2003 Tax Shelter and 2004 Tax Shelter would not be false or misleading. The Defendants, however, never

disclosed to Menzies that their representations to him were false or misleading, and were intended for the sole purpose of generating fees.

130.    But for Defendants' conduct, including their fraudulent misrepresentations and omissions, all in effort to further Defendants' Conspiracy by selling to Menzies the services associated with the Menzies Tax Shelters, Menzies would not have: (a) paid Defendants substantial fees and expenses for unnecessary tax consulting services, (b) filed personal federal tax returns that were determined to be inaccurate by the IRS, (c) incurred substantial costs to the IRS in penalties and interest arising out of the disposition of the AUI stock, and (d) engaged legal and other professional services to investigate and resolve the fraud perpetrated by Defendants.

131.    In addition to the costs identified above, Menzies paid more than $6.7 million in taxes to the IRS arising from the capital gains tax imposed on the disposition of the AUI stock. Rather than engage in the Menzies Tax Shelters, Menzies could have, and would have, engaged in other legal tax savings opportunities related to the disposition of the AUI stock.

132.    The promotion and execution of the Menzies Tax Shelters were part of pattern of similar or identical activity by Defendants, as tax shelter promoters, advisors, and others that had the same or similar purposes, results, participants, victims, or methods of commission. Indeed, it is the very nature of a tax shelter product, such as the Euram Oak Strategy, to be created once and then replicated multiple times to multiple taxpayers.

133.    The threat of repetition and continued criminal activity is implicit, as there was a continued threat that it later could be replicated for other taxpayers.

134.    Ferenc invested in a Euram Oak Strategy at the same time as Menzies and, on information and belief, paid substantial fees associated with the initial investment.

34

135.     In addition to Menzies and Ferenc, Defendants promotion and marketing of the Euram Oak Strategy and other fraudulent tax shelters have caused injury to other individuals, including, without limitation, the individual who invested in the Euram Oak Strategy in May 2003 and the individual investing in the Euram Rowan Strategy.

136.     On information and belief, there were separate but related schemes to defraud other taxpayers, some of whom invested in transactions substantially similar to the Euram Oak Strategy, as well as other fraudulent tax shelters, developed, marketed and promoted by Defendants.  On information and belief, there were multiple victims of Defendants' scheme to defraud, each of whom suffered distinct injuries.

137.     There is a threat of continued racketeering activity in that Defendants predicate acts of mail and wire fraud were part of their regular way of conducting business.

138.     Defendants' pattern of criminal conduct in this case projects into the future, as the manner in which the Euram products were presented as products, with a preexisting team that could execute and support the tax shelter for other taxpayers and from the regular manner in which this enterprise did business with Menzies, Ferenc, and over investors in fraudulent Euram strategies.

## COUNT I
## VIOLATIONS OF RICO 18 U.S.C. § 1962(c)
(Against all Defendants)

139.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 138 and incorporates them by reference herein as if fully set forth.

140.     At all relevant times, Plaintiff and each of the Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

141.    This enterprise was not a specific legal entity, but rather a union or group of individuals associated in fact.

142.    Defendants' Conspiracy is an association-in-fact for the common and continuing purpose described above, and which constitutes an enterprise ("Enterprise").  The Enterprise consisted of, among others: (a) Seyfarth, (b) Taylor, (c) Northern Trust; (d) Christiana Bank, (e) Euram Bank, and (f) Pali Capital.

143.    The Enterprise engaged in interstate and foreign commerce and activities which affect interstate and foreign commerce by providing financial, legal, and estate planning services across state lines and between countries.

144.    The Defendants that make up the Enterprise, either individually or through their agents, formed the Enterprise to participate in Defendants' Conspiracy, whose main purpose was to generate income by a common plan, transaction and course of conduct described herein in connection with the design, promotion, and sale of the Menzies Tax Shelters, pursuant to which each Defendant knew or recklessly engaged in acts, transactions, practices and a course of conduct of business which operated as a fraud upon Menzies.

145.    While Defendants participated in the Enterprise and were part of it, the Defendants also had and have an existence separate and distinct from the Enterprise.

146.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged in, directing and controlling the conduct of the Enterprise in furtherance of Defendants' Conspiracy.

147.    Defendants' control and participation in the Enterprise was necessary for the successful operation of Defendants' Conspiracy, which included, among other things:

    a.      Establishing a common plan to share in the income generation received from selling and promoting the Menzies Tax Shelters;

    b.      Establishing a common plan as to how to market the Menzies Tax Shelters to participants; and

    c.      Concealing the true nature of the relationship between Defendants and any participants, including Menzies.

148.    Each Defendant played an important role in the success of the Enterprise:

    a.      Seyfarth and Taylor were responsible for providing legal documentation and providing the Opinion Letters that purported to approve the Menzies Tax Shelters;

    b.      Northern Trust was responsible for promoting the Euram Oak Strategy to participants and coordinating Defendants roles and responsibilities in implementing the Menzies Tax Shelters; and

    c.      Christiana Bank was responsible for creating the trust documents and operating as trustee of the Menzies Tax Shelters.

149.    Defendants conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

150.    18 U.S.C. 1961(1) provides that "racketeering activity" is limited to the specific acts statutorily enumerated, including mail and wire fraud under 18 U.S.C. § 1341 (mail) and 18 U.S.C. § 1343 (wire).  As set forth herein, Defendants engaged in conduct violating each of these laws to effectuate Defendants' Conspiracy and to defraud Menzies in furtherance of the Menzies Tax Shelters.

151.    For the purpose of executing and/or attempting to execute the Menzies Tax Shelters to defraud and to obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1341 placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter and things therefrom including but not limited to contracts, loan documents, promissory notes, trust documents, instructions, correspondence, opinion letters, and other related documents.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' Conspiracy, or with the knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  Defendants carried out their scheme in different states and different countries, and could not have done so unless they used the Postal Service or other private/commercial interstate and/or foreign carriers.

152.    For the purpose of executing and/or attempting to execute the Menzies Tax Shelters to defraud and to obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1343 transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' Conspiracy, or with the knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  Defendants carried out their scheme in different states and different countries, and could not have done so unless they used wire communication in interstate and foreign commerce.

153. For purposes of both mail and wire fraud, the matter and things sent by Defendants by Postal Service, private or commercial carrier and by wire across interstate lines and to and from foreign countries include, among other things:

  a.  Contracts that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters;

  b.  Loan documents that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters;

  c.  Structured promissory notes that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters;

  d.  Promissory notes that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters;

  e.  Trust documents that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters;

  f.  Correspondence from Defendants that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Menzies Tax Shelters; and

  g.  Other matter and things sent through or received from the Postal Service, private or commercial carrier and by wire across interstate lines and to and from foreign countries in furtherance of the Menzies Tax Shelters.

154.    At least two of the predicate acts of mail and wire fraud identified herein were committed within the past ten years.

155.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Menzies and obtaining his property for Defendants' gain.  Defendants either knew or recklessly disregarded the fact that their misrepresentations and omissions described herein were material, and Menzies relied upon the misrepresentations and omissions described herein.

156.    The Defendants made continual use of mail and wire transmissions to effectuate their fraudulent scheme, and additionally, transmitted numerous specific fraudulent statements to Plaintiff by mail or wire, as described herein.

157.    As a result, Defendants have obtained money and property belonging to Menzies and Menzies has been injured in his property by Defendants' overt acts of mail and wire fraud.

158.    Defendants, each of whom are persons associated with the Enterprise, did knowingly and willfully conduct or participate in the affairs of the Enterprise through a "pattern of racketeering activity" pursuant to 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  As set forth above, Defendants committed and/or conspired to aid and abet a transaction in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters for at least two such acts of racketeering activity, as described above, within the past ten years.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results impacting upon unwitting participants, including Menzies.

159.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of future racketeering activity, and therefore, constitute a "pattern of racketeering."

160. This claim for relief arises under 18 U.S.C. § 1962(c) which provides that "it shall be unlawful for any person … associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

161. As set forth above, Defendants have violated 18 U.S.C. §1962(c) by conducting or participating directly or indirectly in the conduct of the affairs of the Enterprise through a pattern of racketeering. Through the fraudulent and wrongful conduct described herein, Defendants deprived Menzies of property rights. In order to successfully execute their scheme in the manner set forth herein, Defendants had a common plan and system to market and promote the Menzies Tax Shelters to participants such as Menzies. The Enterprise was the vehicle for the common plan and system to be effectuated.

162. In carrying out the overt acts and fraudulent scheme described herein, Defendants engaged in conduct in violation of federal laws, and specifically in violation of 18 U.S.C. §§ 1341 and 1343.

163. As a direct and proximate result, Menzies has been injured in his property by the predicate acts which make up Defendants' pattern of racketeering activity through the Enterprise by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants. In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

41

164.     The promotion and execution of the Menzies Tax Shelter was part of pattern of similar or identical activity by Defendants, as tax shelter promoters, advisors, and others that had the same or similar purposes, results, participants, victims, or methods of commission.  Indeed, the very nature of the creation of this tax product – that can be replicated to multiple taxpayers – is conduct possessing a threat of repetition and continued criminal activity.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of compensatory and actual damages, trebled damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

## COUNT II
## CONSPIRACY TO VIOLATE RICO PURSUANT TO 18 U.S.C. § 1962(d)
### (Against all Defendants)

165.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 164 and incorporates them by reference herein as if fully set forth.

166.     This claim for relief arises under 18 U.S.C. § 1962(d) which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

167.     In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced in at least as early as 2002 and continued through and after the implementation of the Menzies Tax Shelters.  The object for the conspiracy was to obtain funds from Menzies in furtherance of Defendants' Conspiracy in promoting and marketing the Menzies Tax Shelters.

168.     As set forth above, each of the Defendants knowingly, willingly, and unlawfully agreed and combined to conduct or participate directly or indirectly, in the conduct of the affairs and activities of the Enterprise through a pattern of racketeering activity, including acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. Defendants objectively manifested their agreement to the commission of the substantive RICO violations by at least one member of the conspiracy by words or acts, as detailed above.

169.     As set forth above, each Defendant committed at least one overt act of racketeering activity or other wrongful activity in furtherance of such conspiracy including systematic fraudulent practices designed to defraud Menzies of money and other property interest.

170.     The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that the Defendants not only agreed to conspire to violate 18 U.S.C. §1962(c), but that they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

171.     Absent Defendants' conspiracy and joint efforts, Defendants' Conspiracy would not be successful. Acting jointly, Defendants have had greater power and influence, and have been successfully engaged in the activities of promoting and transacting the steps of the Menzies Tax Shelters.

172.     As a direct and proximate result, Menzies has been injured in his property by the predicate acts which make up Defendants' pattern of racketeering activity through the Enterprise by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services

to investigate and resolve the fraud perpetrated by Defendants. In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

173. The promotion and execution of the Menzies Tax Shelter was part of pattern of similar or identical activity by Defendants, as tax shelter promoters, advisors, and others that had the same or similar purposes, results, participants, victims, or methods of commission. Indeed, the very nature of the creation of this tax product – that can be replicated to multiple taxpayers – is conduct possessing a threat of repetition and continued criminal activity.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of compensatory and actual damages, trebled damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

### COUNT III
### <u>FRAUDULENT MISREPRESENTATION</u>
(Against all Defendants)

174. Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 173 and incorporates them by reference herein as if fully set forth.

175. As stated above, Defendants made material misrepresentations in connection with the Menzies Tax Shelters, including:

      a.    That the Menzies Tax Shelters were valid, legitimate, and legal under federal and state law;

      b.    That the Menzies Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

c. That the Menzies Tax Shelters would not be subject to challenge by the IRS;

d. That the Menzies Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

e. That the Menzies Tax Shelters were not subject to tax penalties;

f. That the Menzies Tax Shelters would not be disallowed by the IRS because of the application of the sham transaction doctrine;

g. That the Menzies Tax Shelters were more likely than not to be upheld by the IRS;

h. That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Menzies Tax Shelters, if audited;

i. That the Menzies Tax Shelters would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

j. That the various trusts being formed to execute the Menzies Tax Shelters had a business purpose and economic substance; and

k. That the various loans and promissory notes being created in furtherance of the Menzies Tax Shelters had a business purpose and economic substance.

176. In addition, the following material omissions were part of the fraud:

a. Failing to disclose the true likelihood that the Menzies Tax Shelters would not provide the tax savings promised;

b. Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Menzies Tax Shelters;

c. Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

d. Failing to disclose that the Opinion Letters relied on factual assumptions that were known by the Defendants to be untrue;

e. Failing to disclose that Christiana was seeking legal advice about whether the Menzies Tax Shelters were a Reportable Transaction, and failing to report this to Menzies;

f. Failing to disclose that Taylor had been indicated for tax fraud; and

g. Failing to revise, alter, and modify the advice and recommendations made to Menzies after issuing the Opinion Letters and after the IRS began its audit related to the Menzies Tax Shelters.

177. These misrepresentations and omissions of Defendants were known to Defendants to be false and untrue.

178. At no point prior to the IRS settlement did Menzies know that the Defendants were conveying false, misleading, or omitted facts that comprised Defendants representations as to the efficacy of the Menzies Tax Shelters.

179. The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions in authorizing Defendants to perform the various transactions involved in the Menzies Tax Shelters.

180. As detailed above, the foregoing material misrepresentations and omissions were made to Menzies by the Defendants intentionally, knowingly, and/or with reckless disregard for the truth.

181.    As a result of the foregoing material misrepresentations and omissions, Menzies authorized Defendants to perform the various transactions that comprised the Menzies Tax Shelters under the belief that AUI stock, when sold, would not be subject to capital gains tax.

182.    As a direct and proximate result, Menzies has been injured in his property by the fraudulent misrepresentations by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.    In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

**COUNT IV**
**CIVIL CONSPIRACY**
(Against all Defendants)

183.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 182 and incorporates them by reference herein as if fully set forth.

184.    Defendants knowingly acted in concert with one another to market and implement the Menzies Tax Shelters in furtherance of Defendants' Conspiracy.    In doing so, Defendants acted with full knowledge and awareness that the Menzies Tax Shelters were designed to give the false impression that a complex series of financial transactions were legitimate business

47

transactions which had economic substance, when they in fact lacked the features necessary for a successful tax strategy.

185.    Defendants acted in their respective roles as described above in furtherance of the Defendants' Conspiracy by working in coordination with each other, communicating with each other and conspiring with each other in a commonly understood and accepted plan of action, to wrongfully advise Menzies about his tax obligations pursuant to the Menzies Tax Shelters for the purpose of effectuating Defendants' Conspiracy.  In other words, Defendants acted as agents of one another in furtherance of their conspiracy and the Defendants' Conspiracy when dealing marketing, promoting, selling and implementing the Menzies Tax Shelters.

186.    At no time prior to the IRS settlement did Menzies know that the Defendants were conveying false, misleading, or omitted facts that comprised Defendants representations as to the efficacy of the Menzies Tax Shelters.

187.    The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions authorizing the Defendants to perform the various transactions that formed the Menzies Tax Shelters.

188.    There was a meeting of the minds between the Defendants to commit the unlawful acts alleged herein, and for each Defendant to operate as an agent for each other in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters.  This conspiracy to commit these unlawful, overt acts was intended to harm and continue to harm Menzies.  One or more of the overt acts described above were in furtherance of the conspiracy.  Said acts were tortious and unlawful, and engaged in solely for the purpose of Defendants' Conspiracy.

189.    Defendants conduct was deliberately done with the intent to induce Menzies to enter into the Menzies Tax Shelters in furtherance of Defendants' Conspiracy.

190.     As a direct and proximate result of Defendants' conspiracy to defraud Menzies, Menzies has been injured by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.  In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

### COUNT V
### <u>JOINT ENTERPRISE LIABILITY</u>
(Against all Defendants)

191.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 190 and incorporates them by reference herein as if fully set forth.

192.     Defendants entered into a joint enterprise for the purpose to effectuate Defendants' Conspiracy and to promote, sell, and implement the Menzies Tax Shelters.

193.     Each of the Defendants participated in and approved decisions made by the joint enterprise related to the promotion, sale, and implementation of the Menzies Tax Shelters.

194.     Defendants benefited financially from the common purpose of the joint enterprise, as intended by Defendants' Conspiracy, by receiving a share of the proceeds from the promotion, sale, and implementation of the Menzies Tax Shelters to Menzies.

195.    As a result, Defendants are jointly and severally liable as partners, joint ventures or members of a joint enterprise, for the tortious conduct of any one of their partners or joint ventures related to the promotion, sale, and implementation of the Menzies Tax Shelters to Menzies.

196.    As a direct and proximate result of Defendants' joint venture and wrongful conduct, Menzies has been injured in his property by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.  In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

### COUNT VI
### NEGLIGENT MISREPRESENTATION
### (In the Alternative)
(Against Northern Trust and Christiana Bank)

197.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 138 and incorporates them by reference herein as if fully set forth.

198.    Defendants Northern Trust and Christiana Bank knew or should have known that the following statements related to the efficacy of the Menzies Tax Shelters were untrue:

a.   That the Menzies Tax Shelters were valid, legitimate, and legal under federal and state law;

b.   That the Menzies Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

c.   That the Menzies Tax Shelters would not be subject to challenge by the IRS;

d.   That the Menzies Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

e.   That the Menzies Tax Shelters were not subject to tax penalties;

f.   That the Menzies Tax Shelters would not be disallowed by the IRS because of the application of the sham transaction doctrine;

g.   That the Menzies Tax Shelters were more likely than not to be upheld by the IRS;

h.   That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Menzies Tax Shelters, if audited;

i.   That the Menzies Tax Shelters would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

j.   That the various trusts being formed to execute the Menzies Tax Shelters had a business purpose and economic substance; and

k.   That the various loans and promissory notes being created in furtherance of the Menzies Tax Shelters had a business purpose and economic substance.

199.     In addition, Defendants Northern Trust and Christiana Bank should have disclosed the following material omissions:

a.     Failing to disclose the true likelihood that the Menzies Tax Shelters would not provide the tax savings promised;

b.     Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Menzies Tax Shelters;

c.     Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

d.     Failing to disclose that the Opinion Letters relied on factual assumptions that were known by the Defendants to be untrue;

e.     Failing to disclose that Christiana was seeking legal advice about whether the Menzies Tax Shelters were a Reportable Transaction, and failing to report this to Menzies; and

f.     Failing to revise, alter, and modify the advice and recommendations made to Menzies after issuing the Opinion Letters and after the IRS began its audit related to the Menzies Tax Shelters.

200.     Defendants Northern Trust and Christiana Bank did not exercise reasonable care or competence in obtaining or communicating the information contained in these false representations as to the propriety of the Menzies Tax Shelters.

201.     Defendants Northern Trust and Christiana Bank had a duty to make sure that the representations made to Menzies, including omissions of fact not made to Menzies, as to the efficacy of the Menzies Tax Shelters was in fact true.   Defendants Northern Trust's and Christiana Bank's duty arises out of their: (a) professional relationship with Menzies (including

fiduciary relationship), (b) superior knowledge and expertise in tax matters, and (c) their complete control over the transactions which Menzies authorized in furtherance of the Menzies Tax Shelters.

202.     The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions in engaging in the various transactions that formed the Menzies Tax Shelters.

203.     Defendants Northern Trust and Christiana Bank breached their duties owed to Menzies, by making material misrepresentations or omissions as detailed above.

204.     As a direct and proximate result of Defendants Northern Trust's and Christiana Bank's negligent misrepresentation, Menzies has been injured by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants Northern Trust and Christiana Bank, each of them, jointly and severally, including an award of compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(In the Alternative)**
(Against Northern Trust)

205.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 190 and incorporates them by reference herein as if fully set forth.

206.    As Menzies' financial advisor, Northern Trust owed fiduciary duties of honesty, loyalty and care.  Northern Trust had the duty to carefully assess Menzies' circumstances and to properly advance Menzies' wealth management and estate planning needs related to tax savings programs.

207.    Northern Trust had both superior knowledge and influence over Menzies and complete control over the handling of the outcome of the Menzies Tax Shelters on behalf of Menzies.

208.    Menzies relied on Northern Trust to provide him with sound wealth management advice when promoting and enticing Menzies to engage in the Menzies Tax Shelters.

209.    Northern Trust and its agents breached their fiduciary responsibilities to Menzies by violating the duty of honesty, loyalty, and care by, among other acts, failing to advise Menzies fully as to true relationship with the other Defendants, failing to disclose to Menzies the actual roles of each Defendant in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters.

210.    As a direct and proximate result of the negligence and carelessness of Northern Trust as set forth above, Menzies has been injured by having: (a) paid Defendants substantial fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings opportunities; and (d) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Northern Trust including an award of compensatory and actual damages, reasonable

attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

## COUNT VIII
## <u>BREACH OF FIDUCIARY DUTY</u>
### (In the Alternative)
(Against Christiana Bank)

211.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 190

and incorporates them by reference herein as if fully set forth.

212.     Christiana Bank through its agent Freney, as trustee of the various trusts described

above, was a fiduciary of Menzies, and thus owed Menzies the duties of honesty, loyalty and

care.

213.     Christiana Bank breached its fiduciary responsibilities to Menzies by violating the

duty of honesty, loyalty, and care by, among other acts, failing to disclose to Menzies the actual

roles of each Defendant in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters,

seeking legal advice about whether the Menzies Tax Shelters were a Reportable Transaction, and

failing to report this to Menzies, and failing to explain the details of the Menzies Tax Shelters to

ensure that Menzies understood the tax strategy and its risks before inducing Menzies to enter

into the various transactions that made up the Menzies Tax Shelters.

214.     As a direct and proximate result of the negligence and carelessness of Christiana

Bank as set forth above, Menzies has been injured by having: (a) paid Defendants substantial

fees and expenses in furtherance of the Menzies Tax Shelters; (b) paid the IRS millions of dollars

in back taxes, penalties, and interest; (c) foregone other legitimate and lawful tax savings

opportunities; and (d) engaged legal and professional services to investigate and resolve the

fraud perpetrated by Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor

and against Christiana Bank including an award of compensatory and actual damages, reasonable

attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

## COUNT IX
## UNJUST ENRICHMENT
(Against all Defendants)

215.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 190 and incorporates them by reference herein as if fully set forth.

216.    As a direct and proximate result of Defendants' misconduct as alleged herein, Defendants were enriched, at the expense of Menzies, through Menzies' payment of substantial fees in furtherance of the Menzies Tax Shelters.

217.    Defendants, through their wrongful conduct described above, have reaped substantial profit and revenue from Menzies by their wrongful and unlawful conduct.

218.    The enrichment by Defendants of this substantial profit and revenue from Menzies was unjust and at the expense of Menzies.

219.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Menzies, as Menzies incurred substantial damages as a result of the misrepresentation and omissions related to the efficacy of the Menzies Tax Shelters, such as paying the IRS millions of dollars in back taxes, penalties, and interest, and having to pay new advisors, consultants, and lawyers to correct the unlawful activity occasioned on Menzies by Defendants' conduct.

220.    Therefore, any fees and expense paid to Defendants by Menzies in furtherance of Defendants' Conspiracy and the Menzies Tax Shelters should be returned to Menzies.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants, each and every one of them, jointly and severally, including an award of

compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff Steven Menzies requests a jury trial on all questions of fact raised by the Amended Complaint.

DATED this 23rd day of December, 2016.

**STEVEN MENZIES**

By: /s/  Jeffrey B. Charkow
One of his attorneys

Jeffrey B. Charkow
Daniel A. Dorfman
HARRIS WINICK HARRIS LLP
333 W. Wacker Drive, Suite 2060
Chicago, IL 60606
(312) 662-4600

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a copy of the foregoing Amended Complaint was served upon all counsel of record in this action via the U.S. District Court CM/ECF e-filing system on December 23, 2016.


/s/ Jeffrey B. Charkow_____