# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEVEN MENZIES,

      Plaintiff,

      v.

SEYFARTH, SHAW LLP,
GRAHAM TAYLOR,
NORTHERN TRUST CORPORATION,
and CHRISTIANA BANK & TRUST
COMPANY,

      Defendants.

Case No. 15 C 3403

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Steven Menzies sued Defendants Seyfarth Shaw LLP (Seyfarth), Graham Taylor (Taylor), Northern Trust Corporation (Northern), and Christiana Bank & Trust Company (Christiana), alleging that Defendants have damaged him by selling him an abusive tax planning product designed to allow him to avoid paying capital gains tax. Plaintiff alleges that the tax plan ultimately failed when uncovered by the IRS, and that, as a result, he owed the IRS back taxes, in addition to fees, interest, and penalties.

Plaintiff asserts causes of action against Defendants for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.* (Count I), and conspiracy to violate the RICO Act (Count II). Plaintiff also asserts state-law claims for fraudulent misrepresentation (Count III), civil conspiracy (Count

IV), joint enterprise liability (Count V), negligent misrepresentation (Count VI), breaches of fiduciary duty (Counts VII and VIII), and unjust enrichment (Count IX).

After an opportunity to conduct discovery and two prior attempts to draft his complaint, Plaintiff filed his Second Amended Complaint (SAC) in August 2017. [165]. Shortly after, Defendants again moved to dismiss the SAC with prejudice. [169] [172] [175]. Plaintiff then filed motions to strike exhibits attached to Defendants' motions to dismiss. [182] [184] [186]. For the reasons explained below, this Court grants Defendants' motions to dismiss, and grants Plaintiff's motions to strike.

This Court presumes familiarity with, and incorporates by reference, its prior opinion granting in part and denying in part Defendants' motions to dismiss Plaintiff's complaint. [57]. Therefore, the Background section only briefly revisits the facts in this case, and details only the additional allegations that Plaintiff has added in his SAC. Likewise, this Court will not repeat in detail its prior legal analysis or the required elements of each cause of action.

## I.     Background

Plaintiff is the co-founder, President and Chief Operating Officer of a financial services firm called Applied Underwriters Inc. (AUI). Plaintiff asserts that Defendants conspired to develop, market, and promote to himself and others an abusive tax avoidance scheme. [165] ¶ 1. Plaintiff claims that, as an unwitting participation in Defendants' scheme, he suffered millions of dollars of damages after

the IRS uncovered that Plaintiff's sale of stock, through various trust tax shelters, allowed him to evade tax liabilities. *Id.* Plaintiff alleges that, since 2003, Defendants aggressively marketed generic tax shelter products to clients, all of which were designed to avoid or evade income tax. *Id.* ¶¶ 13, 15–17. Two of these tax shelters are what Plaintiff calls the "Euram Oak Strategy" and the "Euram Rowan Strategy." *Id.* ¶ 18. Apart from the named Defendants, the alleged enterprise included Euram Bank (Euram), a private bank located in Austria, and Pali Capital (Pali), an entity that worked on behalf of Euram in connection with the Euram Oak and Rowan strategies. *Id.* ¶¶ 17, 19, 188.

In the SAC, Plaintiff adds new allegations regarding three other investors who were purportedly defrauded by Defendants' enterprise: (1) an Arizona investor; (2) a North Carolina investor; and (3) Plaintiff's colleague, Sidney Ferenc.[1] *See* [165] ¶¶ 28, 38, 88, 91, 110–18, 160–80, 181, 184.

The Arizona investor. In or about March 2003, representatives of Euram and/or Pali communicated with the Arizona investor about the Euram Oak Strategy. *Id.* ¶¶ 160–61. About a year later in February 2004, Taylor and Seyfarth provided the Arizona investor with a legal opinion regarding the Euram Oak Strategy. *Id.* ¶ 162. Seyfarth has maintained attorney-client privilege over this opinion; however, Plaintiff alleges (upon information and belief) that, in the opinion, Seyfarth asserted the legality of the strategy, even though Seyfarth and Taylor knew that the strategy

---

[1] Because the identities of the Arizona and North Carolina investors have been kept under seal, this Court will not refer to them by name.

did not constitute legitimate tax planning advice. *Id.* Plaintiff alleges upon his information and belief that the Arizona investor suffered damages equal to, among other things, the tax deficiency from the IRS disallowance of the Euram Oak Strategy, with a purported tax savings of approximately $75 million. *Id.* ¶ 165.

The North Carolina investor. In late 2002, a representative of Pali met with the North Carolina investor to discuss the Euram Rowan Strategy. *Id.* ¶ 173. After this meeting, Euram suggested to the North Carolina investor that he engage Taylor to provide a legal opinion about the tax benefits that he would obtain by implementing the Euram Rowan Strategy. *Id.* ¶ 176. Around October 2003, Taylor and Seyfarth provided the North Carolina investor with a legal opinion regarding the Euram Rowan Strategy. *Id.* ¶ 177. Seyfarth has asserted privilege over this opinion; nonetheless, Plaintiff alleges (also upon information and belief) that the opinion asserted the legality of the Euram Rowan Strategy, even though Seyfarth and Taylor knew that it was not a legitimate tax planning vehicle. *Id.* Ultimately, as a result of the North Carolina investor's entry into the Euram Rowan Strategy, the IRS disallowed the North Carolina investor's claimed $17.5 million loss and assessed a penalty of $911,869. *Id.* ¶ 810.

Ferenc. Ferenc is an executive and colleague of Plaintiff's at AUI. *Id.* ¶ 25. He entered into the Euram Oak Strategy at the same that Plaintiff entered into one of his transactions, the 2003 Tax Shelter. *Id.* ¶¶ 91, 159. Ferenc paid substantial fees associated with his initial investment. *Id.* ¶ 159. In October 2003, Taylor, in

an email, advised Ferenc that he considered various IRS regulations in assuring him that the Euram Oak Strategy constituted legitimate tax planning advice. *Id.* ¶ 88. Taylor also sent Ferenc and Plaintiff a draft tax opinion via email on September 9, 2003, assuring them, among other things, that the Euram Oak Strategy was a lawful tax avoidance mechanism and not a fraudulent tax shelter. *Id.* ¶ 110. Taylor sent further drafts throughout 2004, as well as a final signed opinion letter around September 24, 2004; all of these letters assured Ferenc that the Euram Oak Strategy was a legitimate tax planning vehicle. *Id.* ¶¶ 110–11, 115, 118. Plaintiff does not say whether Ferenc ultimately owed anything to the IRS. *See generally id.*

Apart from the new allegations regarding the three investors, Plaintiff also makes a conclusory allegation that there is a threat of continued racketeering activity because Defendants' predicate acts of mail and wire fraud were part of their regular way of conducting business. *Id.* ¶ 183. Plaintiff also asserts the legal conclusion that Defendants' pattern of criminal conduct projects into the future because there is a preexisting team that could execute and support the tax shelters for other taxpayers as it did for Plaintiff and the other purported victims. *Id.* ¶ 184.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting

*Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

In evaluating a complaint on a Rule 12(b)(6) motion, this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). On a motion to dismiss, this Court may consider the complaint itself, documents attached to the complaint, documents central to the complaint and to which the complaint refers, and information properly subject to judicial notice. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Claims alleging fraud must also meet Rule 9(b)'s heightened pleading requirements. As to the fraud portions of the RICO claims, Rule 9(b) demands that claimants "state with particularity the circumstances constituting fraud." Particularity requires that plaintiffs "describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks omitted); *Slaney v. The Intern. Amateur Athletic*

*Federation*, 244 F.3d 580, 597 (7th Cir. 2001).  Although different cases require different levels of detail for a complaint to satisfy Rule 9(b), *id.* at 442, plaintiffs must provide "precision and some measure of substantiation," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted).

## III.   Analysis

### A.      Counts I and II:  The RICO Claims

#### 1.  This Court's Prior Opinion

In its prior opinion, this Court dismissed Plaintiff's RICO claims because Plaintiff failed to sufficiently allege a pattern of racketeering activity.  [57] at 32–39.  Specifically, this Court found that Plaintiff did not adequately allege "closed-ended" continuity, because the predicate acts—mail and wire fraud—all occurred in furtherance of a single scheme to defraud a single victim, Plaintiff, whose injuries all stem from a single tax planning product.  *Id.* at 33–36.  This Court also found that Plaintiff's allegations lack threat of continuity because Plaintiff alleged only a single victim (himself) and the alleged pattern of criminal activity dispelled any "threat of repetition" because, by the complaint's own allegations, the alleged pattern of Defendants' conduct ended by 2005, when all of the transactions involving Plaintiff had completed.  *Id.* at 36 (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994)).

Based upon these findings, this Court granted Plaintiff leave to replead his RICO claims, instructing Plaintiff that it would review any amended complaint for

the existence of other victims that were defrauded by Defendants' alleged scheme. *Id.* at 39. This Court also stated that it would address whether any amended complaint set forth each requisite element of the predicate fraud acts with the specificity required under Rule 9(b). *Id.*

### 2. Plaintiff's Pattern Allegations Must Be Dismissed

#### a. Plaintiff Fails to Allege A Closed-Ended Pattern

As with his original complaint, Plaintiff attempts to allege a closed-ended pattern involving multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in furtherance of the overall scheme to defraud, all within the affairs of the alleged RICO enterprise. [165] ¶¶ 1–184; [196] at 15–16 (arguing that the SAC alleges a closed-ended pattern because Defendants' schemes involved multiple victims, multiple predicate acts over a period of several years, and at least two tax shelter products). Where, as here, mail and wire fraud form the alleged pattern, each requisite element of the underlying predicate activity must be set forth with the particularity and specificity required by Rule 9(b). [57] at 32 (citing *Slaney v. Intern. Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001)). And, at a minimum, Plaintiff must allege with particularity: (1) a scheme to defraud; (2) the intent to defraud; and (3) the use of the mails or wire communications in furtherance of the scheme to defraud. *Id.*

Defendants argue that the SAC's new allegations do nothing to cure the deficiencies in Plaintiff's pleading of closed-ended pattern because they fail to

plausibly and adequately allege that the three newly added investors were deceived by Defendants. [173] at 9–13.[2]

This Court agrees. In *Emery v. American General Finance, Inc.*, the Seventh Circuit affirmed dismissal of the plaintiff's RICO claim with prejudice where his complaint (which was actually his second amended complaint) included only general allegations about other alleged victims who entered into similar transactions as the plaintiff, but ultimately, "shed[ ] no light" on whether the alleged victims "were deceived." 134 F.3d 1321, 1322–23 (7th Cir. 1998). Thus, *Emery* teaches that, in the context of a RICO claim where the predicate acts are fraud-based, the complaint must set forth, with particularity, facts indicating that other victims were actually deceived by the same alleged pattern of racketeering activity by the same alleged enterprise. *Id. See also Shirley v. Jed Capital, LLC*, 724 F. Supp. 2d 904, 914 (N.D. Ill. 2010) (plaintiff failed to plead pattern of racketeering activity where his complaint omitted "many needed details," such as the content of misrepresentations, why they constituted misrepresentations, and how the plaintiff was misled by those misrepresentations); *Krug v. Am. Family Mut. Ins. Co.*, 227 F. Supp. 3d 942, 945 (N.D. Ill. 2016) (dismissing fraud claim because "the essence of fraud is deception, and plaintiff does not claim to have been deceived by defendant's conduct.").

In his SAC, Plaintiff adds new allegations concerning three other investors who were allegedly lured by Defendants into entering into illegal tax avoidance

---

[2] Because each Defendant has echoed, or incorporated by reference, the arguments raised by the other Defendants in their motions to dismiss, this Court addresses the motions collectively.

schemes. These allegations, however, do not pass muster under Rule 9(b) because they fail to plausibly state that the investors were victims of fraud.

For instance, the allegations concerning the Arizona investor describe, in general terms, a tax shelter transaction that the Arizona investor entered into upon the advice of Seyfarth and Taylor. [165] ¶¶ 160–69. Conspicuously missing, however, are any particularized allegations demonstrating why, how, or even if, he was actually deceived by Defendants' conduct. *See generally id.* Plaintiff does not allege any particular facts about what the Arizona investor was actually told about the Euram Oak Strategy; rather, he states only that "it is reasonable to assume" that Seyfarth advised the Arizona investor as to the legality of the Euram Oak Strategy. *Id.* ¶ 162. Even more troubling, Plaintiff does not assert what, if anything, about the Euram Oak Strategy or what any of the Defendants said about the Euram Oak Strategy, actually deceived the Arizona investor.

The allegations concerning the North Carolina investor suffer the same defects. Here again, Plaintiff sets forth the general contours of the North Carolina investor's transaction, alleging that Seyfarth and Taylor provided him a legal opinion about the so-called Euram Rowan strategy and falsely represented that it was a legal tax planning vehicle. *Id.* ¶¶ 170–80. Yet, Plaintiff does not set forth any specific facts demonstrating that the North Carolina investor *was* actually deceived by any of Defendants' conduct, or *how* he was deceived. Like those relating to the Arizona investor, these allegations suggest only that the North Carolina investor

lost money after entering into an ill-advised tax shelter. The allegations nowhere indicate, however, that the North Carolina investor lost that money as a result of being *defrauded* by Defendants.

Lastly, Plaintiff's allegations concerning Ferenc fare no better. In Ferenc's case, Plaintiff provides some detail about his transaction—including that he obtained a $22,800,000 loan from Euram bank—and alleges that he received tax opinion letters from Seyfarth and Taylor that were "substantially similar to" the ones that they issued to Plaintiff. *Id.* ¶¶ 91, 123. Plaintiff alleges that Ferenc invested in a Euram Oak Strategy at the same time as Plaintiff, and on his information and belief, paid substantial fees associated with the initial investment. *Id.* ¶ 159. As with the other two investors, however, Plaintiff utterly fails to set forth any facts stating that Ferenc was actually deceived. Indeed, Plaintiff does not allege that Ferenc was deceived, how he was deceived, or even that he suffered any injury in the way of IRS penalties or disallowances. *See generally id.*

In short, the SAC is devoid of any allegations that Defendants' conduct *actually deceived* other investors. Plaintiff's failure to plead such facts is particularly problematic in a case, like this one, where the purported victims knowingly entered into tax shelters, which by their nature are designed to avoid taxes. The SAC thus begs the question of how exactly the purported victims (who might not be victims at all) were actually deceived by Defendants. Because the SAC does not answer that question, Plaintiff fails to cure his RICO claims to state "when, why, how, or even if"

other investors were actually defrauded. [57] at 38; *see also Emery*, 134 F.3d at 1323; *Shirley*, 724 F. Supp. 2d at 914. By insufficiently alleging other victims, Plaintiff is back at square one, in that he alleges no more than a single victim (himself) whose injuries all flowed from a single scheme. [57] at 38–39. Under these circumstances, Plaintiff fails to allege closed-ended continuity. *Id.*

### b. Plaintiff Fails to Allege Open-Ended Continuity

Open-ended continuity is satisfied by "past conduct that by its nature projects into the future with a threat of repetition." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 341 (1989)). To demonstrate open-ended continuity, Plaintiff must show: (1) a "specific threat of repetition"; (2) that the predicate acts form "part of an ongoing entity's regular way of doing business"; or (3) that Defendants operate a "long term association that exists for criminal purposes." *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 693 (N.D. Ill. 2012) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992)).

None of these bases are present in the SAC. First, there is no specific threat of repetition because the allegations do not suggest that any future acts of wire or mail fraud will take place. Although, as Plaintiff correctly argues, the threat of continuity must be assessed as of "the time the racketeering occurred," *Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-cv-6976, 2017 WL 1196957, at *10 (N.D. Ill. Mar. 30, 2017), the SAC indicates that Defendants' alleged scheme would not have

continued indefinitely, even when assessed prospectively from the date of the last alleged predicate act, in 2005.

Plaintiff alleges that Taylor was indicted for tax fraud in 2005 and was ultimately convicted in January 2008. [165] ¶¶ 105, 108. Taylor was a key member of Defendants' alleged enterprise because he was the attorney who drafted the necessary opinion letters to provide legal justification and appearance of "legitimacy" for the tax shelter plans. *See, e.g.*, *id.* ¶¶ 100–01, 110, 111, 162, 177. When a RICO scheme depends upon a specific employment relationship, the end of that relationship may eliminate any threat of repetition. *See Midwest Grinding*, 976 F.2d at 1025. In light of the factors previously discussed in this Court's prior opinion [57] and because Taylor's indictment in 2005 surely meant that he would immediately or soon depart from the alleged enterprise, this Court finds that no specific threat of repetition exists by that point. *Id.* ("It follows that once [defendant] left Midwest, any threat of future illegal activity ceased to exist."); *Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 777–78 (N.D. Ill. 2005) (finding no specific threat of repetition of predicate acts because the complaint alleged that the enterprise's ringleader was incarcerated and the plaintiff did not plead any predicate acts since his incarceration).

Second, Plaintiff fails to allege that the predicate acts form "part of an ongoing entity's regular way of doing business." While Plaintiff baldly alleges that there is a "threat of continued racketeering activity in that Defendants['] predicate acts of mail and wire fraud were part of their regular way of doing business," [165] ¶ 183, such

allegation is conclusory and speculative, and insufficient to survive a motion to dismiss. *See Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885, 904–05 (N.D. Ill. 2008) ("A RICO plaintiff is required to allege sufficient facts to support each element, and cannot simply allege these elements using boilerplate language."); *Vicom, Inc. v. Harbridge Merch. Servs.*, Inc., 20 F.3d 771, 783 (7th Cir. 1994) (cursory and unparticularized allegations of continuing racketeering activities insufficient to show open-ended continuity). Moreover, merely alleging multiple acts of Defendants' purported fraud is not sufficient to support a finding that fraud constituted their "regular way of doing business." *See A.I. Credit Corp. v. Hartford Computer Grp., Inc.*, 847 F. Supp. 588, 603 (N.D. Ill. 1994) (alleging multiple acts of fraud, without more, could not suffice to show that predicate acts were a regular way of doing business, because the "same could be said in almost any case, since dishonesty tends to become habitual."). Here, there are insufficient facts from which this Court can draw an inference that Defendants have incorporated mail and wire fraud into their regular business practices.

Finally, Plaintiff does not sufficiently allege that Defendants are engaged in a criminal pattern of activity that otherwise projects into the future. Plaintiff generally states that:

> Defendants' pattern of criminal conduct in this case projects into the future, as the manner in which the Euram products were presented as products, with a preexisting team that could execute and support the tax shelter for other taxpayers and from the regular manner in which this enterprise did business with [the alleged victims].

*Id.* ¶ 184.   Once again, this allegation is purely speculative and conclusory, and therefore insufficiently pled.   Moreover, this Court finds nothing in the SAC that allows it to infer a RICO pattern that projects into the future.   Plaintiff's allegations suggest, at most, that Defendants collaborated on several transactions that produced negative tax consequences for Plaintiff and several other investors, and each Defendant profited separately from those transactions.

### c.  Plaintiff's RICO Claims Are Dismissed

Because Plaintiff has failed to allege either closed-ended or open-ended continuity, he fails to state a "pattern of racketeering activity."   Accordingly, this Court dismisses Plaintiff's RICO claim (Count I).

Further, Plaintiff's RICO conspiracy claim rests upon the same facts as his substantive RICO claim.   *See* [165] ¶¶ 211–19.   Accordingly, given the record here, Plaintiff's failure to state a RICO pattern requires dismissal of his conspiracy claim as well.   *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000).

### B.    Counts III to IX:  Plaintiff's State-Law Claims

Plaintiff's remaining claims in his SAC all sound in Illinois state law.   *See generally* [165] ¶¶ 220–66.   Defendants all argue that these state-law claims are time-barred by the Illinois Securities Law, 735 ILCS 5/12, *et seq.* (ISL).[3]   This Court agrees, as explained below.

---

[3] Because invoking a statute of repose is an affirmative defense, the Court construes these portions of Defendants' briefs under Federal Rule of Civil Procedure 12(c).  *See Johnson v. City of S. Bend*, 680 F.

### 1. The ISL's Scope

During the relevant time period,[4] the ISL's statute of repose provided that "[n]o action shall be brought for relief under this Section or *upon or because of any of the matters for which relief is granted by this Section*," after five years from the sale of the securities at issue. 815 ILCS 5/12(D) (emphasis added). Thus, under Illinois law, even "claims that do not directly invoke" the ISL "may still fall within its" repose period. *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007). Whether Plaintiff's state-law claims here are subject to the ISL's statute of repose "depends on what acts are encompassed within" the ISL's substantive provisions. *See id.* at 671.

Section 12(F) of the ISL prohibits engaging in "any transaction, practice or course of business *in connection with* the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof." 815 ILCS 5/12(F) (emphasis added). This "in connection with" standard is subject to a "broad interpretation," capturing even fraud that merely "coincided with or touched a

App'x 475, 478 (7th Cir. 2017) ("The expiration of a statute of limitations is an affirmative defense. And since plaintiffs need not anticipate affirmative defenses in a complaint, a motion to dismiss under Rule 12(b)(6) is not the appropriate means for defendants to seek dismissal based on a statute of limitations.").

[4] The statute of repose formerly found in 815 ILCS 5/13(D) was removed via amendment on August 5, 2013. The Court is nevertheless bound to enforce that repose period under Illinois law. Once "a claim is time-barred, it cannot be revived through subsequent legislative action." *Doe A v. Diocese of Dallas*, 917 N.E.2d 475, 486 (Ill. 2009); *see also M.E.H. v. L.H.*, 685 N.E.2d 335, 339 (Ill. 1997) ("If the claims were time-barred under the old law, they remained time-barred even after the repose period was abolished by the legislature."). Removing the statute of repose is also, at least in this case, a distinction without a difference. Plaintiff was informed of the IRS audit in 2009, [165] ¶ 137, which at the very least put him on sufficient notice to begin the three-year limitations period reflected in the current version of 815 ILCS 5/13(D).

securities transaction." *First Nat'l Bank & Tr. Co. of Rochelle, Ill. v. McGraw-Hill Comps., Inc.*, 85 F. Supp. 3d 963, 969 (N.D. Ill. 2015) (explaining that the ISL's "in connection with" requirement is, under Illinois law, substantially similar to the expansive standard of Section 10b and Rule 10b-5 of the Securities Exchange Act). Section 12(I), meanwhile, prohibits employing "any device, scheme or artifice to defraud in connection with the sale or purchase of any security, *directly or indirectly*." 815 ILCS 5/12(I) (emphasis added).

### 2. Plaintiff's State-Law Claims Are Subject To The ISL

The putative fraud at the heart of the SAC clearly "coincided with" or otherwise "touched" Plaintiff's sale of his AUI stock. As alleged in the SAC, Plaintiff essentially exchanged AUI's stock for trust certificates, at Defendants' direction, as part of their tax shelter scheme. *See generally* [165]. Transfers of this sort qualify as sales under the ISL. *See Disher v. Fulgoni*, 514 N.E.2d 767, 772 (Ill. App. Ct. 1987) (the definition of "sale" is "liberal" and the exchange of stock for trust certificates is clearly a "sale" under the ISL).

Indeed, the SAC is rife with allegations that bring Plaintiff's state-law claims within the ISL's purview. The pleading states that Plaintiff's "disposition of over $60 million of AUI stock, through the artifice of various tax shelters," was the basis of the IRS's subsequent audit and penalty. [165] ¶ 1; *see also id.* ¶ 138 ("Near the end of its audit, the IRS focused on BHI's purchase of the AUI stock from the Persephone Trust."); *id.* ¶ 143 ("The IRS determined that Menzies, not the Persephone Trust, had

sold the AUI stock . . . ."). Defendants' ostensible misrepresentations related directly to the sale of the AUI stock; in fact; the SAC confirms that the entire purpose of the tax shelter was to shield the proceeds of that stock sale. *Id.* ¶ 97 ("Defendants, through Northern Trust and Taylor, assured Plaintiff that the 2004 Tax Shelter would eliminate capital gains from the sale of his AUI stock . . . ."); *see also id.* ¶ 99 ("Defendants represented to Menzies that the purpose of the complicated (and costly) 2003 Tax Shelter and 2004 Tax Shelter . . . was to effectively and lawfully shield the disposition of the AUI stock from capital gains tax.").

The ISL also provides a remedy for the violations alleged in the SAC. Section 13(G) of the ISL allows "any party in interest" to bring suit against "any person" who allegedly violated the Act. 815 ILCS 5/13(G)(1). This subsection provides a remedy in cases where "the plaintiffs sought compensatory and other damages without expressly requesting injunctive relief." *First Nat'l Bank & Tr. Co.*, 85 F. Supp. 3d at 972. Even where, as here, a plaintiff principally seeks compensatory damages, Section 13(G) provides "some relief," which is sufficient to trigger application of the ISL. *See id.*

Plaintiff attempts to avoid this result by insisting that "there is no allegation (or evidence) that the sale of AUI securities took place in Illinois." [197] at 18. This argument remains inconsistent with guidance from the Illinois Supreme Court. In *Benjamin v. Cablevision Programming Investments*, that court explained how the ISL's definition of a "sale" was formulated "to exclude nothing that could possibly be

regarded as a sale," such that "every step toward the completion of a sale would be a sale" within the meaning of the statute. 499 N.E.2d 1309, 1315 (Ill. 1986) (quoting *Silverman v. Chicago Ramada Inn, Inc.*, 211 N.E.2d 596, 599 (Ill. App. Ct. 1965)). The court accordingly rejected the notion that the ISL's sole purpose was to "protect Illinois residents and others who purchase securities in this state." *Id.* The court explained that in its view, the ISL's "paternalistic character" was "broader." *Id.* So long as the stock sale at issue has "some physical nexus with Illinois," the ISL applies. *Id.* at 1316. The instant case meets this standard. *See* [165] ¶ 3 (Seyfarth is an LLP organized under Illinois law); *id.* ¶ 6 (Northern is a corporation organized under Illinois law); *id.* ¶ 11 (alleging that venue is proper here because, *inter alia*, Christiana's conduct "as alleged in the Complaint has been committed by and through its co-conspirators . . . ."); *id.* ¶ 121 (explaining that John Rogers, Taylor's partner in Chicago, approved the legal opinion letter provided to Plaintiff).

In the end, Plaintiff's state-law claims are sufficiently "in connection with" the sale of the AUI securities to justify imposition of the ISL's statute of repose. *See id.* ¶ 155 ("But for Defendants' conduct," Plaintiff would not have "incurred substantial costs to the IRS in penalties and interest arising out of the disposition of the AUI stock."). This is not an incongruous result. *See Klein*, 500 F.3d at 671 (holding that fraud and breach of fiduciary duty claims fall under the ISL); *Tregenza v. Lehman Bros.*, 678 N.E.2d 14, 15 (Ill. App. Ct. 1997) (holding that negligent misrepresentation claims fall under the ISL); *see also Orgone Capital III, LLC v. Daubenspeck*, No. 16 C

10849, 2017 WL 3087730, at *8 n.9 (N.D. Ill. July 20, 2017) (wherein plaintiffs implicitly conceded that the ISL controlled their state-law claims).

### 3.    Plaintiff's State-Law Claims Are Untimely

Because the ISL's statute of repose applies to Plaintiff's state-law claims, they should have been brought by at least May 2011, five years after the AUI stock sale in May 2006. [165] ¶ 132. Plaintiff did not bring these claims until April of 2015 [1], which was far too late. Plaintiff's state-law claims are accordingly dismissed.

### C.    Plaintiff's Motions to Strike

Plaintiff moves to strike materials attached to Defendants' motions to dismiss, arguing that they are extraneous to the pleadings and should not be considered on a Rule 12(b)(6) motion to dismiss. *See* [182] [184] [186]. Because this Court did not need to consider—and indeed, did not consider—those materials in deciding Defendants' motions to dismiss, it grants Plaintiff's motions to strike.

## IV.  Conclusion

This Court grants Defendants' motions to dismiss [169] [172] [175], and grants Plaintiff's motions to strike [182] [184] [186].  Because (1) it does not appear that Plaintiff would be able to amend his complaint to successfully state RICO claims, (2) his state-law claims are time-barred, and (3) this is already Plaintiff's third complaint (after discovery and the benefit of this Court's prior opinion), Plaintiff's Second Amended Complaint [165] is dismissed in its entirety, with prejudice.  Civil case terminated.

Dated: September 21, 2018

Entered:

John Robert Blakey
United States District Judge